Raymond B. Ludwiszewski
Peter E. Seley
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Jeffrey D. Neumeyer
Boise Cascade Corporation
1111 West Jefferson Street
Boise, Idaho 83702
Telephone: (208) 384-7718
Facsimile: (208) 384-4961

Theresa L. Gardunia
Boise County Prosecuting Attorney
P.O. Box 186
Idaho City, Idaho 83631
Telephone: (208) 392-4485
Facsimile: (208) 392-3760

Richard T. Roats
Valley County Prosecuting Attorney
P.O. Box 532
Cascade, Idaho 83611
Telephone: (208) 382-4277
Facsimile: (208) 382-4809

Paul A. Turcke
Moore Smith Buxton & Turcke
225 North 9th Street, Suite 420
Boise, Idaho 83702
Telephone: (208) 331-1731
Facsimile: (208) 331-1202

LeRoy Wilder
LeRoy Wilder, P.C.
0225 S.W. Montgomery St., No. 10
Portland, Oregon 97201
Telephone: (503) 242-0705
Facsimile: (503) 242-0716

Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 1

U.S. COURTS

01 JAN -8 PM 3: 54

CAMERON S. BURKE
CLERK            IDAHO

9277

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

KOOTENAI TRIBE OF IDAHO; BOISE
COUNTY, IDAHO, by and through the Boise
County Board of Commissioners; VALLEY
COUNTY, IDAHO, by and through the Valley
County Board of Commissioners;
BLUERIBBON COALITION, INC.; IDAHO
STATE SNOWMOBILE ASSOCIATION;
ILLINOIS ASSOCIATION OF
SNOWMOBILE CLUBS; AMERICAN
COUNCIL OF SNOWMOBILE
ASSOCIATIONS; LITTLE CATTLE
COMPANY LIMITED PARTNERSHIP;
HIGHLAND LIVESTOCK AND LAND
COMPANY; and BOISE CASCADE
CORPORATION,

                Plaintiffs,

vs.

DANIEL GLICKMAN, in his official capacity
as the Secretary of Agriculture; MICHAEL
DOMBECK, in his official capacity as the
Chief Forester of the USDA Forest Service;
UNITED STATES DEPARTMENT OF
AGRICULTURE; and UNITED STATES
FOREST SERVICE,

                Defendants.

Case No. CIV01 - 010 - N - EJL

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 2

## INTRODUCTION

1. Defendants Daniel Glickman, Michael Dombeck, United States Department of Agriculture, and the United States Forest Service (collectively, "Defendants" or "Forest Service") have embarked upon an unprecedented and illegal scheme to permanently prevent road and trail construction and reconstruction on "Inventoried Roadless Areas," which the Defendants deem to consist of over 58 million acres of National Forest land (the "Roadless Initiative"). In their rush to implement the Roadless Initiative before the end of the Clinton administration, Defendants have issued a Notice of Intent, prepared a Draft Environmental Impact Statement ("DEIS"), a proposed rule ("Proposed Rule"), a Final Environmental Impact Statement ("FEIS") and a final rule implementing this plan ("Final Rule") in just over one year's time. In their hurried efforts to unilaterally impose a federal lands legacy as directed by the Clinton administration, Defendants have done violence to numerous statutes designed to safeguard the environment. Indeed, Defendants' disregard for local community input and public involvement has been roundly criticized by thousands of interested parties, including Indian tribes, recreational groups, state and local governmental officials, and Congressional subcommittees. Further, the vast majority of Forest Service employees who have commented publicly on the Roadless Initiative have been highly critical, stating that the Roadless Initiative is inconsistent with established laws dealing with National Forest land. Not surprisingly, in light of the breathless pace of this massive project, Defendants violated the National Environmental Policy Act ("NEPA"), and numerous federal laws governing use of the National Forests. In the process of trying to create their own legacy, Defendants also usurped Congress' authority by creating *de facto* wilderness areas – a power specifically reserved to Congress under the Wilderness Act.

2. Plaintiffs are entitled to declaratory and injunctive relief under § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, for violations of NEPA, 42 U.S.C.

§ 4321 *et seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1604; the Organic Administration Act ("OAA"), 16 U.S.C. § 475; the Multiple Use-Sustained Yield Act ("MUSYA"), 16 U.S.C. §§ 528-531; Section 108 of Title I of the Department of the Interior and Related Agencies Appropriations Act of 1997 (Title I, § 101(d) of the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996)) ("Section 108"); the APA, 5 U.S.C. § 553; the Wilderness Act, 16 U.S.C. §§ 1131, *et seq.*; and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470, *et seq.*

## JURISDICTION AND VENUE

3.     This action arises under NEPA, NFMA, OAA, MUSYA, Section 108, the APA, the Wilderness Act, and NHPA, and their implementing regulations. Judicial review is sought pursuant to §10 of the APA, 5 U.S.C. §§ 701-706, authorizing judicial review of final agency actions. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361, and may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PLAINTIFFS

4.     The Kootenai Tribe of Idaho ("Kootenai Tribe") is a federally recognized Indian Tribe. The Kootenai Tribe's reservation is located in Boundary County, Idaho. The Final Rule will impact the Kootenai Tribe's ancestral homeland, largely located in the Panhandle National Forest. The Kootenai Tribe has been harmed by the Forest Service's failure to engage in a meaningful consultation process with the Tribe as required by law. In addition, the Final Rule will harm the Kootenai Tribe because it will have a substantial influence on their uses of National Forest land, which include spiritual, aesthetic, self-determination, recreational interests, and subsistence hunting, fishing, and gathering on open unclaimed land. The Treaty of Hellgate, 12 Stat. 975. July 16, 1855; *State of Idaho v. Coffee*, 97 Idaho 905, 556 P.2d 1185 (1976).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 4

5. Boise County is a political subdivision of the State of Idaho, comprised of 1.2 million acres of land, of which approximately 1 million acres constitute federal public land, most of which is National Forest land. There are approximately 7,000 residents of Boise County, who regularly engage in activities within the National Forest land in Boise County, including fishing, hunting, hiking, camping, fire wood gathering, sightseeing, and wildlife viewing from the roads, trails, and pathways. Roads, trails, and pathways on National Forest land offer access to public and private land in Boise County and are the subject of federal land rights-of-way. The Final Rule will significantly affect the ability of the County to exercise its regulatory police power on National Forest land within Boise County. The County is also responsible for local land use planning and regulation within Boise County, I.C. §§ 67-6501, *et seq.*, through which the County seeks to protect and enhance property values, the economy, and important environmental features; protect life and property in areas subject to natural hazards; and protect fish, wildlife, and recreation resources. The Final Rule will significantly affect the County's ability to carry out these purposes in planning and land use regulation.

6. Valley County is a political subdivision of the State of Idaho, comprised of 2.4 million acres of land, of which approximately 2.1 million acres constitute federal public land, most of which is National Forest land. There are approximately 9,500 residents of Valley County, who regularly engage in activities within the National Forest land in Valley County, including fishing, hunting, hiking, camping, fire wood gathering, sightseeing, and wildlife viewing from the roads, trails, and pathways. Roads, trails, and pathways on National Forest land offer access to public and private land in Valley County and are the subject of federal land rights-of-way. The Final Rule will significantly affect the ability of the County to exercise its regulatory police power on National Forest land within Valley County. The County is also

responsible for local land use planning and regulation within Valley County, I.C. §§ 67-6501, *et seq.*, through which the County seeks to protect and enhance property values, the economy, and important environmental features; protect life and property in areas subject to natural hazards; and protect fish, wildlife, and recreation resources. The Final Rule will significantly affect the County's ability to carry out these purposes in planning and land use regulation.

7.      The BlueRibbon Coalition, Inc. ("BlueRibbon") is a non-profit corporation representing over 1,055 businesses and organizations with approximately 600,000 members nationwide. BlueRibbon advocates responsible motorized and nonmotorized outdoor recreation. BlueRibbon's goals include working with land managers to provide recreational opportunities, preserve resources, and promote cooperation between public land users. BlueRibbon's members frequent portions of the Inventoried Roadless Areas during all times of the year for aesthetic and recreational purposes, including use of National Forest land for sightseeing, photography, rockhounding, hunting, wildlife and nature study, and other similar pursuits. BlueRibbon's members will be harmed by the Final Rule because it will impair their ability to use National Forest land for their aesthetic and recreational purposes.

8.      The Idaho State Snowmobile Association ("ISSA") is a non-profit organization whose goals include encouraging the safe, courteous, and responsible use of snowmobiles; supporting the preservation of the environment; promoting the development of recreational areas for the use of snowmobiles within the state of Idaho; and rendering public service in case of emergency or disaster. ISSA's members frequent portions of the Inventoried Roadless Areas for aesthetic and recreational purposes, including use of National Forest land for recreational snowmobiling. ISSA members will be harmed by the Final Rule because it will impair their ability to use National Forest land for their aesthetic and recreational purposes. Without

reconstruction, roads and trails will become obstructed and unsafe, and limit ISSA members' recreational uses of federal land.

9.      The Illinois Association of Snowmobile Clubs ("IASC") is an organization formed to promote safe and enjoyable snowmobiling, preservation of a trail system, and other interests of snowmobilers. Its members are individual snowmobilers, snowmobiling clubs (whose members are individual snowmobilers), and snowmobile-related businesses. IASC's members frequent portions of the Inventoried Roadless Areas for aesthetic and recreational purposes, including use of National Forest land for recreational snowmobiling. The IASC members will be harmed by the Final Rule because limitations on construction and reconstruction of roads and trails in the Inventoried Roadless Areas will impair their ability to use National Forest land for their aesthetic and recreational purposes.

10.     The American Council of Snowmobile Associations ("ACSA") is a non-profit corporation that represents 2,392 snowmobile clubs across the United States, including 27 state snowmobile associations and approximately 279,532 individuals. The goals of ACSA include: providing information to increase public awareness, understanding, and appreciation of the sport of snowmobiling; promoting safe and responsible snowmobiling; and working with and educating federal government entities and diversified coalitions to move for legislative and regulatory initiatives that will encourage equitable treatment of funding and maintenance of snowmobile trails. ACSA's members frequent portions of the Inventoried Roadless Areas for aesthetic and recreational purposes, including use of National Forest land for recreational snowmobiling. ACSA members will be harmed by the Final Rule because limitations on construction and reconstruction of roads and trails in the Inventoried Roadless Areas will impair their ability to use National Forest land for their aesthetic and recreational purposes.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 7

11.     Little Cattle Company Limited Partnership ("Little Cattle Company") is a company engaged primarily in the business of cattle ranching which includes grazing. Little Cattle Company holds several permits for grazing on state and federal public land, including land within the Boise National Forest. Little Cattle Company is dependent on the use of roads, trails, and pathways within and throughout the Boise National Forest for access to and from leaseholds on federal land. The Final Rule prohibits construction and reconstruction of roads and trails on much of this land, thereby significantly impairing Little Cattle Company's use of the Boise National Forest and harming its ranching operation.

12.     Highland Livestock and Land Company ("Highland Livestock Company") is a company engaged primarily in the business of sheep ranching, which includes grazing. Highland Livestock Company holds several permits for grazing on state and federal public land, including land within the Boise National Forest. Highland Livestock Company owns land adjacent to the Boise National Forest, which is used in conjunction with its ranching operation. Highland Livestock Company is dependent on the use of roads, trails, and pathways within and throughout the Boise National Forest for access to and from private, state, and federal land. The Final Rule prohibits construction and reconstruction of roads and trails on much of this land, thereby significantly impairing Highland Livestock Company's use of the Boise National Forest and harming its ranching operation.

13.     Boise Cascade Corporation ("Boise Cascade") is an integrated forest products company with corporate headquarters in Boise, Idaho, and forestland management and manufacturing facilities in Idaho, Oregon, Washington, and other states. Boise Cascade owns and manages approximately 2.3 million acres of forestland for sustainable timber production and other beneficial uses. Approximately 60% of this land is intermixed with, and in proximity to,

National Forest land—much of which would be regulated by the Roadless Initiative. As a neighboring landowner, Boise Cascade has rights and interests in maintaining adequate and reasonable road access to its land and to National Forest land, and is concerned with protection of the forest from fire, disease, and depredation, and balanced multiple use of the National Forests in a sustainable manner.

DEFENDANTS

14.    Defendant Daniel Glickman is, and was at all times relevant hereto, the Secretary of the U.S. Department of Agriculture ("USDA"). He is sued in his official capacity. In this capacity, Mr. Glickman has overall responsibility for the operation and management of the USDA, of which the Forest Service is an agency. Mr. Glickman exercises cabinet level oversight and supervisory authority for management of the National Forest System by the Forest Service. Mr. Glickman has participated in or is responsible for the specific actions, delayed actions, and inactions challenged herein.

15.    Defendant Michael Dombeck is, and was at all times relevant hereto, the Chief of the Forest Service. He is sued in his official capacity. He has overall responsibility for the operation and management of the National Forest System. Mr. Dombeck has participated in or is responsible for the specific actions, delayed actions, and inactions challenged herein.

16.    Defendant United States Department of Agriculture is, and was at all times relevant hereto, an executive agency of the United States government. The USDA has oversight and supervisory authority over the Forest Service.

17.    Defendant United States Forest Service is, and was at all times relevant hereto, an agency within the USDA. The Forest Service is responsible for planning and management of the

National Forest System land. The Forest Service is responsible for the rule making that is the subject of this suit.

FACTUAL BACKGROUND

18.    On October 13, 1999, President Clinton announced his administration's Roadless Initiative which was designed to halt construction and reconstruction of roads and trails on millions of acres of National Forest land. Six days later, the Forest Service published its Notice of Intent to prepare an EIS for a proposed and final rule to implement the October 13, 1999 directive. Despite the monumental breadth of the proposed federal action, the Forest Service permitted only 60 days for public comment and steadfastly refused to extend this scoping period. Rather than proceed in an orderly and considered manner, the Forest Service rushed to complete over 180 public meetings across the nation concerning the rule making prior to December 20, 1999. This frenzied scoping process was plagued with problems, including inadequate notice and opportunity to comment at meetings, and a glaring lack of information about the areas that would be impacted by the rule making. Notably, no state maps of areas under consideration for regulation were made available until January 18, 2000, nearly a month *after* the NEPA scoping process and attendant public comment had ended. Moreover, the Forest Service completely failed to timely consult with the Kootenai Tribe. These deficiencies in the scoping phase marked the beginning of a NEPA process that denied interested parties, including Plaintiffs, adequate opportunity to comment on the environmental analysis being conducted.

19.    On May 9, 2000, the Forest Service released its DEIS. The 700-page draft was riddled with errors, inconsistencies, and ambiguities. The draft failed to analyze adequately the environmental impacts of all land impacted by the Proposed Rule. The DEIS provided no information particular to any individual roadless area, providing instead only state maps and

summaries of very limited data on a state or Forest Service Region basis. As noted by the State of Idaho in its July 14, 2000, comments, the DEIS did not "do an adequate job of individually examining each roadless area to determine whether the alleged benefits of protecting the area from road construction are outweighed by the risks to forest health and the economic impact on surrounding communities." The Forest Service Council, representing over one-half of all Forest Service employees, complained that the DEIS did not contain any "specific economic or environmental impacts on the individual Forests."

20.    The DEIS failed to analyze numerous reasonable alternatives to the Proposed Rule that had been suggested by Plaintiffs and other interested parties during the scoping process. Like many other commenters, the Wyoming Association of Conservation Districts noted in its comments that the DEIS fails "to adequately address a full range of alternatives."

21.    On May 9, 2000, the Forest Service also released the Proposed Rule, which appeared in the Federal Register the following day. 65 Fed. Reg. 30276 (May 10, 2000). The Proposed Rule identified 54.3 million acres of "Inventoried Roadless Areas." Inventoried Roadless Areas are mapped areas identified during the "Roadless Area Review and Evaluation II" ("RARE II") project in 1977 and during subsequent periodic updates. The Proposed Rule declared that at least 43 million acres of land would be immediately subject to prohibitions on road construction and reconstruction upon issuance of the Final Rule. 65 Fed. Reg. 30276, 30288. Moreover, the Proposed Rule discussed regulating unidentified portions of 95.2 million *additional* acres of noninventoried, "unroaded areas where conservation of roadless characteristics may be desirable." 65 Fed. Reg. 30277, 30288. The Proposed Rule outlined numerous characteristics to guide local Forest Service officials in identifying these additional areas that would be subject to the prohibitions on road construction and reconstruction at the

time of each National Forest's Land and Resource Management Plan revision. 64 Fed. Reg. 30288. The Proposed Rule further subjected the Inventoried Roadless Areas in the Tongass National Forest—approximately 8.5 million acres of land—to these same identification processes as part of the five year review of the April 1999 Tongass Land and Resource Management Plan. 64 Fed. Reg. 30288. The Proposed Rule did not prohibit timber harvesting on the regulated areas.

22. Remarkably, the Proposed Rule set a July 17 deadline for accepting public comments on the Roadless Initiative. Thus, the public was given only 68 days from the release date of the Proposed Rule to the close of the comment period to comment on a proposal that would immediately prohibit road construction and reconstruction on at least 43 million acres of land and would potentially regulate unidentified portions of an additional 95.2 million acres and the Inventoried Roadless Areas in the Tongass National Forest.

23. Given the enormous size and scope of the Proposed Rule, numerous commenters requested an extension of the comment period. Defendants denied these requests. Even under these severe time constraints, Plaintiffs and numerous other interested parties submitted comments, many of which raised serious problems with, and alternatives to, the Proposed Rule.

24. When the Forest Service published its FEIS on November 13, 2000, these comments were essentially ignored. Much like the DEIS, the FEIS made no attempt to analyze the environmental impacts of the Proposed Rule on any specific parcels of land. Instead, the FEIS presented yet another vague and broad analysis based upon generalizations instead of thoughtful, deliberate, and site-specific analysis. In addition, the FEIS failed to consider numerous reasonable alternatives suggested by Plaintiffs and other commenters. As noted by the National Association of Forest Service Retirees ("NAFSR") in their December 15, 2000 letter to

Secretary Glickman, the "lack of specificity [in the FEIS] does not permit objective evaluation of the effects of alternatives on the environment." The NAFSR concluded that the Defendants' refusal to consider meaningful alternatives that do not conform with the "stated purpose and need of the proposed action" resulted in a FEIS that "has illegally lopped off the entire spectrum of possibilities that does not meet its intended, predetermined 'purpose and need'."

25. Without warning or notice of any kind, the scope of land to be affected by the Roadless Initiative shifted dramatically from the DEIS to the FEIS. The DEIS proposed a ban on road construction and reconstruction within "unroaded portions of inventoried roadless areas." The DEIS also proposed a "procedural alternative," which would apply to the "unroaded portions of inventoried roadless areas" as well as to "other unroaded areas" that have not been inventoried. The DEIS did not define an unroaded area as an area without roads, rather, the document defined an "unroaded portion of inventoried roadless area" as a "portion of an inventoried roadless area in which no classified road has been constructed since the area was inventoried." Similarly, the DEIS defined an "unroaded area" as an area "without the presence of a classified road." Thus, under the terminology used in the DEIS, the "unroaded" land could have unclassified roads, which it defined as "[r]oads not intended to be part of, and not managed as part of, the forest transportation system such as temporary roads, unplanned roads, off-road vehicle tracks, and abandoned trailways." The DEIS excluded from the immediate prohibitions on road construction and reconstruction portions of Inventoried Roadless Areas where classified roads had been constructed since the area was inventoried. The FEIS, by contrast, proposed to expand the ban to all Inventoried Roadless Areas, regardless of whether classified roads had been constructed since the area was inventoried. As Governor Jesse Ventura of the State of Minnesota complained in his December 5, 2000 letter to Secretary Glickman, the FEIS "includes

restrictions on land outside of unroaded portions of inventoried roadless areas. This new restriction was not included in the alternatives offered for public comment."

26.    The size of the Inventoried Roadless Areas shifted dramatically as well. The DEIS stated that Inventoried Roadless Areas accounted for 54.3 million acres of land. The FEIS, by contrast, stated that Inventoried Roadless Areas totaled 58.5 million acres of land. In the six months between issuing the DEIS and the FEIS, the Forest Service "discovered" millions of acres of Inventoried Roadless Areas that it did not previously recognize, and "lost" hundreds of thousands of acres in other places. Comparing total Inventoried Roadless Areas listed by National Forest in the DEIS and the FEIS, half of the roadless areas' acreage have become appreciably larger or smaller in the FEIS. Forty-five of the forests listed have more Inventoried Roadless Area in the FEIS than reported in the DEIS, and twelve of the forests have less Inventoried Roadless Area than reported in the DEIS. Many of the changes in area are quite large. For example, the FEIS classifies 1.9 million more acres of land as Inventoried Roadless Area in the Chugach National Forest in Alaska than were identified in the DEIS. The FEIS classifies an additional 860,000 acres of Inventoried Roadless Area to the Tongass National Forest than were identified in the DEIS. The FEIS adds 179,000 acres of Inventoried Roadless Area to the Lewis & Clark National Forest than were classified in the DEIS, while the Wallowa-Whitman and Green Mountain National Forests have more than twice as many Inventoried Roadless Area acres in the FEIS than in the DEIS. The sum total of these "discoveries" was the FEIS's addition of 4.2 million acres of land to the Inventoried Roadless Areas as compared to the DEIS. At no time was the public able to comment on inclusion of these lands.

27.    The Final Rule bans construction of new roads and reconstruction of old roads in the Inventoried Roadless Areas. *See* USDA Forest Service, *Final Rule and Record of Decision*

(January 8, 2001) <http://roadless.fs.fed.us./documents/rule/rule.PDF> ("Final Rule & ROD"). The sheer magnitude of this proposal cannot be overstated. The National Forest System contains 192 million acres of land. Of this, 42 million acres, or 22%, are currently preserved in wilderness or natural areas where road construction and timber management are prohibited. The Final Rule bans road construction and reconstruction on another 58.5 million acres, or 31%. Accordingly, under the Final Rule, more than 50% of the National Forest land base has been withdrawn from multiple use. The impacts vary significantly by area. For example, Alaska's multiple use area is reduced from the current 62% to 7%. Idaho's multiple use area is reduced from the current 76% to 31%.

28.    Despite the enormous scope of the Roadless Initiative, which would more than double the amount of National Forest land no longer available for multiple use, the entire NEPA process has been purposely compressed. In a letter to Forest Service staff dated October 28, 1999, Forest Service Chief Michael Dombeck instructed his staff to expedite NEPA procedures, authorizing them to "take whatever executive actions are necessary" to complete the DEIS by March 2000, and warning that "[w]e cannot afford to waste a single day." The Forest Service's apparent haste has been previously noted: "The sheer magnitude of this governmental action involving 40 to 60 million acres nationwide that precipitated 500,000 comments in sixty days is the best evidence the Forest Service should proceed with caution. Time is *not* of the essence on an issue that has been studied for over 30 years." *Idaho v. United States Forest Service*, No. CV 99-611-N-EJL, Slip Op. at 11 (D. Idaho, Feb. 18, 2000) (emphasis in original). That case was dismissed as unripe, an infirmity that the current case does not suffer because Defendants' FEIS and Final Rule constitute a final agency action ripe for review.

29.     The Federal District Court of Idaho also found an undisputed "trust responsibility to consult with federally recognized tribes prior to taking actions that may affect such tribes," and "urge[d] the Forest Service to conduct meaningful consultation prior to adopting any final rule as failure to conduct the meaningful consultation could easily void or delay the implementation of such final rule." *See Idaho v. United States Forest Service*, No. CV 99-611-N-EJL, Slip Op. at 3, 5 (D. Idaho, Sep. 11, 2000). The Forest Service ignored this trust responsibility and the Court's admonishments by failing to hold timely and meaningful discussions with the Kootenai Tribe.

30.     The Roadless Initiative is but one of an unprecedented number of large, complex, and interrelated initiatives recently undertaken by the Clinton Administration that will impact the National Forests, including the massive Interior Columbia Basin Ecosystem Management Project, the National Forest Management Act Planning Regulations, and the Forest Service Transportation Policy. The FEIS identifies ten such rule making and policy efforts, but provides only the most limited and cursory discussion of each. Again, the Governor of the State of Minnesota complained that interested parties "have not been given the opportunity to comment on the combined, cumulative effects of these . . . interconnected rules."

31.     The Final Rule was announced on January 5, 2001, although it has not yet been published in the Federal Register. The Final Rule adopts the FEIS's expansion of regulated areas that were not included in the DEIS and that the Plaintiffs and the public have not had an opportunity to comment upon. The Final Rule also contains additional new elements that were not included in either the Proposed Rule or the FEIS. One dramatic shift involved the Final Rule's treatment of Inventoried Roadless Areas within the Tongass National Forest ("Tongass"). The Proposed Rule deferred consideration of whether Tongass would be subject to the

prohibitions on road construction and reconstruction until April 2004. The preferred alternative in the FEIS required application of the prohibitions on the Tongass, but delayed implementation until April 2004. The Final Rule went one step further—immediately including all 9.34 million acres of the Inventoried Roadless Areas on the Tongass. According to the Final Rule, this immediate inclusion of the Tongass prevents 95 percent of the timber harvesting that would have been permitted under the FEIS's preferred alternative. *See* Final Rule & ROD, at 45.

32.    While the Proposed Rule did not prohibit timber harvesting at all, the preferred alternative in the FEIS limited timber harvesting in Inventoried Roadless Areas to "stewardship" purposes. The Final Rule "adds a new prohibition on timber harvesting . . . ." Final Rule & ROD, at 55. This new blanket prohibition has an exception that allows for the removal of "small diameter timber" to improve "threatened, endangered, proposed, or sensitive species habitat" or "[t]o maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects. . . ." Final Rule & ROD, at 118; 36 C.F.R. § 294B.13(b)(1). Defendants acknowledge that "a description of what constitutes 'generally small diameter timber' is not specifically included in this rule." Final Rule & ROD, at 56.

33.    The exceptions in the Final Rule to the timber harvest prohibition are only applicable "so long as road construction or reconstruction is not necessary." Final Rule & ROD, at 60. Despite Defendants' acknowledgement that the prohibition on timber harvesting "was not in the proposed rule," Defendants claim that the "public had sufficient opportunity to comment on this provision" because the DEIS and FEIS analyzed timber harvesting prohibitions in general. Final Rule & ROD, at 55-56.

34.    The Final Rule also regulates vested property rights essential to states and local governments throughout the West and Alaska. These rights-of-way (termed "R.S. 2477 Rights-

of-Way") are property rights granted by the federal government in the late 19th Century to establish the transportation network essential to settlement of western communities. These rights-of-way generally were made to local governments which hold them in trust for the public. Today, R.S. 2477 rights-of-way continue to provide virtually all the public access to and across hundreds of millions of acres of public land in the West and Alaska, including millions of acres of Inventoried Roadless Areas.

35.    Under the Final Rule, construction or reconstruction of a road on Inventoried Roadless Areas to facilitate an R.S. 2477 right-of-way will only be permitted "if the Responsible Official determines that . . . [a] road is needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty." Final Rule & ROD, at 117; 36 C.F.R. § 294B.12(b).

## APPLICABLE LAW

### National Environmental Policy Act

36.    The National Environmental Policy Act, 42 U.S.C. § 4321, establishes a national policy to "prevent or eliminate damage to the environment and biosphere." The Act recognizes "the critical importance of restoring and maintaining environmental quality," declares that the federal government has a continuing responsibility to use "all practicable means" to minimize environmental degradation, and directs that "to the fullest extent possible . . . the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." 42 U.S.C. §§ 4331(a) and 4332(1). The Act further recognizes the right of each person to enjoy a healthful environment. 42 U.S.C. § 4331(c).

37.    In order to comply with this mandate, the Council for Environmental Quality ("CEQ") NEPA Regulations (see, e.g., 40 C.F.R. § 1501.2), binding on the Forest Service,

establish a complex system to ensure that the government consider the environmental impacts of their actions *before* taking those actions. This system requires notice to and comments from the public and other affected parties who provide the government with information about the potential environmental impacts their actions may have.

38.    NEPA requires "responsible [federal] officials" to prepare environmental impact statements on proposals for legislation and "other major Federal actions significantly affecting the quality of the human environment." Under NEPA, an agency must prepare an EIS when an "action" may have a significant environmental effect. 40 C.F.R. § 1508.3.

39.    Federal agencies are required to begin the scoping process as soon as they determine that they will prepare an EIS. 40 C.F.R. § 1501.7. Under these regulations, federal agencies must invite the meaningful participation of all interested parties. This requirement expressly includes Indian Tribes, and is echoed by executive orders (Exec. Order 13084; 63 Fed. Reg. 27655), federal trust responsibility (Forest Service Manual ("FSM") § 1563.03 (declaring that the Forest Service policy shall be to honor "legally mandated trust responsibilities")), and the USDA's own regulations (USDA Regulation No. 1020-6 at 2 (Oct. 16, 1992) ("USDA officials will consult with tribal governments . . . regarding the influence of USDA activities on water, land, forest, air, and other natural resources of tribal governments")). The purpose of the scoping process is to identify those issues that the agency should address in its EIS. A failure to conduct the scoping process in a manner that includes all interested parties and identifies all relevant issues is a violation of NEPA.

40.    NEPA requires agencies to include a discussion of "alternatives to the proposed action" in their EISs. 42 U.S.C. § 4322 (2)(C)(iii). NEPA also requires the agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 19

that involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332 (2)(E). CEQ NEPA regulations also require that agencies consider "reasonable alternatives not within the jurisdiction of the lead agency," together with the no-action alternative.

41.     When an agency undertakes a major federal action that constitutes an irretrievable commitment of resources, it is required to prepare a detailed EIS relating to its intention to act upon each particular site that will be impacted. In addition, the EIS must "succinctly describe the environment of the area(s) to be affected by the alternatives under consideration." 40 C.F.R. § 1502.15. Furthermore, the EIS must describe the direct and indirect environmental effects of the regulation. 40 C.F.R. §1508.8.

42.     CEQ NEPA regulations mandate that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6. Each agency "shall . . . request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected." 40 C.F.R. § 1503.1(a)(4). In addition, an agency's final EIS must make meaningful reference to all responsible opposing viewpoints.

National Forest Management Act

43.     In 1976, Congress passed the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614, requiring the Forest Service to conduct strategic planning for the management of the National Forests. The NFMA directs the Forest Service to develop Land and Resource Management Plans for each forest unit in the National Forest System, establishing standards and guidelines for the management of each forest. 16 U.S.C. § 1604(e). The plans can

only be amended or revised pursuant to NFMA procedures, which provide for public participation.  16 U.S.C. § 1604(f); 36 C.F.R. § 219.10(f-g).

### Multiple Use and Sustained Yield Requirements

44.    The Organic Administration Act ("OAA"), Multiple Use-Sustained Yield Act ("MUSYA"), and National Forest Management Act ("NFMA") require the Forest Service to manage the National Forests under the principles of multiple use and sustained production of renewable forest resources.  The OAA provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States."  16 U.S.C. § 475.

45.    MUSYA requires that National Forests be "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes" and that the Forest Service "develop and administer the renewable surface resources of the National Forests for multiple use and sustained yield of the several products and services obtained therefrom."  16 U.S.C. §§ 528 and 529.  The "multiple use" standard requires the Forest Service to manage the various forest resources to maximize their combined utility, without impairment of the land's productivity. 16 U.S.C. § 531(a).  The "sustained yield" standard requires the Forest Service to maintain at least a regular periodic output from the renewable forest resources without impairment of the land's productivity.  16 U.S.C. § 531(b).  These principles of multiple use and sustained yield are in turn incorporated into the NFMA and its regulations.  16 U.S.C. §§ 1600, 1602 and 1604; 36 C.F.R. § 219.1 – .29 (1999).

Section 108

46.    Section 108 of Title I of the Department of the Interior and Related Agencies Appropriations Act of 1997 (Title I, § 101(d) of the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996)), provides: "No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act."

47.    Revised Statute 2477 ("R.S. 2477") states, in its entirety, that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (1970), *repealed by* Federal Land Policy Management Act, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 (1976).  In 1976, Congress adopted the Federal Land Policy Management Act of 1976 ("FLPMA") that repealed R.S. 2477.  At the same time, the FLPMA expressly preserved these valid R.S. 2477 rights that had existed prior to the date of enactment. 43 U.S.C. § 1769(a); *Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir. 1993).

The Administrative Procedure Act

48.    The APA requires that a governmental agency give general notice of a proposed rule making.  5 U.S.C. § 553(b).  After notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of [comments]."  5 U.S.C. § 553(c).

The Wilderness Act

49.    The Wilderness Act, 16 U.S.C. §§ 1131, *et. seq.*, reserves to Congress the exclusive authority to create and designate "wilderness" areas.  Under the Wilderness Act, the Executive Branch recommends to Congress areas to be designated as "wilderness."  But a

wilderness designation becomes effective "only if so provided by an Act of Congress." 16 U.S.C. § 1132(b); *see also*, 16 U.S.C. § 1131(a) (expressly prohibiting all wilderness designations "except as provided in this Act").

50.    The Act defines wilderness areas as "undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land . . . ; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value." 16 U.S.C. § 1131(c). Once land is designated as wilderness, commercial enterprise and permanent or temporary roads generally are prohibited. 16 U.S.C. § 1133(c).

<u>The National Historical Preservation Act</u>

51.    Section 10 of the NHPA requires that, prior to any federal undertaking, the relevant federal agency "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

52.    Under the NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5

and 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c) and 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e) and 800.9(c).

53.    In carrying out its responsibilities under the NHPA, a federal agency "shall consult with any Indian Tribe . . . that attaches religious and cultural significance to properties" of religious and cultural importance.  16 U.S.C. § 470a(d)(6).  Specifically, "[w]hen an undertaking will affect Indian lands, the Agency Official shall invite the governing body of the responsible tribe to be a consulting party and to concur in any agreement. . . .  When an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons." 36 C.F.R. § 800.1(c)(2)(iii).

54.    This requirement is amplified by the Forest Service's own regulations, which require the Forest Service to conduct forest planning in a manner consistent with the "[p]rotection and preservation of the inherent right of freedom of American Indians to believe, express, and exercise their traditional religions."  36 C.F.R. § 219.1(b)(6).

## CAUSES OF ACTION
## COUNT I

### Failure to Examine Site-Specific Impacts as Required by NEPA

55.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 54 above.

56.    When an agency undertakes a major federal action, it is required to prepare a detailed EIS that examines the environmental impacts of that action on each particular site that will be impacted.

57.    Subject to minor exceptions, the Final Rule prohibits road construction, road reconstruction, and timber harvesting on all Inventoried Roadless Areas.  Locking up 58.5

million acres of land constitutes a major federal action. Thus, Defendants were required to prepare a detailed EIS that examined the environmental impacts of the Roadless Initiative on each individual site affected by the Roadless Initiative.

58. Defendants have made no attempt whatsoever to analyze the impact that the prohibitions in the Final Rule will have upon specific parcels of land. Instead, they have made a generalized, broad, cursory, and shallow examination of the impacts that the designation will have without reference to, or examination of, particularized impacts.

59. Defendants' failure to examine the particularized site-specific environmental impacts of its proposed action constitutes a violation of NEPA.

60. Due to Defendants' failure to comply with NEPA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

61. Defendants' failure to comply with NEPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

62. Plaintiffs are entitled to a declaration that the Final Rule violates NEPA, 42 U.S.C. § 4332(2)(C), and is therefore null and void and of no legal force and effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with NEPA.

COUNT II

Failure to Consider Reasonable Alternatives as Required by NEPA

63. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 62 above.

64.     NEPA requires agencies to include a discussion of "alternatives to the proposed action" in their EISs.  42 U.S.C. § 4332(2)(C)(iii).  NEPA also requires the agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  The CEQ NEPA regulations also require that agencies consider "reasonable alternatives not within the jurisdiction of the lead agency," together with the no-action alternative.

65.     Defendants failed to consider any reasonable alternative that would not ban all road construction and reconstruction except for the narrow exemptions provided.

66.     Due to Defendants' failure to comply with NEPA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

67.     Defendants' failure to comply with NEPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

68.     Plaintiffs are entitled to a declaration that Defendants' actions violate NEPA, 42 U.S.C. § 4332(2)(c)(iii), and the Final Rule is therefore null and void and of no legal force and effect.  Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with NEPA.

## COUNT III

### Failure to Allow Adequate Public Participation

69.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 68 above.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 26

70.     Federal agencies are required to begin the scoping process as soon as they determine that they will prepare an EIS. 40 C.F.R. § 1501.7. The purpose of the scoping process is to identify those issues that the agency should address in its EIS. A failure to conduct this process in a manner that includes all interested parties and identifies all relevant issues is a violation of NEPA.

71.     Defendants' failure to conduct adequate scoping constitutes a violation of NEPA and has adversely affected Plaintiffs. Defendants did not disseminate adequate information to the public during the initial stages of the scoping process. Indeed, Defendants failed to provide maps of the affected area until well after the scoping period ended. Defendants' failure to disseminate adequate public information continued through the scoping meetings, where Defendants were unprepared to answer questions relating to the proposed action. These failings made meaningful public participation impossible, as both the public and the agency were confused as to the proposal's content. These failings might have been remedied with an extension of the time period, but the Defendants denied requests for time extensions, even though NEPA CEQ regulations advise that the NEPA process should take longer where the size of the proposed action is large and the action is controversial, as it is here. 40 C.F.R. § 1501.8. Consequently, the scoping process failed to "identify[] the significant issues related to the proposed action." 40 C.F.R. § 1501.7.

72.     Defendants failed to produce an adequate DEIS as required by 40 C.F.R. § 1502.9. The DEIS failed to include millions of acres of land that are regulated under the FEIS. As such, the DEIS failed to adequately notify the public that these lands were subject to regulation and consequently, did not allow meaningful public comment on the regulation of these lands.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 27

73.     Pursuant to 40 C.F.R. § 1501.7, federal policy, and Defendants' trust obligations to Indian tribes, Defendants were also required to consult with Indian Tribes. *See e.g.*, Exec. Order 13084; 63 Fed. Reg. 27655; FSM § 1563.03; USDA Regulation No. 1020-6 at 2 (Oct. 16, 1992) ("USDA officials will consult with tribal governments . . . regarding the influence of USDA activities on water, land, forest, air, and other natural resources of tribal governments"). Defendants failed to consult with the Kootenai Tribe, in clear violation of their legal obligations.

74.     Due to Defendants' failure to comply with NEPA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

75.     Defendants' failure to comply with NEPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

76.     Plaintiffs are entitled to a declaration that Defendants' actions violate NEPA, and the Final Rule is therefore null and void and of no legal force and effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with NEPA.

## COUNT IV

### Failure to Adequately Consider Cumulative Impacts

77.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 76 above.

78.     NEPA regulations require a federal agency to consider "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).

79.     While acknowledging the possibility of cumulative impacts from the numerous recently proposed and finalized rules and policies that address, in various ways, the issues of road construction, reconstruction, and decommissioning, and the protection of resources in roadless areas, the FEIS provides only the most cursory, generalized, and conclusory discussion of such impacts, in violation of NEPA.

80.     Due to Defendants' failure to comply with NEPA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

81.     Defendants' failure to comply with NEPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

82.     Plaintiffs are entitled to a declaration that Defendants' actions violate NEPA, and the Final Rule is therefore null and void and of no legal force and effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with NEPA.

## COUNT V

### Failure to Comply with The National Forest Management Act

83.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 82 above.

84.     The NFMA, 16 U.S.C. §§ 1600-1604, directs the Secretary of Agriculture to develop Land and Resource Management Plans for the management of the National Forest System, 16 U.S.C. § 1604(e), and requires that amendments or revisions to these forest plans occur pursuant to NFMA procedures. 16 U.S.C. § 1604(f); 36 C.F.R. § 219.10(f-g).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 29

85.    The Final Rule violates these provisions of the NFMA because the Final Rule's prohibition of road construction and reconstruction constitutes a *de facto* amendment or revision to existing forest plans, without complying with the procedures prescribed by the NFMA for such forest plan changes.

86.    Due to Defendants' failure to comply with NFMA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

87.    Defendants' failure to comply with NFMA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

88.    Plaintiffs are entitled to a declaration that the Final Rule violates the APA and NFMA, and is therefore null and void and of no legal force and effect.  Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with the NFMA.

## COUNT VI

### Failure to Comply with Multiple Use and Sustained Yield Requirements

89.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 88 above.

90.    The OAA, MUSYA, and NFMA require the Forest Service to manage the National Forests under the principles of multiple use and sustained production of renewable forest resources.

91.    The "multiple use" standard of MUSYA requires the Forest Service to manage the various forest resources to maximize their combined utility, without impairment of the land's productivity.  16 U.S.C. § 531(a).  The "sustained yield" standard requires the Forest Service to

maintain at least a regular periodic output from the renewable forest resources without impairment of the land's productivity. 16 U.S.C. § 531(b). These principles of multiple use and sustained yield are in turn incorporated into the NFMA and its regulations. 16 U.S.C. §§ 1600, 1602 and 1604; 36 C.F.R. § 219.1 – .29 (1999).

92. By prohibiting road construction and reconstruction and timber harvesting except under very limited exceptions, the Final Rule violates the multiple use and sustained yield mandates of the OAA, 16 U.S.C. § 475, MUSYA, 16 U.S.C. §§ 528-531, and the NFMA, 16 U.S.C. §§ 1600-1604.

93. Due to Defendants' failure to comply with the OAA, MUSYA, and NFMA, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

94. Defendants' failure to comply with the OAA, MUSYA, and NFMA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

95. Plaintiffs are entitled to a declaration that the Final Rule violates the OAA, MUSYA and the NFMA, and is therefore null and void and of no legal force and effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with the OAA, MUSYA and the NFMA.

COUNT VII

Failure to Comply with Section 108

96. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 95 above.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 31

97.    The Final Rule violates Section 108 because it pertains to the recognition, management, and validity of R.S. 2477 rights-of-way.  Section 108 of the Department of the Interior and Related Agencies Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996), withdrew the authority of Defendants and all other federal agencies to issue a final rule "pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932)" unless expressly authorized by an Act of Congress subsequent to the Act's date of enactment, which was September 30, 1996.  110 Stat. 3009-200; 43 U.S.C. § 932 note (Supp. 2000).

98.    The Final Rule contains an exception to the prohibition of road construction and reconstruction: "The responsible official may authorize road construction or reconstruction in any inventoried roadless areas when . . . [a] road is needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty." FEIS, at 2-13; Final Rule & ROD, at 117; 36 C.F.R. § 294B.12(b)(3).  The Final Rule pertains to the "recognition" and "validity" of R.S. 2477 rights-of-way because it provides Defendants with discretion to determine "when . . . [a] road is needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty." *Id.* This exception provides the responsible official with discretion to make recognition and validity determinations of R.S. 2477 in deciding whether to invoke the exception.  The Final Rule pertains to the "management" of R.S. 2477 rights-of-way because it places road construction and reconstruction prohibitions on R.S. 2477 rights-of-way and provides the responsible official with discretion to determine whether to authorize road construction or reconstruction. *See* Final Rule & ROD, at 117; 36 C.F.R. § 294B.12(b).

99.    Plaintiffs Boise County, Idaho and Valley County, Idaho have asserted and possess valid R.S. 2477 rights-of-way.  Declaration of John S. Foard, Jr., Chairman, Boise

County Board of Commissioners, in and for Boise County, Idaho, Acknowledgement and Assertion of Rights-of-Way (Jan. 24, 2000); Declaration of J.F. Lyons, Request for Acknowledgement and Assertion of Right of Way (Sept. 16, 1994); Declaration of J.F. Lyons, in and for Valley County, Idaho, Assertion of Rights of Way (Sept. 8, 1997); Declaration of J.F. Lyons, Request for Acknowledgment and Assertion of Rights of Way (Sept. 8, 1997). Plaintiffs' R.S. 2477 rights-of-way are located within and throughout areas included in the Inventoried Roadless Areas subject to the Final Rule.

100.    Due to Defendants' failure to comply with Section 108, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

101.    Defendants' failure to comply with Section 108 is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

102.    Plaintiffs are entitled to a declaration that the Final Rule violates Section 108, and is therefore null and void and of no legal force and effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with Section 108.

## COUNT VIII

### The Defendants Gave Insufficient Notice and Did Not Allow
### For An Adequate Opportunity To Comment On The Roadless Initiative

103.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 102 above.

104.    The APA requires that federal agencies, including the Defendants, give adequate notice and opportunity to comment on any proposed rule making. 5 U.S.C. § 553.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – Page 33

105.    The Defendants' notice of the proposed rule making relating to the Roadless Initiative was grossly inadequate. Most egregiously, neither the Proposed Rule nor the DEIS mentioned the possibility that the Final Rule might prohibit road construction and reconstruction on approximately 3 million acres of Inventoried Roadless Areas with classified roads and 4.2 million acres of newly discovered Inventoried Roadless Areas. Because both of these areas are included in the Final Rule, Defendants failed to provide adequate notice and allow for meaningful comment on the rule making.

106.    Defendants denied repeated reasonable requests for additional time to comment on the Proposed Rule. As such, Defendants did not allow for sufficient time to provide for meaningful comment on a rule of this magnitude. By allowing only 68 days for the public to comment on the entire proposal that covered, at a minimum, approximately 50 million acres of land, Defendants effectively denied Plaintiffs and the public the opportunity to adequately comment on the Proposed Rule.

107.    Due to the Defendants' failure to comply with the Notice and Comment provision of the Administrative Procedure Act, 5 U.S.C. § 553, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

108.    Defendants' failure to comply with the Notice and Comment provisions of the APA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

109.    Plaintiffs are entitled to a declaration that the Final Rule violates the notice and comment requirements of the APA, and is therefore null and void and of no legal force and

effect. Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with the Notice and Comment mandates of the APA.

COUNT IX

The Wilderness Act Prohibits the Forest Service From Bypassing Legislation<br>by Unilaterally Creating <em>de Facto</em> Wilderness Areas Through the Final Rule

110. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 109 above.

111. With the exception of minor additions to pre-existing "wilderness" areas, the designation of all "wilderness" areas must occur through an Act of Congress, pursuant to Article 1, § 7 of the United States Constitution. 16 U.S.C. § 1132.

112. The Final Rule prohibits road construction, road reconstruction, and timber harvesting in Inventoried Roadless Areas. These prohibitions treat Inventoried Roadless Areas as indistinguishable in purpose, design, management, and character from the "wilderness" areas properly designated by Congress through legislation. *See* 16 U.S.C. §§ 1311, *et seq*. The Roadless Initiative was pursued in response to President Clinton's October 13, 1999 directive to the Forest Service to protect roadless areas that "represent some of the last, best, unprotected wildland in our Nation." This purpose is nearly identical to the purpose evinced by Congress in the Wilderness Act. 16 U.S.C. § 1311. Because the Final Rule created *de facto* "wilderness" areas and the Final Rule has taken effect without an act of Congress, the Forest Service has violated the Wilderness Act and unlawfully encroached upon Congress' authority.

113. Due to the Defendants' failure to comply with the Wilderness Act, Plaintiffs have suffered legal wrongs because of agency action and are adversely affected and aggrieved by agency action within the meaning of the APA, 5 U.S.C. § 702.

114.    Defendants' failure to comply with the Wilderness Act and constitutional separation of powers is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

115.    Plaintiffs are entitled to a declaration that the Final Rule violates the Wilderness Act, and is therefore null and void and of no legal force and effect.  Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with the Wilderness Act.

COUNT X

The Forest Service's Failure to Consult With the Kootenai Tribe with Respect to Properties of Significant Cultural And Religious Importance Violates the NHPA

116.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 115 above.

117.    Section 10 of the NHPA requires that, prior to any federal undertaking, the relevant federal agency "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f.

118.    Under the NHPA, a  federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5 and 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c) and 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e) and 800.9(c).

119.    In carrying out its responsibilities under the NHPA, a federal agency "shall consult with any Indian Tribe . . . that attaches religious and cultural significance to properties" of religious and cultural importance.  16 U.S.C. § 470a(d)(6).  Specifically, "[w]hen an undertaking will affect Indian lands, the Agency Official shall invite the governing body of the responsible tribe to be a consulting party and to concur in any agreement. . . .  When an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons." 36 C.F.R. § 800.1(c)(2)(iii).

120.    This requirement is buttressed by the Forest Service's own regulations, which require the Forest Service to conduct forest planning in a manner consistent with the "[p]rotection and preservation of the inherent right of freedom of American Indians to believe, express, and exercise their traditional religions."  36 C.F.R. § 219.1(b)(6).

121.    The Roadless Initiative is a federal "undertaking" within the meaning of the NHPA.

122.    Property of religious and cultural significance to the Kootenai Tribe will be affected by the Final Rule.  Indeed, Defendants' own definition of "Roadless Area Values and Characteristics" includes "[t]raditional cultural properties and sacred sites."  Final Rule & ROD, at 116; 36 C.F.R. § 944(B).11.  Moreover, the Final Rule acknowledges that these "sites may be eligible for protection under the National Historic Preservation Act."  Final Rule & ROD, at 10.

123.    The Forest Service did not fulfill its mandatory obligation to consult with the Kootenai Tribe with respect to the property affected by the Roadless Initiative that is of religious and cultural significance to the Kootenai Tribe.

124.    The Forest Service has made no effort to examine the impacts of the Roadless Initiative on property of religious and cultural significance to the Kootenai Tribe.  Instead, they merely admit that "many of them have not yet been inventoried, especially those that occur in inventoried roadless areas."  Final Rule & ROD, at 10.

125.    Defendants' failure to consider the Roadless Initiative's impact on property of religious and cultural significance to the Kootenai Tribe violates the NHPA and is therefore arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

126.    Defendants' failure to consult with the Kootenai Tribe pursuant to the NHPA is arbitrary, capricious, and an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

127.    Plaintiffs are entitled to a declaration that the Final Rule violates NHPA, 42 U.S.C. § 4332(2)(C), and is therefore null and void and of no legal force and effect.  Plaintiffs are also entitled to an injunction prohibiting Defendants from taking any actions in furtherance of the Final Rule until such time as Defendants have complied with NHPA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Defendants' FEIS was made without a detailed consideration of the site-specific impacts of its proposed action, thereby constituting a violation of NEPA and of the APA and thereby rendering the Final Rule null and void and of no legal force and effect;

B.    Declare that Defendants' FEIS was made without a detailed consideration of reasonable

alternatives to the FEIS's preferred alternative, thereby constituting a violation of NEPA and of the APA and thereby rendering the Final Rule null and void and of no legal force and effect;

C.      Declare that Defendants' FEIS was made without adequate scoping and notice and comment to interested parties, thereby constituting a violation of NEPA and of the APA and thereby rendering the Final Rule null and void and of no legal force and effect;

D.      Declare that Defendants' FEIS was made without adequate consideration of the cumulative impacts of the FEIS's preferred alternative, thereby constituting a violation of NEPA and of the APA and thereby rendering the Final Rule null and void and of no legal force and effect;

E.      Declare that the Final Rule violates the APA and NFMA, 16 U.S.C. §§ 1604(e), (f), and is therefore null and void and of no legal force and effect;

F.      Declare that the Final Rule violates the APA and the OAA, 16 U.S.C. § 475, MUSYA, 16 U.S.C. §§ 528-531, and NFMA, 16 U.S.C. § 1600-04, and is therefore null and void and of no legal force and effect;

G.      Declare that the Final Rule violates the APA and Section 108 of the Department of the Interior and Related Agencies Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996), and is therefore null and void and of no legal force and effect;

H.      Declare that the Final Rule violates the notice and comment requirements of the APA, 5 U.S.C. § 553, and is therefore null and void and of no legal force and effect;

I.      Declare that the Final Rule violates the Wilderness Act, 16 U.S.C. §§ 1131 *et. seq.*, and is therefore null and void and of no legal force and effect;

J.    Declare that the Final Rule violates the NHPA, 16 U.S.C. §§ 470, *et seq.*, and is therefore null and void and of no legal force and effect;

K.    Issue a mandatory injunction requiring Defendants to withdraw the Final Rule;

L.    Allow Plaintiffs to recover costs and attorney fees attendant to bringing this action; and

M.    Grant such other and further relief as the Court deems just and proper.

Dated:  January 8, 2000                Respectfully submitted,


_____
Raymond B. Ludwiszewski
Peter E. Seley
*Pro Hac Vice Motions Submitted Herewith*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500


_____
Paul A. Turcke
MOORE, SMITH, BUXTON & TURCKE, CHARTERED
225 North 9th Street
Suite 420
Boise, ID 83702
(208) 331-1800


_____
Jeffrey D. Neumeyer
BOISE CASCADE CORPORATION
1111 West Jefferson Street
Boise, ID  83702
(208) 384-7718

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- Page 41