Douglas L. Honnold
Timothy J. Preso
Sanjay Narayan
Earthjustice Legal Defense Fund
209 South Willson Ave.
Bozeman, MT 59715

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501

Attorneys for Defendant-Intervenor-Applicants

Laurence ("Laird") J. Lucas (ISB # 4733)
PO Box 1342
Boise ID 83701
(208) 424-1466

Local Counsel for Defendant-Intervenor-Applicants

UNITED STATES COURTS
DISTRICT OF IDAHO

FEB - 6 2001

———— M. REC'D ————
LODGED ———— FILED ————

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

KOOTENAI TRIBE OF IDAHO; BOISE
COUNTY, IDAHO, by and through the Boise
County Board of Commissioners; VALLEY
COUNTY, IDAHO, by and through the Valley
County Board of Commissioners; IDAHO
STATE SNOWMOBILE ASSOCIATION;
ILLINOIS ASSOCIATION OF SNOWMOBILE
CLUBS; AMERICAN COUNCIL OF
SNOWMOBILE ASSOCIATIONS; LITTLE
CATTLE COMPANY LIMITED
PARTNERSHIP; HIGHLAND LIVESTOCK
AND LAND COMPANY; and BOISE
CASCADE CORPORATION,

        Plaintiffs,

      vs.

DANIEL GLICKMAN, in his official
capacity as the Secretary of Agriculture;
MICHAEL DOMBECK, in his official capacity
as the Chief Forester of the USDA Forest
Service: UNITED STATES DEPARTMENT OF
AGRICULTURE; and UNITED STATES
FOREST SERVICE,

        Defendants,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: Civ. 01-010-N-EJL

and,                                    )
                                        )
                                        )
IDAHO CONSERVATION LEAGUE, IDAHO        )
RIVERS UNITED, SIERRA CLUB, THE         )
WILDERNESS SOCIETY, OREGON              )
NATURAL RESOURCES COUNCIL,              )
PACIFIC RIVERS COUNCIL, NATURAL         )
RESOURCES DEFENSE COUNCIL, and          )
DEFENDERS OF WILDLIFE,                  )
                                        )
        Defendant-Intervenor-Applicants. )
                                        )

**MEMORANDUM IN SUPPORT OF IDAHO CONSERVATION LEAGUE ET AL.'S
MOTION TO INTERVENE AS DEFENDANTS**

This is the third case brought in this Court challenging the U.S. Forest Service's regulatory initiative to protect National Forest roadless areas.[1]  The Court allowed Idaho Conservation League, Sierra Club, The Wilderness Society, Oregon Natural Resources Council and Pacific Rivers Council to intervene as defendants in both prior suits.  These same organizations, along with Idaho Rivers United, Natural Resources Defense Council, and Defenders of Wildlife (collectively "Applicants"), hereby request leave to intervene as defendants in this action, under Federal Rule of Civil Procedure 24.  Applicants have an interest both in the specific agency rule that is the subject of this lawsuit, as well as in the roadless lands protected by the rule.  As in the prior cases, these interests entitle Applicants to intervene.

## I.    FACTS AND PREVIOUS PROCEEDINGS[2]

### A.    The Roadless Area Rule-Making Process and Final Rule

After three years of extensive public discussion, the U.S. Forest Service has issued a rule that protects the 58.5 million acres of "inventoried" roadless lands on the National Forests (34.3 million acres of which were previously open to road-building). See Roadless Area Conservation, 66 Fed. Reg. 3,244 (January 12, 2001) (to be codified at 36 C.F.R. pt. 294) ("Roadless Rule") (copy attached as Exhibit 1).  Those National Forest roadless areas are of immense environmental value.  To take but one example, they support myriad rare and dwindling wildlife species, including 220 species of wildlife listed or proposed for listing under the Endangered Species Act, and 1,930 agency-identified sensitive species. Id. at 3,247.  In sharp contrast, the lands protected by the Roadless Rule account for less than one-half of one percent of total U.S. timber production. Id. at 3,261.

---

[1]    The State of Idaho filed a fourth challenge one day after this action was commenced. State of Idaho v. U.S. Forest Serv., No. CV01-011-N-EJL (D. Idaho, filed January 9, 2001). Applicants have filed a simultaneous motion to intervene in that case.

[2]    As this Court presided over the proceedings summarized below in State of Idaho v. U.S. Forest Serv., No. CV99-611-N-EJL (D. Idaho filed Dec. 30, 1999), consolidated with Boise County v. Glickman, No. CV00-0141-S-EJL (D. Idaho filed March 17, 2000), this discussion of them is abbreviated.  Aside from Section I.D, this memorandum is also virtually identical to the memorandum filed in support of Applicants' Motion to Intervene in State of Idaho v. U.S. Forest Serv., No. CV01-011-N-EJL (D.Idaho, filed January 9, 2001), also filed on this date.

The road system that interlaces the remainder of the National Forest system has, meanwhile, overwhelmed the Forest Service's financial resources. The agency is currently facing an $8.4-billion backlog in its maintenance and reconstruction of the more than 360,000 miles of roads that have already been built on National Forest lands. Id. at 3,245.

These environmental and economic concerns gave rise to a revision of Forest Service transportation regulations that consumed three years of public process and debate, and eventually resulted in the Roadless Rule challenged by plaintiffs here. The process began on January 28, 1998, when the Forest Service announced that it would revise its Transportation System regulations. Advanced Notice of Proposed Rulemaking, 63 Fed. Reg. 4,350 (January 28, 1998). The Forest Service suspended new road construction in certain designated roadless areas in order to allow the assessment and policy formulation required for that revision. The suspension went into effect, after extensive notice and comment, in February 1999, and expired 18 months later. See Temporary Suspension of Road Construction and Reconstruction in Unroaded Areas, 64 Fed. Reg. 7,290, 7,304 (Feb. 12, 1999) (codified at 36 C.F.R. § 212.13).

The Forest Service received more than 119,000 comments in response to its revision of its road-building policies, many of which voiced the public's interest in permanent protection of National Forest roadless areas. 66 Fed. Reg. at 3,247. Accordingly, on October 13, 1999, the Forest Service initiated a rule-making process to develop, and solicit public comment on, the appropriate long-term protection of such areas. Id. During that process, the Forest Service received and evaluated more than 1.6 million comments. The Service held more than 600 public meetings, including over forty in Idaho, and distributed extensive materials relating to roadless areas. Id. at 3,248; <<http://roadless.fs.fed.us/states/id/meeting4.shtml>> (visited on February 2, 2001). At each stage leading up to publication of the Rule itself – scoping, publication of a proposed rule and Draft Environmental Impact Statement, publication of a revised proposal and Final Environmental Impact Statement – the Forest Service solicited and assessed public comment. At each stage, in response to those comments, the Forest Service adjusted its proposals. The final Roadless Rule, which restricts road-building, road reconstruction, and

commercial timber harvest in all "inventoried" roadless areas, subject to various exceptions, was published in the Federal Register on January 12, 2001.[3]

### B. Prior Litigation

Boise Cascade Corporation and the State of Idaho, along with many of the other plaintiffs herein, filed two earlier suits asking this Court to halt the rule-making process described above. Boise County, Idaho v. Glickman, No. CV-00-0141-S-EJL (D. Idaho filed March 17, 2000); State of Idaho v. U.S. Forest Serv., No. CV99-611-N-EJL (D. Idaho filed Dec. 30, 1999). This Court allowed applicants Idaho Conservation League, Sierra Club, The Wilderness Society, Oregon Natural Resources Council, and Pacific Rivers Council to intervene as defendants, noting that "Idaho Conservation League, et al., has demonstrated interests relating to the subject matter of this action that at a minimum permit intervention under Federal Rule of Civil Procedure 24(b)." State of Idaho v. U.S. Forest Serv., No. CV99-611-N-EJL, slip op. at 2 (D. Idaho Feb. 18, 2000) (copy attached as Exhibit 2); see also Minutes of Civil Proceedings, Pending Motions, State of Idaho v. U.S. Forest Serv., No. CV99-611-N-EJL (D. Idaho June 14, 2000) at 2 (granting applicants' motion to intervene in Boise County v. Glickman, No. CV00-0141-S) (attached as Exhibit 3). The Court later dismissed all claims raised in those suits as non-ripe, or for failure to state a claim.

### C. This Litigation

This case represents a renewal of the prior litigation. All of the plaintiffs here were plaintiffs in the earlier litigation, and their claims closely track those previously raised. Plaintiffs allege that in promulgating the Roadless Rule the Forest Service has violated: the National Environmental Policy Act, 42 U.S.C. 4321 et seq., the National Forest Management Act, 16 U.S.C. §§ 1600 et seq., the Forest Service's Organic Act, 16 U.S.C. § 475, the Multiple Use Sustained Yield Act, 16 U.S.C. § 528 et seq., a 1997 Appropriations Bill, Pub L. No 104-208,

---

[3]     "Inventoried" roadless areas refer to those identified during the Forest Service's Roadless Areas Review and Evaluation II process.

110 Stat. 3009 (1996), the Administrative Procedure Act, 5 U.S.C. § 533, the Wilderness Act, 16

U.S.C. 1131 et seq., and the National Historic Preservation Act, 16 U.S.C. 470f.

## II.    ARGUMENT

### A.    Applicants' Interest in the Roadless Rule Entitles Applicants to Intervene As A Matter of Right

The Ninth Circuit has established the following four-part test to determine whether

intervention as of right is warranted under Rule 24(a):

> (1) the applicant's motion must be timely; (2) the applicant must assert an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that without intervention the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the other parties.

Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527 (9th Cir. 1983). Rule 24 "is construed

broadly in favor of the applicants." Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1397

(9th Cir. 1995).

This Court has twice granted motions by certain of the Applicants herein to intervene in

earlier rounds of litigation challenging the Roadless Rule. See Exs. 2 & 3. The same

considerations justify Applicants' intervention in this new round of Roadless Rule litigation.

1.    Applicants' Motion For Intervention Is Timely

Plaintiffs filed this action on January 8, 2001. Applicants file this motion to intervene

less than a month later. No answer has been filed by defendants, and no substantive orders or

rulings have been issued by this Court. See, e.g., 7C Charles A. Wright & Arthur R. Miller,

Federal Practice and Procedure, § 1916 & n.13 (2d ed. 1986) (application for intervention made

before parties have joined issue in the pleadings is "clearly timely"). Because this litigation is at

such an early stage, and because Applicants agree to abide by whatever briefing or other

schedules are established by this Court, Applicants' intervention will not prejudice any party in

any way. Applicants have, therefore, met the "timeliness" prong of the Rule 24(a) inquiry. See

Tocher v. City of Santa Ana, 219 F.3d 1040, 1044 (9th Cir. 2000) (timeliness depends upon (1)

the stage of the proceedings at which an applicant seeks to intervene; (2) the prejudice to the

existing parties if intervention is allowed; and (3) the reasons for and length of any delay),

petition for cert. filed, 69 U.S.L.W. 3410 (Nov. 29, 2000) (No. 00-916).

   2. Applicants Have An Interest In The Subject Matter Of This Action

   Applicants have a vital interest in the Roadless Rule challenged by this lawsuit, and in the

roadless lands protected by that Rule.  Rule 24(a) requires that an applicant for intervention

possess an interest relating to the property or transaction that is the subject matter of the

litigation.  It does not pose a stringent test:

> Whether an applicant for intervention demonstrates sufficient interest in an action
> is a practical, threshold inquiry.  No specific legal or equitable interest need be
> established.  Nevertheless, the movant must demonstrate a "significantly
> protectable interest."

Greene v. United States, 996 F.2d 973, 976 (9th Cir. 1993) (citation omitted).  Applicants have

two "significantly protectable" interests in this suit that meet Rule 24's requirements: first, in the

roadless lands that the Roadless Rule protects, and second, in the Rule itself.

   a. Applicants' Members Use and Enjoy the Roadless Lands Protected by The Rule

   Applicants are all national or regional conservation organizations whose members use

and enjoy the roadless lands that the Roadless Rule protects.  Declaration of David Bayles

("Bayles Decl.") ¶¶ 1-2, 8; Declaration of Sara Denniston ("Denniston Decl.") ¶¶ 1-2, 7-9;

Declaration of Craig Gehrke ("Gehrke Decl.") ¶¶ 2, 6-9; Declaration of Suzanne Laverty

("Laverty Decl.") ¶¶ 2, 5-6; Declaration of John McCarthy ("McCarthy Decl.") ¶¶ 1-2, 9-11;

Declaration of Ken Rait ("Rait Decl.") ¶¶ 2, 4-6; Declaration of Roger Singer ("Singer Decl.") ¶¶

2, 6-9; Declaration of Johanna Wald ("Wald Decl.") ¶¶ 2, 4-7.  They frequent that land to enjoy

its pristine qualities, and for the wildlife that depend on its roadless character.  Bayles Decl. ¶ 8;

Denniston Decl. ¶¶ 7-9; Gehrke Decl. ¶¶ 6-9; Laverty Decl. ¶¶ 5-7; McCarthy Decl. ¶¶ 9-11;

Rait Decl. ¶¶ 4-6; Singer Decl. ¶¶ 6-9; Wald Decl. ¶¶ 4-7.  That use and enjoyment would be

impaired if the Rule were withdrawn. Bayles Decl. ¶ 9; Denniston Decl. ¶ 9; Gehrke Decl. ¶ 9; Laverty Decl. ¶ 7; McCarthy Decl. ¶ 11; Rait Decl. ¶ 5; Singer Decl. ¶ 9; Wald Decl. ¶ 8.

These activities give rise to a "legally protectable" interest that suffices to justify intervention as of right. Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1303 (9th Cir. 1993) (applying stricter Article III test and finding that plaintiff conservation groups had protectable interest where they filed member affidavits describing visits and uses of public land area at issue, and that their use and enjoyment of area would be harmed by challenged federal action); see also Sagebrush Rebellion, 713 F.2d at 526-28 (holding environmental groups' "environmental, conservation and wildlife interests" sufficient for intervention as a matter of right).

        b.      Applicants Have An Interest In the Forest Service's Roadless Rule

Applicants also have a distinct interest in the Roadless Rule that plaintiffs seek to invalidate, based upon Applicants' longstanding advocacy in support of the Rule. Applicants' staff and members participated in the numerous Forest Service hearings held in Idaho and elsewhere, spoke to members of the media, produced and mailed information regarding the importance of roadless areas, educated the public, held rallies, and voiced their support for strong, long-term protection for National Forest roadless areas to state and federal legislators and Forest Service officials. See Bayles Decl. ¶¶ 2-7; Denniston Decl. ¶¶ 2-6; Gehrke Decl. ¶¶ 2-5; Laverty Decl. ¶ 3; McCarthy Decl. ¶¶ 2-8; Rait Decl. ¶¶ 2-3; Singer Decl. ¶¶ 3-5; Wald Decl. ¶ 3. And most of the Applicants herein intervened to protect the Roadless Rule from prior legal challenges.

This long-standing support for the Roadless Rule is sufficient to support intervention as of right under Rule 24(a). A "public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." Idaho Farm Bureau Fed'n, 58

F.3d at 1397 (9th Cir. 1995); see also Sagebrush Rebellion, 713 F.2d at 526-27 (National

Audubon Society had right to intervene in challenge to creation of bird preserve that Society

supported during administrative process); Washington State Bldg. & Constr. Trades v. Spellman,

684 F.2d 627, 630 (9th Cir. 1982) (public interest group entitled to intervention as of right in

action challenging legality of measure group had supported).

      3.     Applicants' Interests May Be Impaired As A Result Of This Litigation

      This lawsuit threatens to undo the above-described advocacy efforts, allowing the

continued development of National Forest roadless areas and the destruction of the natural

resources they contain and the wildlife that depend upon them.  That threat establishes the third

prong of Rule 24(a)'s test for intervention of right – i.e., that the applicant be "so situated that the

disposition of the action may as a practical matter impair or impede the applicant's ability to

protect that interest." Fed. R. Civ. P. 24(a)(2) (emphasis added); see also Natural Resources

Defense Council v. Nuclear Regulatory Comm'n, 578 F.2d 1341, 1345 (10th Cir. 1978) (court

"may consider any significant legal effect on the applicant's interest").

      This lawsuit threatens, first, Applicant's interest in the preservation of National Forest

roadless areas' wildlife and natural resources.  Without the Roadless Rule, many roadless areas

will be subject to continued road-building and logging, activities that destroy the resources in

which Applicants are vitally interested. Bayles Decl. ¶¶ 8-9; Denniston Decl. ¶¶ 7-9; Gehrke

Decl. ¶¶ 6-9; Laverty Decl. ¶¶ 5-7; McCarthy Decl. ¶¶ 9-11; Rait Decl. ¶¶ 4-5; Singer Decl. ¶¶ 6-

9; Wald Decl. ¶¶ 4-8.  Indeed, the alleged standing of many of the plaintiffs in this suit is based

upon their desire to build roads and extract timber from National Forest roadless lands.

Complaint ¶¶ 11-13. The threat of such development demonstrates that this litigation may

impair Applicants' interest within the meaning of Rule 24(a). Sagebrush Rebellion, 713 F.2d at

528 (impairment prong satisfied where "[a]n adverse decision in this suit would impair the

[applicants'] interest in the preservation of birds and their habitat.").

This litigation also could invalidate the Roadless Rule, vitiating plaintiffs' efforts to

secure long-term protection for National Forest roadless areas. That possibility establishes a

second impairment of Applicants' interests that is threatened by this litigation, independently

satisfying Rule 24(a). Sagebrush Rebellion, 713 F.2d at 527-28 (holding that there "can be no

serious dispute" regarding, inter alia, potential impairment of interest where lawsuit seeks to

invalidate regulatory measure that proposed intervenors had supported).

4.    Applicants' Interests Are Not Adequately Represented

Finally, the federal defendants in this action do not adequately represent Applicants'

interests. "The requirement of [Rule 24(a)(2)] is satisfied if the applicant shows that representation

of his interest 'may be' inadequate; and the burden of making that showing should be treated as

minimal." Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972). To determine

whether an applicant's interest is adequately represented by the existing parties, courts in the

Ninth Circuit consider:

> (1) whether the interest of a present party is such that it will undoubtedly make all
> the intervenor's arguments; (2) whether the present party is capable and willing to
> make such arguments; and (3) whether the would-be intervenor would offer any
> necessary elements to the proceedings that other parties would neglect.

Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 838 (9th Cir. 1996) (emphasis

added).

Judged by those factors, Applicants' interests are not "adequately represented" by the

federal defendants. The Applicants' conservation interests are not necessarily shared by the

Forest Service, which must represent the public's broader interests rather than the Applicants'

specific conservation interests. See Trbovich, 404 U.S. at 538-39 (finding intervention

appropriate because government's duty to represent both broad interests of the public and narrower interests of proposed intervenor were "related, but not identical").

President George W. Bush's accession as President – the federal officer ultimately responsible for this lawsuit's defense – only heightens the divergence of interests in this case. President Bush has stated publicly that he opposes the roadless area protections established during the Clinton Administration, and that he intends to reverse the new roadless policy if possible. See Joel Connelly, Bush Would Seize Reins On Lands Policy, Seattle Post-Intelligencer, June 26, 2000 (Bush "promised to reverse, if possible, Clinton's initiative that would ban road construction on 43 million acres of national forests") (copy attached as Exhibit 4). And Vice President Dick Cheney is already on record rejecting the Forest Service's authority to protect roadless areas in Wyoming. See Letter from Dick Cheney to Rhey Solomon (March 6, 1998) (copy attached as Exhibit 5). Moreover, plaintiffs' counsel is listed among those advising President Bush's Administration on environmental issues. See Bush-Cheney Transition Advisory Teams, EPA, Interior (copy attached as Exhibit 6). The Bush Administration's control over the federal defendants in this case indicates that, at a minimum, the federal defendants "may not" adequately represent Applicants' interests in strong long-term protection of National Forest roadless lands. See Sagebrush Rebellion, 714 F.2d at 528 (accession of defendant Interior Secretary with record of opposing challenged action suggests that representation may be inadequate).

**B.    Alternatively, Applicants Should Be Allowed Permissive Intervention**

In the alternative, Applicants should be allowed to intervene permissively. Under Federal Rule of Civil Procedure 24(b), "[a]n applicant who seeks permissive intervention must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the

main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." Donnelly v. Glickman, 159 F.3d 405, 412 (9th Cir. 1998).

As set out above, this application is timely and will not prejudice the rights of the existing parties. Additionally, Applicants' claims and defenses share substantial questions of law and fact with the main action. And the Court has clear jurisdiction over the issues of statutory interpretation that Applicants wish to litigate. See 28 U.S.C. § 1331 (federal question jurisdiction). Because Applicants represent interests that are not represented by the existing parties, Applicants' participation will contribute to the equitable resolution of this case. Accordingly, permissive intervention is warranted as well.

### III.    CONCLUSION

For the foregoing reasons, Applicants respectfully seek leave to intervene as defendants.

Respectfully submitted this 5th day of February, 2001,

_____
Douglas L. Honnold
Timothy J. Preso
Sanjay Narayan
Earthjustice Legal Defense Fund
209 South Willson Ave.
Bozeman, MT 59715
(406) 586-9699


_____
Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA  98501
(360) 570-9309

Attorneys for Defendant-Intervenor-Applicants


_____
Laurence ("Laird") J. Lucas (ISB # 4733)
PO Box 1342
Boise ID 83701
(208) 424-1466

Local Counsel for Defendant-Intervenor-Applicants

## INDEX OF EXHIBITS

1. Special Areas; Roadless Areas Conservation, 66 Fed. Reg. 3,244 (January 12, 2001)

2. Order, <u>State of Idaho v. U.S. Forest Serv.</u>, No. CV99-611-N-EJL (D. Idaho Feb. 18, 2000)

3. Minutes of Civil Proceedings, Pending Motions, <u>State of Idaho v. U.S. Forest Serv.</u>, No. CV99-611-N-EJL (D. Idaho June 14, 2000)

4. Joel Connelly, <u>Bush Would Seize Reins On Lands Policy</u>, Seattle Post-Intelligencer, June 26, 2000

5. Letter from Dick Cheney to Rhey Solomon (March 6, 1998)

6. Bush-Cheney Transition Advisory Teams, EPA, Interior



Friday,
January 12, 2001

Part VI

# Department of Agriculture

**Forest Service**

36 CFR Part 294
Special Areas; Roadless Area
Conservation; Final Rule

*Exh 1*

## DEPARTMENT OF AGRICULTURE

**Forest Service**

**36 CFR Part 294**

**RIN 0596–AB77**

**Special Areas; Roadless Area Conservation**

**AGENCY:** Forest Service, USDA.

**ACTION:** Final rule and record of decision.

**SUMMARY:** The Department of Agriculture is adopting this final rule to establish prohibitions on road construction, road reconstruction, and timber harvesting in inventoried roadless areas on National Forest System lands. The intent of this final rule is to provide lasting protection for inventoried roadless areas within the National Forest System in the context of multiple-use management.

**EFFECTIVE DATE:** This rule is effective March 13, 2001.

**ADDRESSES:** For additional information, refer to the Roadless Area Conservation website (*roadless.fs.fed.us*). Written inquiries may be directed to USDA Forest Service, National Forest System Roadless Project, P.O. Box 96090, Washington, DC 20090–6090.

**FOR FURTHER INFORMATION CONTACT:** Scott Conroy, Project Director, Forest Service (703) 605–5299 or (800) 384–7623.

**SUPPLEMENTARY INFORMATION:** The following outline displays the contents of the preamble for this regulation.

Introduction

**Purpose and Need for the Roadless Area Conservation Rule**

Roadless Area Values and Characteristics
Fiscal Considerations
National Direction vs. Local Decisionmaking
Importance of Watershed Protection
Improving Ecosystem Health
Need for Action

**Public Comments on the Proposed Rule**

How Was Public Involvement Used in the
    Rulemaking Process?
What General Issues Were Identified
    Regarding the Proposed Rule and Draft
    Environmental Impact Statement?
    Overview Issues Raised by Those Opposed
        to Prohibitions
    Issues Raised by Those Who Favor
        Prohibitions
    Issues Raised by Federal, Tribal, State, and
        Local Public Officials
What Specific Issues Were Raised on the
    Proposed Rule and What Changes Did
    the Agency Make From Proposed to
    Final Rules?
    Proposed § 294.10. Purpose
    Proposed § 294.11. Definitions

Proposed § 294.12. Prohibition on road
    construction and reconstruction in
    inventoried roadless areas
Final § 294.13. Prohibition on timber
    cutting, sale, or removal in inventoried
    roadless areas
Proposed § 294.13. Consideration of
    roadless area conservation during forest
    plan revision
Proposed § 294.14. Scope and applicability
What Other Issues Were Considered in the
    Final Environmental Impact Statement?
    Environmental Effects
    Forest Dependent Communities
    Local Decisionmaking

**The Final Rule and Alternatives Considered**

What Alternatives and Mitigation Measures
    Were Considered by the Agency?
    Prohibition Alternatives
    Exceptions and Mitigation Measures
    Tongass National Forest Alternatives
What is the Environmentally Preferred
    Alternative?
What is the Final Rule and What Are the
    Reasons for Selecting that Alternative?
    Prohibition Alternatives
    Exceptions
    Tongass National Forest Alternatives
    Decision Summary

**Regulatory Certifications**

Regulatory Impacts
    Summary of the Results of the Regulatory
        Impact Analysis
    Summary of the Results of the Final
        Regulatory Flexibility Analysis
Environmental Impact
    The Endangered Species Act of 1973, as
        Amended
    Other Required Disclosures
Controlling Paperwork Burdens on The
    Public
    Unfunded Mandates Reform
    No Takings Implications
    Civil Justice Reform Act
    Federalism and Consultation with Tribal
        Governments

**Introduction**

The Department of Agriculture is adopting this final rule to protect and conserve inventoried roadless areas on National Forest System lands. This preamble states the basis and purpose of the rule, includes responses to comments received on the proposed rule, and serves as the record of decision for this rulemaking. Preparation of the record of decision is required by the Council on Environmental Quality regulations (40 CFR 1505.2) implementing the National Environmental Policy Act (NEPA) (42 U.S.C. 4321). This document sets forth the reasons supporting the decision to adopt the final rule; the major policy issues that were raised in public comment; responses to public comment and changes adopted in response to comments; and the reasons this final rule was selected from among the alternatives considered to meet the agency's purpose and need, as described

in the four volume final environmental impact statement (FEIS) and project record, which are incorporated by reference. Agency responses to comments on the draft environmental impact statement (DEIS) are contained in Volume 3 of the Forest Service Roadless Area Conservation FEIS (November 2000). Responses in Volume 3 relevant to the final rule are summarized in this document. Throughout this preamble and record of decision, citations to chapters and pages of the FEIS are provided for further information regarding the alternatives and effects analysis; for example, (FEIS Vol. 1, 3–237) refers to volume 1, chapter 3, page 237.

This final rule is available on the Forest Service website (*roadless.fs.fed.us*), along with the FEIS and much of the record supporting the decision for this final rule.

**Purpose and Need for the Roadless Area Conservation Rule**

The Department of Agriculture is responsible for managing National Forest System resources to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations. As noted in the USDA Forest Service Strategic Plan (2000 Revision) (*www.fs.fed.us/plan*, October 2000), demands for, and supplies of, renewable resources change over time in response to social values, new technology, and new information. In the future, expanding urban areas and increased fragmentation of private lands make it likely that the largest and most extensive tracts of undeveloped land will be those in public ownership.

This final rule prohibits road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics. Although other activities may also compromise roadless area values, they resist analysis at the national level and are best reviewed through local land management planning. Additionally, the size of the existing forest road system and attendant budget constraints prevent the agency from managing its road system to the safety and environmental standards to which it was built. Finally, national concern over roadless area management continues to generate controversy, including costly and time-consuming appeals and litigation (FEIS Vol. 1, 1–16 to 1–17). This final rule addresses these needs in the context of a national rulemaking.

## Roadless Area Values and Characteristics

Inventoried roadless areas considered in this rule constitute roughly one-third of all National Forest System lands, or approximately 58.5 million acres. Although the inventoried roadless areas comprise only 2% of the land base in the continental United States, they are found within 661 of the over 2,000 major watersheds in the nation (FEIS Vol. 1, 3–50) and provide many social and ecological benefits.

As urban areas grow, undeveloped private lands continue to be converted to urban and developed areas, and rural infrastructure (such as roads, airports, and railways). An average of 3.2 million acres per year of forest, wetland, farmland, and open space were converted to more urban uses between 1992 and 1997. In comparison, 1.4 million acres per year were developed between 1982 and 1992. The rate of land development and urbanization between 1992 and 1997 was more than twice that of the previous decade, while the population growth rate remained fairly constant (FEIS Vol. 1, 3–12). In an increasingly developed landscape, large unfragmented tracts of land become more important. For example, from 1978 to 1994, the proportion of private forest ownerships of less than 50 acres nearly doubled (Birch, T.W. 1996. Private forest-land owners of the United States, 1994. Resource Bulletin NE–134. Radnor, PA: USDA Forest Service, Northeastern Experiment Station. 183 p). Subdivision and other diminishment of tract size of these lands can discourage long-term stewardship and conservation.

Inventoried roadless areas provide clean drinking water and function as biological strongholds for populations of threatened and endangered species. They provide large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species. Inventoried roadless areas provide opportunities for dispersed outdoor recreation, opportunities that diminish as open space and natural settings are developed elsewhere. They also serve as bulwarks against the spread of non-native invasive plant species and provide reference areas for study and research (FEIS Vol. 1, 1–1 to 1–4).

The following values or features often characterize inventoried roadless areas (FEIS Vol. 1, 3–3 to 3–7):

*High quality or undisturbed soil, water, and air.* These three key resources are the foundation upon which other resource values and outputs depend. Healthy watersheds catch, store, and safely release water over time, protecting downstream communities from flooding; providing clean water for domestic, agricultural, and industrial uses; helping maintain abundant and healthy fish and wildlife populations; and are the basis for many forms of outdoor recreation.

*Sources of public drinking water.* National Forest System lands contain watersheds that are important sources of public drinking water. Roadless areas within the National Forest System contain all or portions of 354 municipal watersheds contributing drinking water to millions of citizens. Maintaining these areas in a relatively undisturbed condition saves downstream communities millions of dollars in water filtration costs. Careful management of these watersheds is crucial in maintaining the flow and affordability of clean water to a growing population.

*Diversity of plant and animal communities.* Roadless areas are more likely than roaded areas to support greater ecosystem health, including the diversity of native and desired nonnative plant and animal communities due to the absence of disturbances caused by roads and accompanying activities. Inventoried roadless areas also conserve native biodiversity by serving as a bulwark against the spread of nonnative invasive species.

*Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land.* Roadless areas function as biological strongholds and refuges for many species. Of the nation's species currently listed as threatened, endangered, or proposed for listing under the Endangered Species Act, approximately 25% of animal species and 13% of plant species are likely to have habitat within inventoried roadless areas on National Forest System lands. Roadless areas support a diversity of aquatic habitats and communities, providing or affecting habitat for more than 280 threatened, endangered, proposed, and sensitive species. More than 65% of all Forest Service sensitive species are directly or indirectly affected by inventoried roadless areas. This percentage is composed of birds (82%), amphibians (84%), mammals (81%), plants (72%), fish (56%), reptiles (49%), and invertebrates (36%).

*Primitive, Semi-Primitive Non-Motorized, and Semi-Primitive Motorized classes of dispersed recreation.* Roadless areas often provide outstanding dispersed recreation opportunities such as hiking, camping, picnicking, wildlife viewing, hunting, fishing, cross-country skiing, and canoeing. While they may have many Wilderness-like attributes, unlike Wilderness the use of mountain bikes, and other mechanized means of travel is often allowed. These areas can also take pressure off heavily used wilderness areas by providing solitude and quiet, and dispersed recreation opportunities.

*Reference landscapes.* The body of knowledge about the effects of management activities over long periods of time and on large landscapes is very limited. Reference landscapes of relatively undisturbed areas serve as a barometer to measure the effects of development on other parts of the landscape.

*Natural appearing landscapes with high scenic quality.* High quality scenery, especially scenery with natural-appearing landscapes, is a primary reason that people choose to recreate. In addition, quality scenery contributes directly to real estate values in nearby communities and residential areas.

*Traditional cultural properties and sacred sites.* Traditional cultural properties are places, sites, structures, art, or objects that have played an important role in the cultural history of a group. Sacred sites are places that have special religious significance to a group. Traditional cultural properties and sacred sites may be eligible for protection under the National Historic Preservation Act. However, many of them have not yet been inventoried, especially those that occur in inventoried roadless areas.

*Other locally identified unique characteristics.* Inventoried roadless areas may offer other locally identified unique characteristics and values. Examples include uncommon geological formations, which are valued for their scientific and scenic qualities, or unique wetland complexes. Unique social, cultural, or historical characteristics may also depend on the roadless character of the landscape. Examples include ceremonial sites, places for local events, areas prized for collection of non-timber forest products, or exceptional hunting and fishing opportunities.

## Fiscal Considerations

The Department is also concerned about building new roads in inventoried roadless areas, when there presently exists a backlog of about $8.4 billion in deferred maintenance and reconstruction on the more than 386,000 miles of roads in the Forest Transportation System. The agency

estimates that at least 60,000 miles of additional unauthorized roads exist across National Forest System lands.

The agency receives less than 20% of the funds needed annually to maintain the existing road infrastructure. As funding needs remain unmet, the cost of fixing deteriorating roads increases exponentially every year. Failure to maintain existing roads can also lead to erosion and water quality degradation and other environmental problems and potential threats to human safety. It makes little fiscal or environmental sense to build additional roads in inventoried roadless areas that have irretrievable values at risk when the agency is struggling to maintain its existing extensive road system (FEIS Vol. 1, 1–5 and 3–22). The National Forest System was founded more than 100 years ago to protect drinking water supplies and furnish a sustainable supply of timber. Neither objective is fully achievable given the present condition of the existing road system. The risks inherent in building new roads in presently roadless areas threaten environmental, social, and economic values.

Development activities in inventoried roadless areas often cost more to plan and implement than on other National Forest System lands. Some planned timber sales in inventoried roadless areas are likely to cost more to prepare and sell than they realize in revenues received. Because of the level of public controversy and analytical complexity, projects in roadless areas often require development of costly environmental impact statements for most resource development activities, including timber harvesting, in inventoried roadless areas. In some cases, road construction costs are higher due to rugged terrain or sensitive ecological factors. Many development projects in inventoried roadless areas are appealed or litigated. These factors contribute to generally higher costs for the agency to plan and implement development activities in inventoried roadless areas.

## National Direction vs. Local Decisionmaking

At the national level, Forest Service officials have the responsibility to consider the "whole picture" regarding the management of the National Forest System, including inventoried roadless areas. Local land management planning efforts may not always recognize the national significance of inventoried roadless areas and the values they represent in an increasingly developed landscape. If management decisions for these areas were made on a case-by-case basis at a forest or regional level,

inventoried roadless areas and their ecological characteristics and social values could be incrementally reduced through road construction and certain forms of timber harvest. Added together, the nation-wide results of these reductions could be a substantial loss of quality and quantity of roadless area values and characteristics over time.

In 1972, the Forest Service initiated a review of National Forest System roadless areas generally larger than 5,000 acres to determine their suitability for inclusion in the National Wilderness Preservation System. A second review process completed in 1979, known as Roadless Area Review and Evaluation II (RARE II), resulted in another nationwide inventory of roadless areas. In the more than 20 years since the completion of RARE II, Congress has designated some of these areas as Wilderness. Additional reviews have been conducted through the land management planning process and other large-scale assessments. The 58.5 million acres of inventoried roadless areas used as the basis for this analysis were identified from the most recent analysis for each national forest or grassland, including RARE II, land and resource management planning, or other large-scale assessments such as the Southern Appalachian Assessment.

Of the 58.5 million acres of inventoried roadless areas considered in the FEIS, approximately 34.3 million acres have prescriptions that allow road construction and reconstruction. The remaining 24.2 million acres are currently allocated to management prescriptions that prohibit road construction; however, protections in these existing plans may change after future forest plan amendments or revisions.

Over the past 20 years, roads have been constructed in an estimated 2.8 million of those 34.3 million acres of inventoried roadless areas. The agency anticipates that the trend of building roads in inventoried roadless areas will gradually decrease in the future even without this rule due to economic and ecological factors already discussed, changes in agency policy, increasing controversy and litigation, and potential listings under the Endangered Species Act. While these anticipated changes may reduce some of the impact to inventoried roadless areas, they would not eliminate the future threat to roadless area values (FEIS Vol. 1, 1–14 to 1–15).

On many national forests and grasslands, roadless area management has been a major point of conflict in land management planning. The controversy continues today,

particularly on most proposals to harvest timber, build roads, or otherwise develop inventoried roadless areas. The large number of appeals and lawsuits, and the extensive amount of congressional debate over the last 20 years, illustrates the need for national direction and resolution and the importance many Americans attach to the remaining inventoried roadless areas on National Forest System lands (FEIS Vol. 1, 1–16). These disputes are costly in terms of both fiscal resources and agency relationships with communities of place and communities of interest. Based on these factors, the agency decided that the best means to reduce this conflict is through a national level rule.

## Importance of Watershed Protection

Watershed protection is one of the primary reasons Congress reserved or authorized the purchase of National Forest System lands. Watershed health and restoration is also one of four emphasis areas in the agency's Natural Resource Agenda. Protecting the remaining healthy components of a watershed provides multiple benefits and a strong base to anchor future restoration in unprotected portions of these watersheds. Rivers, streams, lakes, and wetlands within a watershed are the circulatory system of ecosystems, and water is the vital fluid for inhabitants of these ecosystems, including people (FEIS Vol. 1, 1–1).

Inventoried roadless areas comprise a small fraction of the national landscape, representing less than 2% of the land base of the continental United States. They are, however, disproportionately important to the small percentage of the land base they occupy. Overall, National Forest System watersheds provide about 14% of the total water flow of the nation, about 33% of water in the West (FEIS Vol. 1, 3–46). Of the watersheds on National Forest System land, 661 contain inventoried roadless areas and 354 of those watersheds serve as source areas of drinking water used by millions of people across the nation. Therefore, the health of these watersheds is important to people's health throughout the United States.

Roads have long been recognized as one of the primary human-caused sources of soil and water disturbances in forested environments (FEIS Vol. 1, 3–44). For example, while landslides are a natural process, extensive research and other investigations in the West have closely associated land management activities, particularly roading and timber harvest, with accelerated incidence of landslides by several orders of magnitude (FEIS Vol.

1, 3–58). A joint study by the Forest Service and Bureau of Land Management in Oregon and Washington found that of 1,290 landslides reviewed in 41 sub-watersheds, 52% were related to roads, 31% to timber harvest, and 17% occurred in undisturbed forest (FEIS Vol. 1, 3–59). Another evaluation of landslides initiated by the Siuslaw National Forest found that roads were the source of 41% of landslides, harvest units less than 20 years old were the source of 36%, while natural forest processes accounted for the remaining 23%. Without the disturbance caused by roads and associated activities, stream channels are more likely to function naturally (FEIS Vol. 1, 3–54). Current road construction and timber harvest practices reduce the potential for damage associated with the use of earlier and less sophisticated techniques. However, even with today's improved design standards for road construction and timber harvest, these activities can still result in adverse effects to watersheds. These effects include pollution, changes to water temperatures and nutrient cycles, and increased sediment from storm or runoff events that exceed road design standards (FEIS Vol. 1, 3–45 to 3–50).

### Improving Ecosystem Health

Inventoried roadless areas provide large, relatively undisturbed blocks of important habitat for a variety of terrestrial and aquatic wildlife and plants, including hundreds of threatened, endangered, and sensitive species. In addition to their ecological contributions to healthy watersheds, many inventoried roadless areas function as biological strongholds and refuges for a number of species and play a key role in maintaining native plant and animal communities and biological diversity (FEIS Vol. 1, 3–123 to 3–124). For example, about 60% of unroaded or very low road density sub watersheds within the Interior Columbia Basin Ecosystem Management Project (ICBEMP) assessment area are aquatic strongholds for salmonid populations (FEIS Vol. 1, 3–161). Inventoried roadless areas are key to recovery of salmon and steelhead stocks in decline, providing habitat to protect species until longer-term solutions can be developed for migration, passage, hatchery, and harvest problems associated with the decline of anadromous fish.

Species richness and native biodiversity are more likely to be effectively conserved in larger undisturbed landscapes (FEIS Vol. 1, 3–142). For example, inventoried

roadless areas cover approximately 21% of the centers of biodiversity for animals and 10% for plants identified in ICBEMP (FEIS Vol. 1, 3–144 and 3–173). Inventoried roadless areas also provide reference landscapes that managers can use to gauge the health and condition of other land areas.

Road construction, reconstruction, and timber harvesting activities can result in fragmentation of ecosystems, the introduction of non-native invasive species, and other adverse consequences to the health and integrity of inventoried roadless areas (FEIS Vol. 1, 3–128 to 3–136). As human-caused fragmentation increases, the amount of core wildlife habitat decreases. This fragmentation results in decreased connectivity of wildlife habitat and wildlife movement, isolating some species and increasing the risk of local extirpations or extinctions (FEIS Vol. 1, 3–133). The value of inventoried roadless areas as habitat for threatened, endangered, and sensitive species and as biological strongholds can also be diminished due to these activities. For example, 220 species that are listed as threatened, endangered, or proposed for listing under the Endangered Species Act and 1,930 agency-identified sensitive species rely on habitat within inventoried roadless areas (FEIS Vol. 1, 3–180). The Department of Agriculture believes that the risks associated with certain development activities in inventoried roadless areas should be minimized and that these areas should be conserved for present and future generations.

### Need for Action

Promulgating this rule is necessary to protect the social and ecological values and characteristics of inventoried roadless areas from road construction and reconstruction and certain timber harvesting activities. Without immediate action, these development activities may adversely affect watershed values and ecosystem health in the short and long term, expand the road maintenance backlog which would increase the financial burden associated with road maintenance, and perpetuate public controversy and debate over the management of these areas. The new planning rules provide for review of other activities and allow for additional protection of roadless areas, if warranted. Adoption of this final rule ensures that inventoried roadless areas will be managed in a manner that sustains their values now and for future generations.

### Public Comments on the Proposed Rule

*How Was Public Involvement Used in the Rulemaking Process?*

In January 1998, Forest Service Chief Mike Dombeck proposed to temporarily suspend road construction and reconstruction in most inventoried roadless areas and other adjacent unroaded areas, and provided advance notice of revisions to the regulations governing the management of the Forest Transportation System. After analyzing public comments on the proposal, the Agency issued an interim rule at 36 CFR part 212, Administration of the Forest Development Transportation System: Temporary Suspension of Road Construction and Reconstruction in Unroaded Areas (February 12, 1999; 64 FR 7290). This Interim Roads Rule suspended road construction and reconstruction in certain inventoried roadless areas for 18 months (March 1999 through August 2000), while a long-term forest transportation policy was developed. During the public comment period for the Interim Roads Rule, the Agency received approximately 119,000 public comments, many of which mentioned the need for "permanent protection" of inventoried roadless areas.

On October 13, 1999, President William J. Clinton directed the Forest Service to develop and propose for public comment regulations that would provide appropriate long-term protection for currently inventoried roadless areas. The public, and all interested parties, were to have the opportunity to review and comment on the proposed regulations.

To comply with this presidential directive, the agency published a notice of intent to prepare a DEIS in the **Federal Register** (64 FR 56306) on October 19, 1999, and announced the initiation of the public rulemaking process to propose the protection of certain roadless areas within the National Forest System. Section 553(a) of the Administrative Procedures Act exempts public property rules from the public involvement requirements set forth in section 553. In 1971, the United States Department of Agriculture published a voluntary waiver of the exemption from the notice and comments requirements of 5 U.S.C. 553(b) and (c) (36 FR 13804). Accordingly, the Forest Service published a proposed rulemaking in the **Federal Register** and provided opportunity for public participation during the development of the proposed and final rules. (See *Rodway* v. *USDA, 514 F.2d 809 (D.C. Cir. 1975)*).

On May 10, 2000, the Forest Service issued a proposed rule in the **Federal Register** (65 FR 30276). The notice of availability of the DEIS was published in the **Federal Register** on May 19, 2000 (65 FR 31898). The public comment period on the proposed rule and DEIS closed on July 17, 2000. The notice of availability of the FEIS was published in the **Federal Register** on November 17, 2000 (65 FR 69513).

The agency's notice of intent to prepare an environmental impact statement drew about 16,000 people to 187 public meetings and elicited more than 517,000 responses. Although the purpose of the notice of intent was merely to solicit issues that the public thought should be addressed in the development of a DEIS, the Forest Service provided maps and other information to address public concerns and questions. On March 15, 2000, two months before release of the proposed rule and DEIS, news releases and letters were sent to news media, other Federal, State, and local government agencies, libraries, and Forest Service units to explain how to obtain the proposed rule and DEIS in a variety of electronic and hardcopy formats. The proposed action and other alternatives, background information, and a schedule of public meetings were posted on the agency's Roadless Area Conservation website (*roadless.fs.fed.us*).

The Forest Service hosted two cycles of meetings during the comment period on the DEIS and proposed rule—one for information sharing and discussion and the other to collect oral comments. Written comments were collected at both meetings. About 430 public meetings were held—about 230 for information sharing and written comments and about 200 for collecting oral and written comments. Every national forest and grassland hosted at least two meetings. These meetings drew over 23,000 people nationwide.

The Forest Service also received comments by postal and electronic mail and by telefax. By the close of the comment period, the agency received over 1 million postcards or other form letters; 60,000 original letters; 90,000 electronic mail messages; and several thousand telefaxes (FEIS Vol. 1, 1–7). The Forest Service's Content Analysis Enterprise Team in Salt Lake City, Utah, organized and analyzed the comments on the proposal. Some respondents focused their remarks on provisions of the proposed rule, others concentrated on the alternatives and analyses contained in the DEIS, and many comments applied to both documents.

Information from the formal public meetings, letters, emails, telefaxes, and other sources were all included in the FEIS analysis. The Forest Service reviewed, analyzed, and responded to those comments. Responses to comments directly related to the proposed rule are included in this preamble. An explanation of the comment analysis process and how the comments were used to clarify text, modify alternatives or analysis, or augment technical information is included in Volume 3 of the FEIS.

One of the major process concerns expressed was that the agency did not give the public and governmental entities, such as Tribes, States, and counties adequate notice or time to comment on the proposed action. The agency recognizes that many groups would have preferred additional time for review and comment. However, the time period was adequate to allow for more than 1.6 million comments to be received throughout the process. Throughout the process, the agency's website has provided up-to-date information for interested parties to learn about the proposed action. The straightforward nature of the proposed rule and the sheer volume of comments received are compelling evidence that there was an adequate opportunity for the public to be heard, and sufficient information for officials to make a reasoned and informed decision.

Since the publication of the FEIS, the agency has received comments on the FEIS and the preferred alternative. Generally, these comments mirror comments received on the NOI and DEIS. The majority of these respondents asked for the prohibitions to immediately take effect on the Tongass National Forest, and for additional prohibitions on off-highway vehicle use, grazing, and mining activities. Some respondents provided additional information on potential environmental and economic effects, which the agency has reviewed and determined fall within the range of effects disclosed in the FEIS. These comments were considered by the agency in the development of the final rule and are in the project record.

## What General Issues Were Identified Regarding the Proposed Rule and Draft Environmental Impact Statement?

*Overview.* Comments on the notice of intent, the proposed rule, and the DEIS illustrated strongly held individual values and beliefs and a wide range of views on how to manage inventoried roadless areas. These comments can be divided into two basic and very different perspectives (FEIS Vol. 1, 1–8 to 1–9). One perspective is that decisions concerning management of

inventoried roadless areas should be left to the local responsible official, without national intervention. The other perspective is that national prohibitions on road construction, reconstruction, and timber harvest in inventoried roadless areas, along with a stop to other activities, must occur from a national level, as local decisionmaking does not always reflect the national significance of the issues involved. The agency considered and attempted to balance both perspectives throughout this rulemaking.

These two viewpoints focused on six major categories of issues in the DEIS as follows: public access, identification of other unroaded areas, exemptions and exceptions, environmental effects, local involvement (decisionmaking), and the effect on forest dependent communities (FEIS Vol. 1, 1–9 to 1–14).

After reviewing and analyzing the public comments received during the comment period for the proposed rule and DEIS, the agency found that these major issue categories were still valid. Public comment within these categories is incorporated in the discussions of specific issues and comments related to each section of the proposed rule. These issues also have been used for the following purposes in the rulemaking process: to determine the scope of the proposal (type of decision to be made); to develop a range of alternatives; to identify possible mitigation measures; to direct the analysis of potential environmental, social, and economic effects; and to ensure that the agency is operating within its legal authorities.

*Issues Raised by Those Opposed to Prohibitions.* This group indicated that inventoried roadless areas should remain available for road construction and reconstruction to obtain resources, to provide increased motorized recreation opportunities, and for other uses. These individuals expressed the viewpoint that roadless areas, with active and prudent management, could support both intrinsic benefits and commodity uses, and that local responsible officials should make management decisions on inventoried roadless areas. This group also indicated that environmental concerns should not take precedence over human needs and desired uses, and that maintaining a healthy environment should not preclude resource production, motorized access, and developed recreation opportunities.

Many members of this group also stated that conservation requires active management, such as providing roads for: thinning forest vegetation, insect and disease treatment, commodity resource production, hazardous fuels

reductions, and the development of recreation facilities. They stressed that the failure to actively manage forests and grasslands could result in insect infestations and uncharacteristic wildfire effects, and asserted that prudent management would benefit people and wildlife. They expressed concern for the impact this rule would have on future generations that would not be able to participate in a lifestyle that is dependent on resource use and production. They said that if future generations would not be able to access the land, they would not value the land.

*Issues Raised by Those Who Favor Prohibitions.* These respondents indicated that they viewed forestlands as whole ecosystems and that they thought roadless areas should be conserved for their intrinsic values and for esthetic benefits to humans. In their view, roadless areas should be allowed to evolve naturally through their own dynamic processes, although some proponents agreed with the need for limited stewardship activity. This second group stressed that human desire for commodity production should take second place to needs for a healthy environment (both locally and globally), for quiet natural places, for spiritual and psychological regeneration, and to meet the needs of other living things. They indicated that the social and economic needs of forest-dependent users could be met through job retraining, through development of alternative materials, and by designating already developed areas for motorized recreation and other ground-disturbing activities.

Most of the respondents in this second group maintained that the proposed rule did not prohibit enough development activities. They stated that the final rule should immediately ban timber harvest, other commodity production, and motorized recreation from roadless areas 1,000 acres or larger, and that the agency should not defer conservation of roadless areas to future land management planning processes. They also stressed that the Tongass National Forest should be included in this conservation effort, an issue that the agency specifically requested comment on in the DEIS. Many respondents in this group expressed a desire that future generations receive the benefits of clean air and water, habitat adequate to assure species diversity, and other social and ecological values provided by inventoried roadless areas.

*Issues Raised by Federal, Tribal, State and Local Public Officials.* The agency received many comments from Federal, Tribal, State and local public officials and agencies across the country. Letters received from these sources during the

comment period on the DEIS are published in Volume 4 of the FEIS. These comments reflect a cross-section of the comments received from the public at large.

Many public officials from States and counties concerned about access to and across National Forest System lands and concerned about forest dependent communities expressed strong opposition to the proposed rule, citing negative economic impacts to these communities and commodity production industries, as well as negative impacts to rural lifestyles. Access to State-owned lands and impacts to statutory rights-of-way across public lands were major concerns as well. In general, those Western States with the greatest roadless acreage (for example, Idaho, Montana, Nevada, Utah, and Wyoming) tended to generate the greatest number of negative comments from Governors, agencies, and officials. Public officials from areas with larger urban populations generally supported the proposed rule because of their expressed desire for recreation opportunities, protection of water quality, and undisturbed landscapes.

The following examples illustrate these different views. In the State of Washington, some of the officials and agencies writing in support of the proposed rule included the Governor, King and Spokane Counties, and the Seattle City Council, while Stevens County, the City of Forks, and the City of Port Angeles were opposed (FEIS Vol. 4, 573, 579, 583 to 588). In Missouri, the Dent County Commission was opposed to the proposal while the State's Department of Natural Resources was supportive (FEIS Vol. 4, 250 to 252).

Comments from agencies also varied according to the anticipated effects to their management programs. For example, the Florida Fish and Wildlife Conservation Commission saw the proposed rule as resulting in positive benefits for native wildlife and plant communities, while the Virginia Department of Game and Inland Fisheries saw the proposal as harmful to wildlife and the management of wildlife (FEIS Vol. 4, 79 to 81, 571). Most responding Department of Transportation offices were concerned over access and maintenance issues.

Letters from Tribal officials provided mixed comments and concerns. Some Tribes were generally supportive of the proposed rule, with the provision that traditional uses of the land and access to cultural and sacred sites be allowed to continue. Other Tribes expressed concern about how the proposal might affect economic opportunities. Still others believed that the rule should

further restrict certain activities in inventoried roadless areas that may affect adjacent Tribal lands.

*What Specific Issues Were Raised on the Proposed Rule and What Changes Did the Agency Make From Proposed To Final Rules?*

The following is a section-by-section discussion of issues raised and comments received on the proposed rule, the agency's response, and a description of changes made to the rule.

*Proposed § 294.10—Purpose.* This proposed section identified the agency's goal of providing lasting protection for inventoried roadless areas and other unroaded areas of the National Forest System in the context of multiple-use management.

*Comment on Multiple-Use.* Some respondents commented that the proposed rule did not provide for multiple-use of inventoried roadless areas, since resources cannot always be accessed and developed without roads and, therefore, for example, forest health issues could not be addressed.

*Response.* The Multiple-Use Sustained-Yield Act of 1960 (MUSYA) provides the Forest Service authority to manage national forest and grasslands "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." The NFMA reaffirmed multiple-use and sustained-yield as the guiding principles for land management planning of National Forest System lands (16 U.S.C. 1600, 1604).

In defining "multiple use," the MUSYA, as amended, clearly provides that under multiple-use management some land will be used for less than all of the possible resource uses of the national forests and grasslands. The act also provides that even the establishment of wilderness areas is consistent with the purposes and provisions of the act. The Roadless Area Conservation rule, unlike the establishment of wilderness areas, will allow a multitude of activities including motorized uses, grazing, and oil and gas development that does not require new roads to continue in inventoried roadless areas.

Currently, a wide range of multiple uses is permitted in inventoried roadless areas subject to the management direction in forest plans. A wide range of multiple uses will still be allowable under the provisions of this rule. The National Forest System contains an extensive system of roads measuring approximately 386,000 miles. This final rule will not close or otherwise block access to any of those roads; the final rule merely prohibits the construction of new roads and the

reconstruction of existing roads in inventoried roadless areas.

Under this final rule, management actions that do not require the construction of new roads will still be allowed, including activities such as timber harvesting for clearly defined, limited purposes, development of valid claims of locatable minerals, grazing of livestock, and off-highway vehicle use where specifically permitted. Existing classified roads in inventoried roadless areas may be maintained and used for these and other activities as well. Forest health treatments for the purposes of improving threatened, endangered, proposed, or sensitive species habitat or maintaining or restoring the characteristics of ecosystem composition and structure, such as reducing the risk of uncharacteristic wildfire effects, will be allowed where access can be gained through existing roads or by equipment not requiring roads. Also, see the response to proposed § 294.12 for further discussion of the MUSYA.

*Comment on Forest Plan Amendments.* Many respondents asserted that the rule would supersede forest plans, the National Forest Management Act, and land management planning regulations, and thus exceed existing statutory authority. Others contended that the rule would require an amendment to forest plans.

*Response.* The preamble to the recent NFMA planning regulations identify that "[p]lanning will be conducted at the appropriate level depending on the scope and scale of the issues." The Department went on to note that "[f]undamental to this rule is the notion that there is a hierarchy of scale to be considered when addressing resource management issues, and that it is the nature of the issue that guides the selection of the appropriate scale and level of the organization to address it" (65 FR 67523). The use of rulemaking to address the conservation of inventoried roadless areas is both appropriate and consistent with the NFMA implementing regulations.

Just as development and approval of forest plans must conform to existing laws and regulations, new laws or regulations, including this rule, can supersede existing forest plan management direction. This rulemaking process does not require amendments or revisions to forest plans. However, a Forest or Grassland Supervisor may consider whether an amendment or revision is appropriate given overall circumstances for a particular administrative unit.

*Comment on Roadless Areas in Forest Planning.* A few respondents stated that

the purposed section should require the incorporation of roadless area protection into forest plans.

*Response.* The recently revised regulations at 36 CFR part 219 guiding the development of forest plans (November 9, 2000; 65 FR 67571) contain a requirement at § 219.9(b)(8) that provides additional protection for unroaded and inventoried roadless areas. During the plan revision process, or at other times as deemed appropriate, the responsible official must identify and evaluate inventoried roadless areas and unroaded areas and then determine which, if any, of those areas warrant additional protection and the level of protection to be afforded. For this reason, there is no need to add the suggested language to the purpose section of the final rule. In fact, inclusion of these procedures in the new planning regulations is why the procedures proposed at § 294.13 have been removed from this rule.

*Summary of Changes in Section 294.10 of the Final Rule.* Having considered the comments received, the agency has retained the purpose section with two changes: (1) The sentence has been reorganized to emphasize that the goal of providing lasting protection of roadless areas must occur within the context of multiple-use management; and (2) the agency removed the reference to "other unroaded areas" in this section, since, as already noted, the new land and resource management planning regulations at 36 CFR part 219 provide for evaluation of these areas at the time of land and resource management plan revision (FEIS Vol. 1, 1–16).

*Proposed Section 294.11 Definitions.* This section set out the terms and definitions used in the proposed rule. The proposed rule contained definitions for the following terms: "inventoried roadless areas, responsible official, road, classified road, unclassified road, road construction, road maintenance, road reconstruction, (road) realignment, (road) improvement, (road) rebuilding, unroaded area, unroaded portion of an inventoried roadless area."

*Comment on "Inventoried Roadless Area" Definition.* Some respondents requested a modification of the definition for "inventoried roadless area" to include "undeveloped areas of 1,000 acres and larger" rather than "undeveloped areas exceeding 5,000 acres." Others thought that including references to the minimum criteria for wilderness made the definition too restrictive, eliminating otherwise deserving areas from protection. Some expressed confusion over which inventories were used to determine

inventoried roadless areas, and the possibility of error in identifying inventoried roadless areas.

*Response.* The proposed definition of inventoried roadless areas was based on a group of roadless areas that were evaluated for wilderness consideration beginning in the 1970's and through subsequent planning efforts. With the publication of the DEIS and now the FEIS, the agency can now define these inventoried roadless areas as those areas identified in the set of maps contained in Volume 2 of the FEIS or subsequent revisions. These maps are maintained at the national headquarters of the Forest Service and are the official maps for the final rule. In the event a modification to correct any clerical, typographical, or other technical error is needed, the change will be made to the national headquarters maps and corrected copies of the maps made available to other administrative units. This definition does not apply to future areas that may be inventoried for wilderness consideration or other purposes. This modification, which removed the historical context for the definition of inventoried roadless area, has been included in the final rule.

*Comment on "Unroaded Area" Definition.* The identification of unroaded areas other than those already inventoried was a major issue. It was unclear to some respondents whether the presence of unclassified roads would be a factor in determining whether an area qualified as an unroaded area. Others thought that the definition of "unroaded area" should not include unclassified roads because such areas could not foster isolation, independence, or an undisturbed setting. Others suggested that these issues are better resolved through local land management planning. The public suggested various criteria and processes for the protection and management of these other unroaded areas.

*Response.* These suggestions were considered under procedural alternatives A through D in the DEIS. Since the comment period on the DEIS closed, the consideration of other unroaded areas has been addressed in the context of the final planning regulations at 36 CFR part 219. The agency agreed with the respondents who believed these types of planning issues were more appropriately addressed in the context of the planning rule and local land management planning. Thus, comments on how to consider and manage these other unroaded areas were considered in the preparation of the planning rule. As explained in the discussion of the agency's response to proposed § 294.13

later in this preamble, the provisions of the proposed rule relevant to unroaded areas have been removed. Therefore, the term "unroaded area" is no longer needed.

*Comment on "Responsible Official" Definition.* Some respondents wanted to know whether the responsible official for activities within an inventoried roadless area would be a District Ranger, Forest Supervisor, or Regional Forester.

*Response.* The appropriate responsible official, as defined in the proposed rule, depends on the decision under consideration. For example, District Rangers often make decisions regarding trail construction, special use authorizations, and wildlife habitat improvement projects. Forest Supervisors typically make decisions on major developed recreation sites, large timber sales, and ski area developments. This rule does not alter existing delegations of authority for Forest Service responsible officials. Because the scope of a proposed decision determines who will make the decision, the definition of "responsible official" must be broad enough to embrace the various possibilities. Therefore, the final rule retains, without change, the definition in the proposed rule.

*Comment on "Road" Definition.* Respondents expressed concern that the definition of a road was ambiguous and failed to recognize the primitive travelways used by motorized recreationists. Some respondents were concerned that the definition indicated permission for the construction of a travelway over 50 inches wide for off-road vehicles if the road was determined to be a trail. Other respondents thought that the definition of classified roads should include Revised Statute (R.S.) 2477 roads.

*Response.* For agency consistency, this final rule includes the same definitions of "road," "classified road," "unclassified road," and "temporary road" that are contained in the National Forest System Road Management regulations (36 CFR part 212) and policy (Forest Service Manual 7700 and 7710) transmitted on January 4, 2001 for publication in the **Federal Register**. Based on consideration of public comment received on the road management proposal, these definitions were revised for clarity and a definition for "temporary road" was added.

A trail is established for travel by foot, stock, or trail vehicle, and can be over, or under, 50 inches wide. Nothing in this paragraph as proposed was intended to prohibit the authorized construction, reconstruction, or maintenance of motorized or non-motorized trails that are classified and

managed as trails pursuant to existing statutory and regulatory authority and agency direction (FSM 2350). Nor was anything in this paragraph intended to condone or authorize the use of user created or unauthorized roads or trails. These decisions are made subject to existing agency regulations and policy and that intent has been retained in the final rule.

Future claims and existing rights for R.S. 2477 roads would not be affected by this rule. The agency recognizes valid R.S. 2477 rights-of-way. However, the validity of R.S. 2477 assertions must be evaluated on a case-by-case basis. Therefore, there is no need to modify the definition of classified road for this purpose.

*Comment on Road Management Terms.* Some respondents thought the definitions of "road construction," "maintenance," "reconstruction," "realignment," "improvement," and "rebuilding" were confusing. Others wanted clarification on whether the terms applied only to classified roads, or to unclassified roads as well.

*Response.* As previously noted in this preamble, this final rule includes the definitions of road management terms adopted in the final National Forest System Road Management Rule and policy. The definition of "rebuilding" has been removed; the definition of "road" has expanded to include "temporary road;" and the other terms were revised in the final road management policy and are used verbatim in this rule for consistency.

*Comment on "Unroaded Portion of an Inventoried Roadless Area" Definition.* Many respondents considered the term and definition of "unroaded portion of an inventoried roadless area" confusing and remarked that they did not understand how it would be applied. In response to the identified preferred alternative in the FEIS, which would have applied the prohibitions to developed portions of inventoried roadless areas, respondents questioned why the agency would seek to protect roadless area values and characteristics in areas that have already been roaded and had timber harvest, thereby negating the very characteristics this rule seeks to protect.

*Response.* One of the primary objectives of this rulemaking was to resolve the longstanding controversies surrounding management of inventoried roadless areas. Without additional clarification, the definition of "unroaded portion of an inventoried roadless area" could have begun a new round of land management plan inventories and controversy about how to identify the boundary between the

roaded and unroaded portions of these areas. This had the potential to increase rather than reduce the number of appeals and lawsuits surrounding inventoried roadless area management.

The agency agreed that the terminology and definition in the proposed rule were confusing. Therefore, it proposed in the FEIS eliminating this definition and applying the prohibitions to the entire area within an inventoried roadless area boundary.

To resolve the agency's concern about extending the controversy to future land management planning and to address the public concern about precluding timber harvesting in the portions of inventoried roadless areas that no longer possess roadless characteristics, § 294.13(b)(4) has been added. This paragraph allows timber to be cut, sold, or removed in the portions of inventoried roadless areas where roadless values and characteristics have been substantially altered due to road construction and subsequent timber harvest after the area was inventoried. No new road construction would be allowed. Decisions on whether or not an inventoried roadless area's characteristics have been substantially altered would occur during project planning and decisionmaking.

In response to the proposed rule, some respondents questioned why the agency would only exempt those portions developed after an area was inventoried, rather than exempting all developed portions regardless of when the road construction and timber harvest occurred. Some inventoried roadless areas, particularly those in the East, contained roads at the time of their inventory and timber may also have been harvested in these areas. However, the agency assumes that these prior existing developments and activities did not substantially alter the areas' roadless values and characteristics, or they would not have been inventoried for possible wilderness consideration.

For the reasons described, the term "unroaded portion of an inventoried roadless area" is no longer necessary and has been removed from the definitions in the final rule.

*Comment on "Roadless Area Characteristics."* Some respondents wanted additions to the list of roadless area characteristics identified in proposed § 294.13(a), more specific characteristics for each inventoried roadless area, clarification as to their meaning, and to know how they would be used in the evaluation of inventoried roadless areas and unroaded areas during forest plan revision.

*Response.* Although the term "roadless area characteristics" was not defined in the proposed rule, proposed § 294.13 did include the list of characteristics. While proposed § 294.13 was not retained in the final rule for reasons described in the section of this preamble entitled "Consideration of Roadless Area Conservation During Forest Plan Revision," the roadless area characteristics remain fundamental to the environmental analysis of the alternatives considered in this rulemaking and are critical to evaluating whether trees may be cut, removed, or sold from inventoried roadless areas pursuant to the provisions at § 294.13(b). For these reasons, the list of roadless area characteristics has been reformatted with minor changes for clarification and added to the definitions in § 294.11 of the final rule.

The definition of roadless area characteristics includes "other locally identified unique characteristics" to capture unique characteristics specific to individual inventoried roadless areas identified during local land management planning. Therefore, it is not necessary to identify, in this rule, characteristics for each inventoried roadless area or to add to the list in the definition. A more detailed description of these characteristics is in the section of this preamble entitled "Roadless Area Values and Characteristics".

*Summary of Changes in § 294.11 of the Final Rule.* The definitions section of the final rule reflects the preceding responses to comments received. Revisions have been made in the road management definitions included in § 294.11 to achieve consistency with the final National Forest System Road Management Rule as well as with the provisions of the final National Forest System Land and Resource Management Planning Rule. The terms "unroaded portion of an inventoried roadless area" and "unroaded area" were removed from the definitions. The first sentence was removed from the proposed rule's definition of "inventoried roadless area" because, while the sentence provided historical context, it was not necessary for the definition. The definition of "roadless area characteristics" has been added.

*Proposed Section 294.12. Prohibition on road construction and reconstruction in inventoried roadless areas.* This section of the proposed rule identified the road construction and reconstruction prohibitions, and exemptions and exceptions to the prohibitions. Paragraph (a) of proposed § 294.12 prohibited road construction and reconstruction in the unroaded portions of inventoried roadless areas,

except for the circumstances listed in proposed paragraphs (b)(1) through (b)(4) and paragraph (c).

*Comment on Agency Authority.* The agency received many comments questioning whether the Forest Service had the authority to prohibit road construction through this rulemaking process, and whether the proposed rule was in conflict with existing environmental and land management laws and policies.

*Response.* The Forest Service routinely makes decisions to construct or not construct roads for a variety of purposes. The Secretary has clear authority to promulgate this rule, and this rule does not conflict with existing law and policy. The foundation for any exercise of power by the Federal government is the United States Constitution. The Constitutional provision that provides authority for management of public lands is the Property Clause (Article IV, Section 3). The Property Clause states that Congress has the power to dispose of and make all needful rules and regulations respecting land or other property belonging to the United States. Using this authority, Congress entrusted the Secretary of Agriculture with broad powers to protect and administer the National Forest System by passing laws, such as the Organic Administration Act of 1897 (the Organic Act), the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), and the National Forest Management Act of 1976 (NFMA).

The duties that Congress assigned to the Secretary include regulating the occupancy and use of National Forest System lands and preserving the forests from destruction (16 U.S.C. 551). Through the MUSYA, Congress directed the Secretary to administer the National Forest System for multiple-use and sustained-yield of renewable resources without impairment of the productivity of the land (16 U.S.C. 528–531), thus establishing multiple-use as the foundation for management of national forests and grasslands. These multiple uses include outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The statute defines "multiple use" broadly, calling for management of the various uses in the combination that will best meet the needs of the American people (16 U.S.C. 531). Under this framework, courts have recognized that the MUSYA does not envision that every acre of National Forest System land be managed for every multiple use, and does envision some lands being used for less than all of the resources. As a consequence, the agency has wide discretion to weigh and decide the proper uses within any area (*Wind-River*

*Multiple-use Advocates* v. *Espy,* 835 F. Supp. 1362, 1372 (D.Wyo.1993)).

In passing the MUSYA, Congress also affirmed the application of sustainability to the broad range of resources the Forest Service manages, and did so without limiting the agency's broad discretion in determining the appropriate resource emphasis and mix of uses. Some of the agency's past decisions have been challenged in court, leading to judicial decisions interpreting the extent of Forest Service discretion, or judgment, in managing National Forest System lands. Courts have routinely held that the Forest Service has wide discretion in deciding the proper mix of uses within any area of National Forest System lands. In the words of the Ninth Circuit Court of Appeals, the agency's authority pursuant to the MUSYA "breathes discretion at every pore." (*Perkins* v. *Bergland,* 608 F.2d 803, 806 (9th Cir.1979)).

The NFMA reaffirmed multiple-use and sustained-yield as the guiding principles for land management planning of National Forest System lands (16 U.S.C. 1600, 1604). Together with other applicable laws, the NFMA authorizes the Secretary of Agriculture to promulgate regulations governing the administration and management of the National Forest Transportation System (16 U.S.C. 1608) and other such regulations as the Secretary determines necessary and desirable to carry out the provisions of the NFMA (16 U.S.C. 1613). These laws complement the long-standing authority of the Secretary to regulate the occupancy and use of the National Forest System (16 U.S.C. 551).

*Comment on National Prohibitions* vs. *Local Decisionmaking.* Many respondents supported the proposed national prohibition on new road construction in inventoried roadless areas. Other respondents felt there should not be a national prohibition because this would eliminate the option of making local decisions based on public input. Others felt the decisions regarding construction of roads in inventoried roadless areas should be made when forest plans are revised.

*Response.* The agency has addressed this issue in detail at the outset of this final rule. At the national level, Forest Service officials have the responsibility to consider the "whole picture" regarding the management of the National Forest System, including inventoried roadless areas. Local land management planning efforts may not always recognize the national significance of inventoried roadless areas and the values they represent in an increasingly developed landscape. If

management decisions for these areas were made on a case-by-case basis at a forest or regional level, inventoried roadless areas and their ecological characteristics and social values could be incrementally reduced through road construction and certain forms of timber harvest. Added together, the nationwide results of these reductions could be a substantial loss of quality and quantity of roadless area values and characteristics over time.

On many national forests and grasslands, roadless area management has been a major point of conflict in land management planning. The controversy continues today, particularly on most proposals to harvest timber, build roads, or otherwise develop inventoried roadless areas. The large number of appeals and lawsuits, and the extensive amount of congressional debate over the last 20 years illustrates the need for national direction and resolution and the importance many Americans attach to the remaining inventoried roadless areas on National Forest System lands (FEIS Vol. 1, 1–16). These disputes are costly in terms of both fiscal resources and agency relationships with communities of place and communities of interest. Based on these factors, the agency decided that the best means to reduce this conflict is through a national level rule.

*Comment on Access.* The agency received many comments questioning how the proposed rule would affect access to lands that the agency does not manage, such as State lands or private inholdings, and access pursuant to the General Mining Law of 1872.

*Response.* This rule does not affect a State's or private landowner's right of access to their land. The proposed rule did not close any roads or off-highway vehicle (OHV) trails. The proposed rule provided for the construction and reconstruction of roads in inventoried roadless areas where needed pursuant to existing or outstanding rights, or as provided for by statute or treaty, including R.S. 2477 rights, access to inholdings under the Alaska National Interest Lands Conservation Act (ANILCA) provisions, or circumstances where a valid right-of-way exists.

The most common right of access to non-federally owned property surrounded by National Forest System lands is a road constructed or reconstructed on those National Forest System lands. The final rule at § 294.12(b)(3) provides for construction or reconstruction of a road in an inventoried roadless area "if the Responsible Official determines that * * * a road is needed pursuant to

reserved or outstanding rights, or as provided for by statute or treaty." For example, the ANILCA provides a landowner a right of access across National Forest System lands in certain circumstances, and this rule does not amend or modify that statute.

Title 36 part 251 of the Code of Federal Regulations implements the ANILCA access provisions and sets forth the procedures by which landowners may apply for access across National Forest System lands; this rule does not amend or modify that regulation. Access to non-Federal land does not have to be a road in all cases, nor does it have to be the most economical, direct, or convenient for the landowner, although the agency tries to be sensitive to the cost in time and money to the inholder. The cost to construct or reconstruct road access to non-Federal lands is usually the responsibility of the inholder, not the Forest Service. During the application process for such access, applicable laws, such as the National Environmental Policy Act and the Endangered Species Act, still must be considered.

Access for the exploration of locatable minerals pursuant to the General Mining Law of 1872 is not prohibited by this rule. Nor is reasonable access for the development of valid claims pursuant to the General Mining Law of 1872 prohibited. In some cases, access other than roads may be adequate for mineral activities. This access may include, but is not limited to, helicopter, road construction or reconstruction, or non-motorized transport. Determination of access requirements for exploration or development of locatable minerals is governed by the provisions of 36 CFR part 228.

*Comments on Effect on Fire Suppression.* Numerous respondents expressed concern with the effect of a road construction prohibition on fire fighter safety and access to suppress wildland fires.

*Response.* Proposed § 294.12(b)(1) allowed road construction and reconstruction in inventoried roadless areas when a road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event. In addition, using such suppression resources as smokejumpers and fire crews delivered by helicopters, the current fire suppression organization has been effective in suppressing at a small size approximately 98% of wildland fire starts in inventoried roadless areas. The agency also typically prioritizes fighting roadless and wilderness fires lower than fighting fires in more accessible and populated areas. The Agency has a long

history of successfully suppressing fires in inventoried roadless areas and this high level of suppression performance is expected to continue. Furthermore, the agency rarely builds new roads to suppress fires. Building roads into inventoried roadless areas would likely increase the chance of human-caused fires due to the increased presence of people. Fire occurrence data indicates that prohibiting road construction and reconstruction in inventoried roadless areas would not cause an increase in the number of acres burned by wildland fires or in the number of large fires (FEIS Vol. 1, 3–115).

*Comment on Including Other Unroaded Areas.* Some respondents asserted that prohibitions should be applied to all roadless areas, not just inventoried roadless areas.

*Response.* The agency had adequate information to assess the effects of implementing the prohibition of road construction and limited timber harvesting in inventoried roadless areas. There was not sufficient information to make a decision regarding other uninventoried unroaded areas. Furthermore, the agency decided that these uninventoried unroaded areas would be better evaluated in the context of the new planning regulations at 36 CFR part 219.

*Comment on Relationship to Other Rulemakings.* Some respondents have questioned whether the agency has adequately integrated the decision to prohibit road construction and timber harvesting in inventoried roadless areas with other agency rulemaking efforts.

*Response.* The objective of conserving inventoried roadless areas reflects current scientific understanding of the importance of inventoried roadless area ecosystems and changing values of society as evidenced by comments received on this proposal.

This final roadless area conservation rule is entirely consistent with other Forest Service rulemaking and policy efforts, including the agency's final planning rule at 36 CFR part 219 (November 9, 2000; 65 FR 67514) and newly adopted National Forest System Road Management regulations (36 CFR part 212) and policy (Forest Service Manual 7700 and 7710). It is also consistent with the report of Secretaries Babbitt and Glickman to the President, *Managing the Impacts of Wildfire on Communities and the Environment* (September 8, 2000), the agency's *Protecting People and Sustaining Resources in Fire-Adapted Ecosystems: A Cohesive Strategy* (November 9, 2000; 65 FR 67480), and ongoing efforts to reduce the risk of fire to communities and the environment.

The planning rule provides the overall framework for planning and management of the National Forest System. No provisions in the Roadless Area Conservation rule would require land management or project planning, although managers may decide to initiate plan revisions. However, this final rule does complement the key sustainability, science, and spatial decisionmaking issues raised by the planning rule.

The planning rule also requires that during the plan revision process, or at other times as deemed appropriate, the responsible official must identify and evaluate inventoried roadless areas and unroaded areas and then determine which inventoried roadless areas and unroaded areas warrant additional protection and the level of protection to be afforded. This provision is similar to the procedural requirements proposed in May 2000, as part of the proposed Roadless Area Conservation Rule. Given their inclusion in the final planning rule, the procedural provisions have been removed from this final rule. As disclosed in the DEIS, the proposed procedures do not directly result in adverse physical or biological environmental effects, nor do the procedures cause irreversible or irretrievable resource commitments (DEIS Vol. 1, 3–223). The FEIS disclosed the combined effects of the final planning rule and the final roadless rule as being complementary, not additive (FEIS Vol. 1, 3–397; see also 65 FR 67529).

The National Forest System Road Management regulations and policy are designed to make the agency's existing road system more safe, responsive to public needs, environmentally sound, and affordable to manage. Elements of the regulation and policy requiring planning would be completed using the new planning rules. For example, under the road management policy, national forests and grasslands would have to complete an analysis of their existing road system and then incorporate this analysis into their land management plans. Consistent with the planning rule, this would be accomplished by using a science-based analysis procedure and by working cooperatively with other agency partners and the public.

Together, these requirements ensure that roadless areas and their important social and ecological characteristics will be conserved for present and future generations based on the principles of sustainability, sound science, and collaboration. The Forest Service has coordinated development of each of these rulemakings to ensure that the rules are integrated and consistent. In addition, consistency in the definitions and program emphases has been assured. The resulting rulemaking efforts efficiently align priorities and resources to implement the agency's statutory responsibilities (FEIS Vol. 1, 1–18 to 1–20).

*Comment on Application to the Tongass National Forest.* The agency received many comments regarding the Tongass National Forest. Many respondents stated that the Tongass should not be exempt from the provisions of the proposed rule. Others, concerned that local communities had already experienced substantial social and economic effects due to the recent revision of the Tongass Land and Resource Management Plan and other factors, thought that the Tongass should be exempt from the provisions of the proposed rule. Some respondents stated that the Forest Service should defer action on the Tongass National Forest until the next plan revision.

*Response.* In both the DEIS and FEIS, using the best available science and data, the agency considered the alternatives of exempting and not exempting the Tongass National Forest, as well as deferring a decision per the proposed rule. Social and economic considerations were key factors in analyzing those alternatives, along with the unique and sensitive ecological character of the Tongass National Forest, the abundance of roadless areas where road construction and reconstruction are limited, and the high degree of ecological health. In developing the proposed action, the agency sought to balance the extraordinary ecological values of the Tongass National Forest against the needs of the local forest dependent communities in Southeast Alaska.

With the recent closure of pulp mills and the ending of long-term timber sale contracts, the timber economy of Southeast Alaska is evolving to a competitive bid process. About two-thirds of the total timber harvest planned on the Tongass National Forest over the next 5 years is projected to come from inventoried roadless areas. If road construction were immediately prohibited in inventoried roadless areas, approximately 95 percent of the timber harvest within those areas would be eliminated (FEIS Vol. 1, 3–202).

The Tongass National Forest is part of the northern Pacific coast ecoregion, an ecoregion that contains one fourth of the world's coastal temperate rainforests. As stated in the FEIS, the forest's high degree of overall ecosystem health is due to its largely undeveloped nature including the quantity and quality of inventoried roadless areas and other special designated areas. Alternatives that would immediately prohibit new road construction and timber harvest in all inventoried roadless areas would most effectively protect those values. Other alternatives that exempt, delay, or limit the application of the prohibitions would offer less protection. The environmental impacts of these alternatives are disclosed in Chapter 3 of the FEIS.

The proposed rule would have deferred a decision on whether or not the prohibitions should be applied to the Tongass National Forest until April 2004. This would have allowed an adjustment period for the timber program in Southeast Alaska to occur under provisions of the 1999 Record of Decision for the Tongass Land and Resource Management Plan Revision, but would not have assured long-term protection of the Forest's unique ecological values and characteristics.

In response to public comments, an optional social and economic mitigation measure was considered under the Tongass Not Exempt alternative that would require implementation of the final rule on the Tongass, but delay this implementation until April 2004, to provide a transition period for local communities to adjust to changes that would occur when the prohibitions take effect.

The final rule applies immediately to the Tongass National Forest but adopts a mitigation measure that both assures long-term protection and a smooth transition for forest dependent communities. The final rule provides that the prohibitions do not apply to road construction, reconstruction, and the cutting, sale or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability for a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. This mitigation measure allows an adjustment period for the timber program in Southeast Alaska, but will also assure more certain long-term protection of the Forest's unique ecological values and characteristics.

Allowing road construction and reconstruction on the Tongass National Forest to continue unabated would risk the loss of important roadless area values. The agency had sufficient information to analyze the environmental, social, and economic effects of prohibiting road construction, reconstruction, and limited timber harvesting on the Tongass National Forest and did not see the value in

deferring the issue to further study prior to making a decision.

Moreover, this course of action is consistent with the provisions of the Tongass Timber Reform Act (TTRA). While the TTRA urges the Forest Service to "seek to meet market demand" for timber from the Tongass National Forest, the TTRA does not envision an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation. (*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison, 67 F.3d 723, 731 (9th Cir. 1995)*). The record for this rulemaking fully supports the imposition of the prohibitions on the Tongass National Forest. However, in inventoried roadless areas the Tongass National Forest has 261 MMBF of timber under contract and 386 MMBF under a notice of availability for a DEIS, FEIS, or Record of Decision. In addition, the Tongass has 204 MMBF available in roaded areas that is sold, has a Record of Decision, or is currently in the planning process. This total of 851 MMBF is enough timber volume to satisfy about 7 years of estimated market demand.

Based on the analysis contained in the FEIS, a decision to implement the rule on the Tongass National Forest is expected to cause additional adverse economic effects to some forest dependent communities (FEIS Vol. 1, 3–326 to 3–350). During the period of transition, an estimated 114 direct timber jobs and 182 total jobs may be affected. In the longer term, an additional 269 direct timber jobs and 431 total jobs may be lost in Southeast Alaska. However, the Department believes that the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to those local communities and that a period of transition for affected communities would still provide certain and long term protection of these lands.

The special provision at § 294.14(d) of the final rule allowing road construction, reconstruction, and the cutting, sale, or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability of a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register** is considered necessary because of the unique social and economic conditions where a disproportionate share of the impacts are experienced throughout the entire Southeast Alaska region and concentrated most heavily in a few communities.

*Comment on Exceptions and Conflict with Purpose of the Rule.* Another major issue was whether there should be exemptions or exceptions from the prohibitions. A few respondents stated that the exceptions and exemptions to the prohibitions set out in proposed § 294.12 conflicted with the stated purpose of the rule. A summary of the major comments on this issue and the agency's responses follow.

*Response.* The exceptions to the prohibitions on road construction in inventoried roadless areas found at proposed § 294.12 responded to specific circumstances where the prohibitions might conflict with legal responsibilities to provide for public health and safety or environmental protection (FEIS Vol. 1, 2–13 to 2–14). In some cases, the exceptions could result in effects contrary to the purpose stated in the proposed rule, but the agency determined that they were necessary to honor existing law or address social or economic concerns. While the exceptions and exemptions place limited restrictions on the application of the prohibition, the stated purpose of the rule remains valid. These exceptions were only relevant to FEIS action Alternatives 2 through 4, as Alternative 1 (no action) did not prohibit any activities.

The public health and safety exception at paragraph (b)(1) in the final rule applies only when needed to protect public health and safety in cases of an imminent threat of a catastrophic event that might result in the loss of life or property. It does not constitute permission to engage in routine forest health activities, such as temporary road construction for thinning to reduce mortality due to insect and disease infestation.

The exception in paragraph (b)(2) permits entry for activities undertaken pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and other identified statutes. An example of an allowable CERCLA activity is mitigating the leaching of toxic chemicals from an abandoned mine.

Paragraph (b)(3) permits the construction and reconstruction of a road pursuant to rights granted in statute or treaty, or pursuant to reserved or outstanding rights. These include, but are not limited to, rights of access provided in ANILCA, highway rights-of-way granted under R.S. 2477, and rights granted under the General Mining Law of 1872, as amended. Rights of reasonable access for mineral exploration and development of valid claims would be governed by the

General Mining Law under any of the alternatives considered in the FEIS. These rights of access may or may not include new road construction as discussed elsewhere in this preamble. Therefore, rights of access to locatable mineral exploration and development of valid claims would not be affected by the final rule or any of the alternatives analyzed in the FEIS (FEIS Vol. 1, 3–254).

Paragraph (b)(4) in the final rule permits realignment of an existing classified road when it is found to cause irreparable resource damage because of its design, location, use, or deterioration. The road must be essential for public or private access, natural resource management, or public health and safety. For the realignment exception to apply, the original road must have caused the resource damage and the resource damage cannot be corrected or mitigated by maintenance alone. Following realignment, treatment of the old roadway may include a variety of methods, such as decommissioning or by converting it to another use. An example of a situation where realignment may be appropriate is the presence of a classified road contributing sediment to a stream that is important spawning or rearing habitat for an endangered species of fish, and the sediment is having an adverse impact on the fish or its habitat. Realignment of the classified road and decommissioning the old roadway to eliminate the sediment caused by the old roadway is appropriate.

After considering the public comment on the proposed rule and conducting further analysis, three other exceptions were added to the final rule at § 294.12(b). New paragraph (5) is an exception to the prohibition to allow for reconstruction of a classified road if needed for safety based on accident experience or accident potential on that road. This exception allows for realignment or improvement in situations where road location or design is a threat to health or safety, and reconstruction would reduce that threat. New paragraph (6) was added to mitigate potential social and economic impacts in response to comments on the effects this rule might have on some State highway projects proposed as part of the National Highway System. These exceptions were not a major consideration in evaluating differences among the FEIS action alternatives because they apply to all of the prohibition alternatives. The agency considered other exemptions and exceptions, but eliminated them from detailed study (FEIS Vol. 1, 2–21 to 2–22).

An additional optional exception was considered in detail in the FEIS as a social and economic mitigation measure and was available for selection with any alternative. This exception would have allowed road construction or reconstruction where a road is needed for prospective mineral leasing activities in inventoried roadless areas (FEIS Vol. 1, 2–9). If road construction and reconstruction were allowed for all future mineral leasing, an estimated 59 miles of new roads could be constructed in inventoried roadless areas over the next five years. Road construction or reconstruction in support of future mineral leasing could continue at this level or in greater amounts into the foreseeable future. The agency estimates more than 10 million acres of inventoried roadless area could be roaded for exploration and development of leasable minerals, although the agency believes it is unlikely that more than a small percentage of these acres would contain minerals sufficient for economic development (FEIS Vol. 1, 3–250 to 260 and 313 to 321). Mineral leasing activities not dependent on road construction, such as directional (slant) drilling and underground development, would not be affected by the prohibition.

The Department has decided not to adopt the exception for future discretionary mineral leasing as identified in the FEIS because of the potentially significant environmental impacts that road construction could cause to inventoried roadless areas. Existing leases are not subject to the prohibitions. The Department has decided to adopt a more limited exception at 36 CFR 294.12(b)(7) to allow road construction needed in conjunction with the continuation, extension, or renewal of a mineral lease, on lands that were under lease by the Secretary of the Interior as of the date of publication of this rule in the **Federal Register**. Additionally, road construction needed in conjunction with a new lease may be allowed on these same lands if the lease is issued immediately upon expiration of the existing lease. The lessee would be required to start the process for issuance of a new lease prior to the expiration of the existing lease. Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant

to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.

This provision allows, but does not require, road construction and reconstruction. These decisions would be made through the regular NEPA process. For example, this paragraph does not supersede land management plan prescriptions that prohibit road construction. This exception only applies to lands in inventoried roadless areas that are currently under mineral lease. The agency has less than 1 million acres of high potential oil and gas currently under mineral lease. This provision maintains the status quo for entities that currently hold mineral leases, while at the same time limiting the potential impacts on roadless area characteristics within this identified set of lands.

*Comment on Potential Misuse of Exceptions.* Some respondents felt there should not be any exceptions to the prohibition on construction of roads in inventoried roadless areas, out of fear that the exceptions would be used in situations not intended. These respondents wanted to know who would review decisions granting the exceptions.

*Response.* The Department believes that exceptions to the prohibitions on road construction and reconstruction are warranted to address legal, social, economic, and environmental concerns. Projects proposed under any of the exceptions would still have to comply with all legal requirements and agency policy related to environmental analysis and public involvement. Depending on the specific circumstances of a particular exception, decisions would be subject to administrative appeal or internal review.

*Comment on Multiple-Use Exception.* Some respondents requested an additional exception to the road construction prohibition, whereby the Department would insert "A road is needed to carry out the multiple-uses provided for in the authorities cited for these regulations." in §294.12(b) of the proposed rule.

*Response.* The addition of the proposed exception would allow road construction in inventoried roadless areas for any multiple-use purpose, which would be counter to the purpose of protecting roadless areas.

*Comment on Private Land and Utility Company Exceptions.* Some respondents stated that the construction of roads should be allowed to access State or private lands and water diversions and dams. Utility companies

expressed concern that they would be unable to access existing facilities in an emergency, such as a pipeline rupture or a transmission line toppled by a landslide, and that the exception at proposed paragraph (b)(1) should be expanded to accommodate access to utility facilities in order to ensure their safe operation.

*Response.* The proposed rule did not suspend or modify existing permits, contracts, or other legal instruments authorizing the use and occupancy of National Forest System lands. Existing roads or trails would not have been closed by the proposed rule, and existing rights of access were recognized. The final rule retains all of the provisions that recognize existing rights of access and use. Where access to these facilities is needed to ensure safe operation, a utility company may pursue necessary authorizations pursuant to the terms of the existing permit or contract. Additionally, the examples described by the utility companies could qualify for an emergency exception under paragraph (b)(1) of the final rule depending on local circumstances and risk to public health and safety.

*Comment on Federal and State Highway Exceptions.* Some respondents stated that the final rule should permit road construction, realignment, and reconstruction of Federal and State highways.

*Response.* In response to public comments, the agency has included an exception that would allow road projects funded under Title 23 of the United States Code (23 U.S.C. 317) to occur in inventoried roadless areas. The final rule at §294.12(b)(6) allows for construction, reconstruction, or realignment of a Federal Aid Highway where the Secretary determines that the project is in the public interest or consistent with the purposes for which the land was reserved or acquired, is reasonable and prudent, and no other feasible alternative exists (FEIS Vol. 1, 2–9 to 2–14).

*Summary of Changes in section 294.12 of the Final Rule.* Paragraph (a) of the final rule has been revised consistent with the changes in the definitions of "inventoried roadless areas" and "road," to remove the phrases "the unroaded portions of" and "This prohibition covers classified and unclassified roads," respectively.

Paragraph (b) in the final rule sets out certain limited exceptions to the prohibition on road construction and road reconstruction. The first four exceptions were adopted essentially as proposed with minor editing for clarity and three more exceptions were added.

Paragraph (c) of the proposed rule, which described the rule's application to the Tongass National Forest, has been removed. This change immediately applies the prohibitions in the rule to the Tongass National Forest, except as provided in a new paragraph applicable to the Tongass National Forest, which is added at § 294.14(d).

Proposed paragraph (d) is redesignated as paragraph (c) in the final rule. This paragraph permits maintenance activities for classified roads included in an inventoried roadless area, and is adopted essentially as proposed but with minor editing for clarity.

*Final section 294.13. Prohibition on timber cutting, sale, or removal in inventoried roadless areas.* The final rule adds a new prohibition on timber harvesting (the cutting, sale, or removal of timber) except for clearly defined, limited purposes; when incidental to the implementation of an activity not otherwise prohibited by this rule; for personal and administrative uses; or where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after an area was designated an inventoried area. Even though this provision was not in the proposed rule, the DEIS analyzed timber harvesting prohibition alternatives for public comment and the FEIS identified a preferred alternative that included both timber harvesting and road construction prohibitions. Therefore, the public had sufficient opportunity to comment on this provision and there is adequate information to make a reasoned and informed decision.

Alternative 3 in the FEIS would prohibit timber harvesting except for stewardship and other limited purposes. Concerns over potential confusion of the interpretation of "stewardship" have led the agency to clearly define at § 294.13(b)(1) through (b)(4) the limited circumstances where the cutting, sale, or removal of timber in inventoried roadless areas is permitted. The final rule embodies Alternative 3, but, in contrast to the FEIS, the term "stewardship" does not appear in the final rule.

The cutting, sale, or removal of trees must be clearly shown through project level analysis to contribute to the ecological objectives described in § 294.13(b)(1), or under the circumstances described in paragraphs (b)(2) through (b)(4). Such management activities are expected to be rare and to

focus on small diameter trees. Thinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects would be permissible.

Because of the great variation in stand characteristics between vegetation types in different areas, a description of what constitutes "generally small diameter timber" is not specifically included in this rule. Such determinations are best made through project specific or land and resource management plan NEPA analyses, as guided by ecological considerations such as those described below.

The intent of the rule is to limit the cutting, sale, or removal of timber to those areas that have become overgrown with smaller diameter trees. As described in the FEIS (Vol. 1, 3–76), areas that have become overgrown with shrubs and smaller diameter trees creating a fuel profile that acts as a "fire ladder" to the crowns of the dominant overstory trees may benefit ecologically from thinning treatments that cut and remove such vegetation. The risk of uncharacteristic fire intensity and spread may thus be reduced, provided the excess ladder fuels and unutilized coarse and fine fuels created by logging are removed from the site (FEIS Vol. 1, 3–91). Also, in some situations, cutting or removal of small diameter timber may be needed for recovery or conservation of threatened, endangered, proposed or sensitive species to improve stand structure or reduce encroachment into meadows or other natural openings.

In any event, all such determinations of what constitutes "generally small diameter timber" will consider how the cutting or removal of various size classes of trees would affect the potential for future development of the stand, and the characteristics and inter-relationships of plant and animal communities associated with the site and the overall landscape. Site productivity due to factors such as moisture and elevational gradients, site aspect, and soil types will be considered, as well as how such cutting or removal of various size classes of standing or down timber would mimic the role and legacies of natural disturbance regimes in providing the habitat patches, connectivity, and structural diversity critical to maintaining biological diversity. In all cases, the cutting, sale, or removal of small diameter timber will be consistent with maintaining or improving one or

more of the roadless area characteristics as defined in § 294.11.

*Comment on Scope of the Prohibitions.* Many respondents urged the agency to expand the prohibitions to prohibit timber harvesting, mining, and other activities that harm the undeveloped characteristics of inventoried roadless areas.

*Response.* In preparing the FEIS, the scope of prohibited actions considered in detail was limited to road construction, road reconstruction, and timber harvesting, because these activities pose disproportionately greater risks of altering and fragmenting natural landscapes at regional and national scales (FEIS Vol. 1, 1–15 to 1–16). In addition, the agency can analyze potential social and ecological effects based on the five-year timber sale program of each national forest. Other uses, although potentially as harmful to roadless area values and characteristics, are not scheduled in such a fashion and are more appropriately reviewed through land and resource management planning.

The agency has decided to prohibit timber harvesting because it provides additional protection for roadless area characteristics beyond that provided by a prohibition on road construction alone. However, the agency agrees with those respondents who asserted that science-based forest management might require some level of vegetative management in inventoried roadless areas. Thus, the agency has decided to allow some timber harvesting for clearly defined purposes in the final rule at 294.13(b)(1) through (b)(4).

*Comment on Wildlife Habitat Management.* Many respondents, including some State wildlife management agencies, were concerned that a timber harvest prohibition would preclude all wildlife habitat management opportunities.

*Response.* As provided by final 294.13(b)(1), tree cutting for wildlife habitat improvement could proceed if it is designed to maintain or help restore ecosystem composition or structure to conditions within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period. This will allow the agency to manage for the full range of habitat types needed to support the diversity of native and desired non-native species.

*Comments on Uncharacteristic Wildfire Effects.* Of particular interest to many respondents because of the severity of the 2000 fire season, was how the agency would manage inventoried roadless areas to reduce the risk of uncharacteristic wildfire effects.

*Response.* The effects of uncharacteristic wildfires often include unnatural increases in wildfire size, severity, and resistance to control and the associated impacts to people and property. These uncharacteristic effects have been caused primarily by past wildfire suppression, and past timber harvesting and grazing practices. These have contributed to often-dramatic changes in some areas in wildfire frequency, size, and severity (FEIS Vol. 1, 3–72 to 3–73). The vegetative structure, density, and composition of these areas have changed when compared to less altered ecosystems (FEIS Vol. 1, 3–144).

The use of timber harvesting, as permitted by this rule, and other fuel management techniques will help maintain ecosystem composition and structure within its historic range of variability at the landscape scale. Treatment priorities will be consistent with those identified in the report Protecting People and Sustaining Resources in Fire-Adapted Ecosystems: A Cohesive Strategy (November 9, 2000; 65 FR 67480). These include wildland-urban interface areas, readily accessible municipal watersheds, and threatened and endangered species habitat. Since wildland-urban interface areas and readily accessible municipal watersheds rarely occur in or adjacent to inventoried roadless areas, most fire hazard reduction work would not begin in inventoried roadless areas for at least 20 years, the estimated time it would take to address the extremely hazardous fuel situations outside inventoried roadless areas (FEIS Vol. 1, 3–78). However, hazardous fuels treatment in inventoried roadless areas is not prohibited by this rule, so long as road construction or reconstruction is not necessary. Vegetative management would focus on removing generally small diameter trees while leaving the overstory trees intact. The cutting, sale, or removal of trees pursuant to 294.13(b)(1) must be clearly shown through project level analysis to contribute to the ecological objectives described. Such management activities are expected to be rare and to focus on small diameter trees. Thinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects would be permissible.

*Summary of Changes in new section 294.13 of the Final Rule.* The final rule adds a new prohibition on timber harvesting except for clearly defined, limited purposes, when incidental to

the implementation of a management activity not otherwise prohibited by this rule; for personal or administrative use; or where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Paragraph (a) establishes a prohibition on timber cutting, sale, or removal in inventoried roadless areas except as provided in paragraph (b). Paragraph (b) makes clear that the cutting, sale, or removal of timber in inventoried roadless areas is expected to be infrequent, but allows timber cutting, sale, or removal as identified in paragraphs (b)(1) through (b)(4).

Paragraph (b)(1) allows generally small diameter timber to be cut, sold, or removed in inventoried roadless areas where it maintains one or more of the roadless area characteristics as defined in § 294.11 and: (1) improves habitat for threatened, endangered, proposed or sensitive species or (2) maintains or restores the characteristics of ecosystem composition and structure, such as to reduce uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

Paragraph (b)(2) allows timber cutting, sale, or removal in inventoried roadless areas when incidental to implementation of a management activity not otherwise prohibited by this rule. Examples of these activities include, but are not limited to trail construction or maintenance; removal of hazard trees adjacent to classified roads for public health and safety reasons; fire line construction for wildland fire suppression or control of prescribed fire; survey and maintenance of property boundaries; other authorized activities such as ski runs and utility corridors; or for road construction and reconstruction where allowed by this rule.

Paragraph (b)(3) allows timber cutting, sale, or removal for personal or administrative use as provided for at 36 CFR part 223. Personal use includes activities such as Christmas tree and firewood cutting. Administrative use includes providing materials for activities such as construction of footbridges and fences.

Paragraph (b)(4) allows the cutting, sale, or removal of timber where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. The road construction and subsequent timber harvest must have occurred after the

area was designated an inventoried roadless area and prior to the date of publication of this rule in the **Federal Register**. Timber may be cut, sold, or removed only in the substantially altered portion of the inventoried roadless area. This exception recognizes that road construction and timber harvesting in inventoried roadless areas may have altered the roadless characteristics to the extent that the purpose of protecting those characteristics cannot be achieved. Timber harvest should not expand the area already substantially altered by past management. This exception is subject to applicable laws, regulations, and land and resource management planning direction. Refer to the previous discussion in "Comment on Unroaded Portion of an Inventoried Roadless Area" in the "Proposed § 294.11 Definitions" section of this preamble for more information on this subject.

*Proposed 294.13. Consideration of roadless area conservation during forest plan revision.* This section of the proposed rule would have required the responsible official to evaluate the quality and importance of roadless area characteristics and determine whether and how to protect these characteristics in the context of multiple-use objectives during forest plan revision.

*Comment on Integration with the Planning Rule.* Respondents from a cross section of timber industry and business interests, State, county and Federal representatives, professional associations, and the public expressed concern that this section did not provide adequate direction on how to consider and implement the criteria and procedures during forest plan revision, leading to confusion over integration of this section with the proposed planning and road management rulemaking initiatives.

*Response on Proposed Section 1294.13.* The Department has decided that the appropriate place for considering protections for inventoried roadless areas, in addition to those in this rule, and protections for uninventoried unroaded areas is during the planning process pursuant to the new planning regulations at 36 CFR part 219, Subpart A.

The framework for planning allows for the development of issues leading to the proposal of special designations, and also gives ample opportunity for the public and others to collaborate on the issue at all levels of planning. Based on public comment, specific requirements for evaluating inventoried roadless areas and unroaded areas are included in § 219.9(b)(8) of the final planning rule (65 FR 67571) to emphasize that the

responsible official must evaluate these areas during the plan revision process.

The new planning regulations provide for consideration of roadless areas in the forest planning process in a fashion similar to that set out in the proposed rule at § 294.13. Based on the comments received and reasons stated previously, the Department has determined that those requirements are better considered in the context of 36 CFR part 219. Elimination of proposed § 294.13 from the final rule will not have a significant effect on the purpose or scope of the final rule or on the protections provided to inventoried roadless areas because evaluation of inventoried roadless areas and unroaded areas are now integrated into the final planning rule.

*Proposed Section 294.14. Scope and applicability.* Proposed paragraph (a) of this section of the proposed rule provided that existing contracts, permits, or other legal instruments authorizing the occupancy and use of National Forest System land would not be suspended or modified by the rule.

*Comment on Existing Authorized Activities.* Some respondents were concerned about the impact of the rule on special uses and requested clarification regarding the ability to construct or maintain roads in inventoried roadless areas to access electric power or telephone lines, pipelines, hydropower facilities, and reservoirs. Some suggested that proposed § 294.12(b)(3) be revised to read, "A road is needed pursuant to reserved or outstanding rights or as permitted by statute, treaty or other authorities."

*Response.* Section 294.14(a) of the proposed rule stated that the rule would not suspend or modify any existing permit, contract, or other legal instrument authorizing the use and occupancy of National Forest System lands. Existing authorized uses would be allowed to maintain and operate within the parameters of their current authorization, including any provisions regarding access. Adding the wording "other authorities" to this paragraph is not necessary as the term "other legal instrument" adequately covers other existing authorizations.

Under paragraph (a), road construction or reconstruction associated with ongoing implementation of special use authorizations would not be prohibited. For example, all activities anticipated and described in an authorized ski area's master plan, such as construction or maintenance of ski trails and ski runs, the use of over snow vehicles or off-highway vehicles necessary for ski area operations, including associated road construction,

would not be prohibited even if a specific decision authorizing road construction has not been made as of the date of publication of this rule in the **Federal Register.** Likewise, activities necessary to a mineral lease authorization issued prior to the date of publication of this rule would not be prohibited even if a specific decision authorizing road construction has not been made as of the date of publication of this rule in the **Federal Register.** A phrase has been added to clarify that this paragraph only applies to permits, contracts, or other legal instruments issued before the date of publication of this rule in the **Federal Register.** The term "revoke" has been added to this provision to clarify that this final rule will not revoke existing permits, contracts, or other legal instruments.

Proposed § 294.14(b) made clear that the final rule would not require units to initiate land management plan amendments or revisions.

*Comment on Land Management Plan Amendments.* Some respondents commented that the proposed rule is a "massive change" in existing land management plan direction or land allocation, without amendment or revision of land management plans as required by the National Forest Management Act. Some respondents suggested that amendments were necessary in order to consider site-specific biological and socio-economic information.

*Response.* The Secretary has extensive rulemaking authority governing forest management and development of land management plans. Just as development and approval of land management plans must conform to existing laws and regulations, new laws or regulations can supersede land management plan management direction. Requiring "conforming amendments" to land management plans would be redundant of the rulemaking process.

Local responsible officials' discretion to initiate land and resource management plan amendments, as deemed necessary, would not be limited by this provision. There may be instances where a local responsible official elects to initiate amendment or revision of forest and grassland plans following final promulgation of this final rule. While the analysis undertaken at the national scale is sufficient for the prohibitions established pursuant to this rulemaking, the Department appreciates that additional management issues may need to be addressed, both within and outside of inventoried roadless areas. The local official is best positioned to assess whether any such adjustment is

necessary. For example, although the local official is not free to re-examine the prohibitions established by this rule, it may be appropriate to consider amendments to land and resource management plans regarding plan decisions that guide the use of inventoried roadless areas in light of the final rule.

Forest Service officials have several mechanisms that allow for evaluation of forest and grassland plan implementation, including plan-specific monitoring provisions, the amendment and revision process, and project-level decisionmaking. A determination to amend or revise a land and resource management plan is based on a variety of factors. Forest Supervisors and Regional Foresters have substantial discretion in determining whether or not to initiate plan amendments or revisions.

In the early stages of forest plan amendment or revision, or any decisionmaking process involving land management practices, Regional Foresters, Forest Supervisors, and District Rangers must actively seek input and participation by State, local, and Tribal officials and other affected or interested parties. Therefore, this provision is retained without change in the final rule.

Paragraph (c), as proposed, provided that the regulation, if adopted, would not suspend or modify any decision made prior to the effective date of the final rule.

*Comment on Effect on Project Planning.* Some respondents questioned whether implementation of the rule would prohibit projects where planning is already underway. Most of the comments on this paragraph were related to current and future ski area development, although other land uses would be treated in a similar manner. Some respondents asserted that exemptions from the rule should include all lands or activities described in existing ski area special use permits or master development plans. Specifically listed were White Pass, Arapahoe Basin, Sierra at Tahoe, Pallavicini, Alleys Trails, Mammoth Mountain, June Mountain, Tamarack Resort and Cross Country Skiing Center, and Mammoth Snowmobile Adventures. Respondents also stated that the proposed Pelican Butte Ski Area and expansion of the Sipapu Ski Area should be allowed to continue their current planning processes and that the agency should also allow expansion of commercial recreation activities to benefit local people. Others took an opposing view, stating that the agency should not exempt from the rule any

new ski areas or expansion of any existing ski areas at Pelican Butte, Mount Ashland, Copper Creek, Sherwin, Beaver Creek, Mammoth Mountain, June Mountain, and others.

*Response.* Road construction and timber harvest for expansion of ski areas, resorts, or other recreation developments in inventoried roadless areas would be allowed under paragraph (a) as previously discussed, subject to existing Forest Service procedures, if special use permits are in existence prior to the date of publication of this rule in the **Federal Register** and proposed activities take place within the boundaries established by the special use authorization (FEIS Vol. 1, 3–226). The requirement that a permit be in existence prior to the effective date of this rule has been changed in the final rule to require that the permit be in existence prior to the date of publication of this rule in the **Federal Register**. This change was necessary because the effective date of this rule is delayed 60 days from the date of publication.

Road construction and timber harvest would also be allowed for new ski areas, or expansions of existing ski areas outside the existing special use permit boundaries, in inventoried roadless areas provided that the expansion or construction was approved by a signed Record of Decision, Decision Notice, or Decision Memorandum before the date of publication of the rule in the **Federal Register** (FEIS Vol. 1, 3–226). Under paragraph (c), project decisions for any activity made prior to the date of publication of the final rule in the **Federal Register** would be altered.

*Summary of Changes in § 294.14 of the Final Rule.* Under paragraph (a) of the final rule, road construction, road reconstruction, and timber harvest associated with ongoing implementation of special use authorizations are not prohibited. The term "revoke" and the date of publication of this rule in the **Federal Register** were added to clarify agency intent.

Paragraph (b) makes clear that the final rule would not require units to initiate land management plan amendments or revisions and is adopted without change.

Paragraph (c) states that project decisions made prior to the date of publication of the final rule in the **Federal Register** would not be altered. The term revoke was added to clarify agency intent. The requirement in the proposed rule that a project decision be in existence prior to the effective date of this rule has been changed in the final rule to require that the project decision be in existence prior to the date of publication of this rule in the **Federal**

**Register**. This change was necessary because the effective date of this rule is delayed 60 days from the date of publication.

Proposed paragraph (d) was a "severability" or "savings" clause. This provision identifies the Department's intention that, in the event any provision is determined invalid, the remaining portions of the rule would remain in force. No comments were received on this provision; it has been redesignated as paragraph (f) in the final rule and retained without change.

A new paragraph (d) has been added to the final rule which provides that the prohibitions in the final rule do not apply to road construction, reconstruction, or the cutting, sale or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability for a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. This mitigation measure allows an adjustment period for the timber program in Southeast Alaska, but will also assure the long-term protection of the Forest's unique ecological values and characteristics. Refer to the previous discussion in the section entitled, "Comment on Application to the Tongass National Forest," in, "Proposed § 294.12. Prohibition on road construction and reconstruction in inventoried roadless areas."

To replace and serve the same purpose as proposed § 294.13(f), a new § 294.14(e) has been added to the final rule to address the recently adopted planning regulations at 36 CFR part 219, which require the responsible official to determine which inventoried roadless areas warrant additional protection. Consistent with the original proposal, this new paragraph (e) makes clear that, in determining whether additional protections are needed for any inventoried roadless area, the responsible official cannot reconsider or set aside the prohibitions established in § 294.12 or § 294.13.

*What Other Issues Were Considered in the Final Environmental Impact Statement?*

*Environmental Effects.* Another major issue among those who commented on the proposed rule and DEIS was the environmental effects of the alternatives on inventoried roadless area characteristics. It was also the most important consideration in selection of an alternative. The purpose and need for this proposed action is based on the premise that inventoried roadless areas have characteristics that should be

conserved and maintained. Road construction, reconstruction, and timber harvesting are the activities most likely to harm the characteristics that the agency is seeking to protect. The FEIS documents the contribution of inventoried roadless area characteristics to watershed health and water quality, to biological strongholds for terrestrial and aquatic species, and to habitat for threatened, endangered, and sensitive species. The effects of road construction, reconstruction, and timber harvesting on those characteristics are also documented.

Additionally, some respondents commented on the discussion of spiritual values of inventoried roadless areas in chapter 3 of the DEIS. Some thought it was inappropriate to discuss spiritual values in an environmental analysis produced by the Federal government. Others thought these values were important to consider in the rulemaking process because inventoried roadless areas provided an important setting for their personal spiritual renewal. Reconciling divergent viewpoints on spiritual values is beyond the scope of this proposal. The decision for this rulemaking was not based on the beliefs or principles of one religion or another, but based on the science, policies and laws that guide the decisionmaking process.

Alternative 1 in the FEIS is the no action alternative and, if selected, would not have restricted activities in inventoried roadless areas. While it would not fund, authorize, compel, or carry out any activity in an inventoried roadless area, this alternative does have the greatest potential for adverse impact on the characteristics the agency seeks to protect. It allows the most roads to be constructed and reconstructed and the most timber to be harvested.

Action Alternatives 2, 3, and 4 in the FEIS all provide ecological benefits from prohibiting road construction and reconstruction. The major difference among these alternatives is that Alternative 2 does not restrict timber harvesting; Alternative 3 prohibits timber harvesting for commodity purposes, but allows timber harvesting for clearly defined purposes and circumstances; and Alternative 4 prohibits all timber cutting (except that which may be needed for protection or recovery of threatened, endangered, or proposed species). In alternatives 2, 3, and 4, personal and administrative use harvest, including firewood and Christmas tree cutting, would be permitted. Limited tree cutting could occur incidental to other management activities, such as trail construction or

maintenance, hazard tree removal adjacent to classified roads for public health and safety reasons, fire line construction for wildland fire suppression or control of prescribed fire, or survey and maintenance of property boundaries.

The preferred alternative in the FEIS would prohibit all timber harvest activities in inventories roadless areas except for clearly defined purposes. The final rule provides for the cutting, sale or removal of timber in substantially altered portions of inventoried roadless areas for any purpose as long as the activities do not require additional road construction or reconstruction. By allowing some additional level of timber harvest activity compared to the FEIS preferred alternative, there is an increase in the likelihood of related environmental impacts and decrease in the environmental benefits accrued through the more stringent prohibition in the preferred alternative.

The DEIS estimated that approximately 2.8 million of the 58.5 million acres of inventoried roadless areas had been roaded since the areas were designated as inventoried roadless areas. Some portion of these roaded areas had also been impacted by subsequent management activities facilitated by the road access. It is unknown exactly what portion of these 2.8 million acres has sustained sufficient road construction and timber harvest to substantially alter their roadless characteristics. The determination of whether roadless characteristics have been substantially altered is to be made following a site-specific evaluation. Before any project is authorized that allows the cutting, sale, or removal of timber in an inventoried roadless area, it will subject to site-specific analysis following existing laws and regulations.

Current timber harvesting practices have less impact on the environment than they have had in the past. Increased knowledge, new equipment and techniques, and the application of best management practices have helped to reduce the adverse environmental impacts of timber harvest activities. However, timber-harvesting practices still impact roadless area characteristics, contributing to the fragmentation of habitat and threatening their ability to function as biological strongholds, reference areas, and provide other roadless values.

The final rule allows timber harvesting of generally small diameter timber for limited purposes when it maintains or improves one or more roadless area characteristics and: (1) Improves threatened, endangered,

proposed, and sensitive species habitat or (2) maintains or restores the characteristics of ecosystem composition and structure, such as to reduce the risks of uncharacteristic wildfire effects. The final rule also allows timber to be cut, sold, or removed where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest, and such road construction and subsequent timber harvest occurred after the area was designated an inventoried roadless area. Roadless area characteristics are identified in § 294.11 as: (1) High quality or undisturbed soil, water, and air; (2) sources of public drinking water; (3) diversity of plant and animal communities; (4) habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, relatively undisturbed areas of land; (5) primitive, semi-primitive non-motorized, and semi-primitive motorized classes of dispersed recreation; (6) reference landscapes; (7) naturally appearing landscapes with high scenic quality; (8) traditional cultural properties and sacred sites; and (9) other locally identified unique characteristics (FEIS Vol. 1, 3–3 to 3–7).

*Forest Dependent Communities.* Impacts to forest dependent communities were a major issue among those who commented on the proposed rule and DEIS. Under Alternative 1 of the FEIS, the flow of goods and services would continue according to current policies and land management direction. Alternatives 2 through 4 could reduce future timber harvest, mineral exploration and development, and other activities such as ski area development in inventoried roadless areas. Communities with significant economic activities in these sectors could be adversely impacted. However, the effects on national social and economic systems are minor. For example, the total timber volume affected by this rule is less than 0.5 percent of total United States production, and the total oil and gas production from all National Forest System lands is currently about 0.4 percent of the current national production. None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales, however the effects of the alternatives are not distributed evenly across the United States (FEIS Vol. 1, 3–326 to 3–350).

To reduce the economic impact of this decision, the Chief of the Forest Service

will seek to implement one or more of the following provisions of an economic transition program for communities most affected by application of the prohibitions in inventoried roadless areas (FEIS Vol. 1, 2–14):

(1) Provide financial assistance to stimulate community-led transition programs and projects in communities most affected by application of the prohibitions in inventoried roadless areas;

(2) Through financial support and action plans, attract public and private interests, both financial and technical, to aid in successfully implementing local transition projects and plans by coordinating with other Federal and State agencies and;

(3) Assist local, State, Tribal and Federal partners in working with those communities most affected by the final roadless area decision.

*Local Decisionmaking.* The potential effect of the proposed rule on local involvement in decisionmaking was a major issue identified by many respondents to the DEIS. As described in both the DEIS and FEIS, Alternative 1 would allow local land managers the discretion on whether to construct or reconstruct roads or harvest timber for commodity purposes in inventoried roadless areas. Alternatives 2, 3, and 4 would remove the local decisionmaking authority only for these specific activities. All other management decisions regarding inventoried roadless areas would be made through National Forest System planning procedures. Under all alternatives, management decisions for unroaded areas would be made under the provisions of the new planning regulations at 36 CFR part 219. As explained in the "*National Direction v. Local Decisionmaking*" discussion, the agency has determined that national direction is needed to address the issues regarding road construction, reconstruction, and timber harvesting in inventoried roadless areas.

**The Final Rule and Alternatives Considered**

*What Alternatives and Mitigation Measures Were Considered by the Agency?*

The agency identified two methods to conserve the remaining inventoried roadless areas in the notice of intent for the proposed rule. The first method evaluated whether road construction, reconstruction, and timber harvest should be prohibited in inventoried roadless areas. The second method examined the establishment of procedures to evaluate and conserve roadless area characteristics during land

and resource management plan revisions. These methods were incorporated into the proposed rule and alternatives analyzed in the DEIS. Since publication of the proposed rule, the agency has published final Land and Resource Management Planning Regulations at 36 CFR part 219. The draft and subsequent final planning regulations also provided direction to integrate the consideration of roadless area characteristics into the amendment and revision procedures of land and resource management plans for National Forest System lands. This detailed direction in the final planning regulations eliminated the need for the procedures considered in the Roadless Area Conservation DEIS and proposed rule. Therefore, these procedures have been omitted from the FEIS and final rule.

Public comments on the notice of intent identified a variety of suggestions for alternatives, including different types and combinations of prohibitions, procedures, and exemptions (Summary of Public Comment for the Notice of Intent, Content Analysis Enterprise Team, 2000). Comments on the DEIS and proposed rule provided detailed ways in which to modify the alternatives (Summary of Public Comment for the DEIS, Content Analysis Enterprise Team, 2000).

Summaries of public comment on the notice of intent, proposed rule and the DEIS are part of the record for this rulemaking, and can be viewed at the agency's roadless website (*roadless.fs.fed.us*). The agency's response to comments on the DEIS and proposed rule can be found in Volume 3 of the FEIS. This information was used in forming the alternatives in the FEIS (Chapter 2), which frame the choices for this final rule.

With the removal of the procedures, the agency had two basic decisions to make, with four alternatives for each decision. The first decision was whether road construction, reconstruction, or timber harvesting should be prohibited in National Forest System inventoried roadless areas, or some combination of the three. The second decision was whether the proposed national prohibitions should be applied to the Tongass National Forest or modified to meet the unique situation on the Tongass.

Four alternatives, including a no action alternative, were developed to cover the range of possible prohibited activities in inventoried roadless areas consistent with the stated purpose and need. Four alternative ways of applying the prohibitions to the Tongass National Forest were developed as well (FEIS

Vol. 1, 2–3 to 2–12). Various other alternatives were considered but eliminated from detailed study (FEIS Vol. 1, 2–15 to 2–22).

*Prohibition Alternatives.* Alternative 1 allowed road construction and reconstruction to continue, subject to existing land management plan prescriptions. There was no national restriction on timber harvesting. This was the no action alternative.

Prohibition Alternative 2 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. There was no national restriction on timber harvesting.

Prohibition Alternative 3 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. Timber harvesting was allowed for clearly defined stewardship purposes only, where harvesting could only be used when it maintained or improved roadless characteristics and: (1) improved habitat for threatened, endangered, proposed or sensitive species, (2) reduced uncharacteristic wildfire effects, or (3) restored ecological structure, function, process or composition. Timber harvest for commodity purposes was prohibited.

The definition of timber harvesting for stewardship purposes was reviewed and refined between the proposed rule and the FEIS to more clearly state the agency's intent and to ensure effective protection of roadless characteristics. In the DEIS, timber harvesting for stewardship purposes could be interpreted to accommodate any non-timber production resource management objective that required removal of forest vegetation. Many respondents were concerned about the agency's broad use of timber harvest for stewardship purposes on National Forest System lands. They believed that stewardship purpose timber harvest in inventoried roadless areas needed to be more clearly defined.

The agency agreed that it needed to clearly state the intended purposes for stewardship harvest in inventoried roadless areas. The FEIS identified the range of allowable objectives that are consistent with timber harvesting for stewardship purposes in inventoried roadless areas. In doing so, local decisions about timber harvesting within inventoried roadless areas must maintain or improve one or more roadless characteristics, while focusing on improving threatened, endangered, proposed, or sensitive species habitat; reducing the risk of uncharacteristic wildfire effects; or restoring ecological processes.

Alternative 4 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. No timber cutting was allowed for stewardship or commodity purposes, except where it was necessary for the protection of threatened or endangered species.

*Exceptions and Mitigation Measures.* The agency identified an initial set of exceptions to the prohibition alternatives, as set out in the DEIS and proposed rule. The exceptions addressed the following circumstances where the prohibitions did not apply and are set out in the final rule at § 294.12(b)(1) through (b)(4). These include circumstances where a road is needed to: (1) protect public health and safety; (2) to conduct an environmental response action; (3) pursuant to reserved or outstanding rights or as provided for by statute or treaty; or (4) road realignment is needed to prevent irreparable resource damage by a classified road.

Based on comments received on the proposed rule and the DEIS, the agency developed and considered additional optional exceptions that mitigated the effects of the prohibition alternatives (FEIS Vol. 1, 2–8 to 2–9). These exceptions were available for selection as part of the final rule to reduce or eliminate undesirable social and economic impacts. Any or none of these optional exceptions could have been selected as part of the final rule. If selected, these exceptions would state that the responsible official may authorize road construction or reconstruction in inventoried roadless areas where: (1) reconstruction is needed to implement road safety improvements; (2) the Secretary determines that a Federal Aid Highway project is in the public interest or consistent with the purposes for which the land was reserved or acquired; or (3) a road is needed for prospective mineral leasing activities in inventoried roadless areas.

*Tongass National Forest Alternatives.* The second decision was to select one of the four alternatives created specifically for the Tongass National Forest (FEIS Vol. 1, 2–9). Based on public comments and the agency's decision to integrate procedures for evaluating roadless area characteristics into the planning rule, some of the Tongass alternatives presented in the DEIS were modified accordingly.

The Tongass Not Exempt alternative applied the same prohibition alternative to the Tongass National Forest that applied to the rest of National Forest System lands. An optional social and

economic mitigation measure was developed for the Tongass Not Exempt alternative that delayed implementation of the selected prohibition alternative on the Tongass National Forest until April 2004 in order to provide a transition period for communities most affected by changes that may result if this alternative were enacted.

The Tongass Exempt alternative did not apply a national prohibition to the Tongass National Forest. It allowed road construction and reconstruction on the Tongass to continue subject to existing land management plan prescriptions. Future proposals for road activities in inventoried roadless areas would be considered on a case-by-case basis.

The Tongass Deferred alternative postponed the decision on whether to apply prohibitions to the Tongass National Forest until April 2004, when an evaluation to determine whether the prohibitions against road construction and reconstruction should apply to any or all inventoried roadless areas would be conducted as part of the scheduled 5-year review of the April 1999 Tongass Land and Resource Management Plan.

The Tongass Selected Areas alternative applied the prohibitions on road construction and reconstruction within inventoried roadless areas located in certain land use designations (LUDs) identified in the Tongass Land and Resource Management Plan, specifically those of Old Growth Habitat, Semi-Remote Recreation, Remote Recreation, and LUD II. See Appendix E of Volume 1 of the FEIS for a complete description of these land use designations.

*What is the Environmentally Preferred Alternative?*

Under the National Environmental Policy Act, the agency is required to identify the environmentally preferred alternative (40 CFR 1505.2(b)). This is interpreted to mean the alternative that would cause the least damage to the biological and physical components of the environment, and, which best protects, preserves, and enhances historic, cultural, and natural resources (Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026). Factors considered in identifying this alternative include: (1) fulfilling the responsibility of this generation as trustee of the environment for future generations, (2) providing for a productive and aesthetically pleasing environment, (3) attaining the widest range of beneficial uses of the environment without degradation, (4) preserving important natural

components of the environment, including biodiversity, (5) balancing population needs and resource use, and (6) enhancing the quality of renewable resources.

The agency believes the alternative that best meets these objectives is Alternative 3 combined with the Tongass Not Exempt alternative, without any social or economic mitigation. Alternative 3 protects inventoried roadless areas from adverse environmental impacts associated with road construction, reconstruction, and timber harvesting for commodity purposes, as identified in Chapter 3 of the FEIS.

Alternative 4, by prohibiting timber cutting of any kind (except for protection or recovery of threatened, endangered, and proposed species), does not allow for the array of vegetation management potentially necessary to maintain or improve roadless characteristics, reduce the risks of uncharacteristic wildfire effects, or restore ecological structure, function, processes, or composition. Timber harvesting for the limited purposes under Alternative 3 would allow needed biological treatments to promote a healthy forest for future generations. Alternative 2, although providing for protection from road construction and reconstruction, would still permit harvesting of trees for commodity purposes that could conflict with protecting the physical and biological environment.

Alternative 3, like the other alternatives, contains exceptions that allow road construction and reconstruction for important human and environmental protection measures, such as protection of public health and safety from imminent threats of flood and fire, treatment to clean up hazardous pollution sites, and road realignment to prevent irreparable resource damage. These are important exceptions needed to enhance the productivity and esthetics of the environment. Social and economic mitigation measures are not part of this environmentally preferred Alternative 3 because these measures, although important to reduce the social and economic effects of the action alternatives, do not contribute to the protection of the physical or biological environment.

The Tongass National Forest is part of the northern Pacific coast ecoregion, an ecoregion that contains one fourth of the world's coastal temperate rainforests. As stated in the FEIS, the forest's high degree of overall ecosystem health is largely due to its quantity and quality of inventoried roadless areas and other

special designated areas. The "Tongass Not Exempt" alternative would immediately apply prohibitions to all inventoried roadless areas and is the environmentally preferred alternative. The other Tongass alternatives either delay or limit the inventoried roadless area land base to which the prohibitions would apply, or defer the decision regarding prohibitions altogether. The adverse environmental impacts of these alternatives are disclosed in Chapter 3 of the FEIS.

*What Is in the Final Rule and What Are the Reasons for Selecting That Alternative?*

Selection of an alternative to be adopted in the final rule requires careful consideration of the environmental effects, including cumulative, social, and economic impacts, and the relative values of the various resources to arrive at a fair and reasoned decision to achieve the stated purpose and need for inventoried roadless area protection (FEIS Vol. 1, 3–392 to 3–403). As stated previously, courts have held that the agency has wide discretion in weighing and deciding the proper administration of National Forest System lands.

The Department's judgment regarding the appropriate administration of these lands is embodied in the policies described in this final rule. First and foremost, the Department wants to ensure that inventoried roadless areas sustain their values for this and future generations. By sustaining these values, a continuous flow of benefits associated with healthy watersheds and ecosystems is provided. These benefits include sources for clean drinking water, fish habitat, wildlife habitat, biological diversity, and dispersed outdoor recreational opportunities. Not only are short-term economic and environmental factors considered, but also the long-term productivity of these lands which are so critical to strong, productive economies.

Evaluation of these considerations for this decision is based primarily on these qualitative factors. Quantitative factors, such as volume of timber offered for sale, or roadless acres protected, were also considered and are helpful to distinguish and compare the alternatives (FEIS Vol. 1, 2–24 to 2–38), and their effects (FEIS Chapter 3).

*Prohibition Alternatives.* Alternative 1 in the FEIS has the greatest potential for adverse impact on watershed health and water quality by allowing increased sedimentation and disruption of hydrologic processes; the greatest potential for adverse impact on biodiversity by fragmenting habitat for threatened, endangered, and sensitive

species; the greatest potential for adverse impact on aquatic and terrestrial habitat; and the greatest potential for increase in competition from invasive non-native species. This alternative was not selected because it did not meet the specified purpose and need for this action.

Action Alternatives 2, 3, and 4 in the FEIS all provide ecological benefits from prohibiting road construction and reconstruction. The major difference among these alternatives is that Alternative 2 allows timber harvesting without restriction; Alternative 3 prohibits timber harvesting for commodity purposes, but allows timber harvesting for clearly defined purposes and limited circumstances; and Alternative 4 prohibits all timber cutting (except that which may be needed for protection or recovery of threatened, endangered, or proposed species). Personal and administrative use harvest, including firewood and Christmas tree cutting, would be permitted. Tree removal could occur when associated with management activities not otherwise prohibited by the final rule, such as trail construction or maintenance, hazard tree removal adjacent to classified roads for public health and safety reasons, fire line construction for wildland fire suppression or control of prescribed fire, or survey and maintenance of property boundaries.

Alternative 2 was not selected because it posed more risks to roadless characteristics than Alternatives 3 or 4. Timber harvesting for clearly defined, limited purposes can be a valuable tool for conserving and improving roadless area values and should be available as a management option for the local responsible official. Therefore, the Department did not select Alternative 4 and is selecting Alternative 3.

Reducing the risk of uncharacteristic wildfire effects is one way of restoring ecological processes. The final rule recognizes this by eliminating "reducing the risk of uncharacteristic wildfire effects" as a separate purpose and instead uses it as an example of restoring ecological processes. Also, to address concern about the meaning and implementation of stewardship purpose timber harvest that "restores ecological structure, function, processes, and composition" described in the FEIS, the final rule eliminates use of the term "stewardship". Instead, the rule relies on the purposes specifically listed and mirrors language from the new planning regulations at 36 CFR part 219 stating that timber harvest is allowed in order to maintain or restore the characteristics of ecosystem composition and structure

within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

Alternatives 2 through 4 could reduce future timber harvest, mineral exploration and development, and other activities such as ski area development in inventoried roadless areas. Communities with significant economic activities in these sectors could be adversely impacted. However, the effects on the social and economic situation nationally are minor. For example, the reduction in timber harvest from National Forest System lands is less than 3%, which is less than 0.5 percent of total United States timber production. The total oil and gas production from all National Forest System lands is about 0.4 percent of the current national production, and the oil and gas resources located inside inventoried roadless areas are an insignificant portion of total resources.

Rights of reasonable access to prospect and explore lands open to mineral entry and to develop valid claims, would be unaffected under these alternatives as provided by the General Mining Law. Reasonable rights of access may include, but are not limited to, road construction and reconstruction, helicopters, or other nonmotorized access (FEIS Vol. 1, 3–254). None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales; however, the effects of the alternatives are not distributed evenly across the United States (FEIS Vol. 1, 3–329 to 3–350).

Comment was received concerning the cumulative relationship of the Roadless Area Conservation Rule with the Bureau of Land Management's proposed rule for Mining Claims Under the General Mining Laws; Surface Management, published on February 9, 1999 (64 FR 6422). Since that comment was received, the Mining Claims rule became final (65 FR 69998, November 21, 2000). Both the final Roadless Area Conservation Rule and the final Bureau of Land Management mining rule have comparable goals to prevent unnecessary or undue degradation of public lands. However, the Roadless Area Conservation Rule at 294.12(b)(3) does not affect rights of reasonable access to prospect and explore lands open to mineral entry and to develop valid claims. Reasonable access includes, road construction or reconstruction for mining activities covered under the General Mining Law, while the performance standards at proposed 3809.420(c) would require

that permitted roads and structures be designed, constructed, and maintained to control or prevent erosion, siltation, and air pollution and to minimize impacts to resources. Cumulative effects of these two rules are expected to be minimal because of the exception for locatable minerals under § 294.12(b)(3) in the final roadless rule.

*Exceptions.* The Department is adopting the exceptions for road safety projects and for Federal Aid Highway projects. The exception for road safety projects is a narrow exception that only allows road reconstruction where past experience or expert opinion has indicated that the road design would present a threat to public safety. The Department decided to adopt the Federal Aid Highway exception to allow road construction based on social considerations and Federal-State relationships. The Department believes that this exception will have a very limited application, and the Secretary of Agriculture retains the discretion to approve or deny authorization when warranted (23 U.S.C. 317). The analysis in the FEIS identified only one application of this exception in the next five years for a proposed 5.5-mile State highway relocation project on the Chugach National Forest in Alaska (FEIS Vol. 1, 3–33).

After publication of the FEIS for Roadless Area Conservation, the Department of Energy (DOE) and the Office of Management and Budget (OMB) received and shared with the Forest Service several letters from mining interests outlining their concerns with the preferred alternative. The Forest Service also received comments directly from the National Mining Association. DOE provided an analysis of potential impacts related to oil and gas resources, and compiled information on coal resources as well. Upon being informed of these concerns, the Forest Service evaluated the information provided by DOE and others. The Forest Service also met with and discussed these concerns with DOE.

The FEIS analysis focused on impacts to coal, phosphate, and oil and gas resources, based on input from the national forests and grasslands and from public comment on the draft environmental impact statement (DEIS) and proposed rule (May 10, 2000; 65 FR 30276). Comment received from DOE on the DEIS was focused only on transmission line corridors. Potential economic impacts related to existing coal and phosphate operations with known plans to expand into inventoried roadless areas were quantified in the FEIS (Vol. 1, pp. 3–308 to 3–324). Areas of known high potential for coal,

phosphate, and oil and gas were also discussed (Vol. 1. pp. 3–254 to 3–260). With respect to oil and gas, no attempt was made to estimate the proportion of these resources within inventoried roadless areas because of the high degree of uncertainty of these estimates.

After publication of the FEIS for Roadless Area Conservation, the Department of Energy (DOE) raised concerns about the potential impacts on leasable energy minerals, particularly for natural gas and coal, if the final Roadless Area Conservation Rule did not allow road building in support of exploration and development for leasable minerals.

Currently, the NFS lands play a minor role in providing natural gas resources, only about 0.4% of national production (76.4 billion cubic feet) in 1999. The resource estimates by DOE were made assuming that the resources are homogeneously distributed across play areas, which is generally not the case with oil and gas resources. It is reasonable to assume, under the current demand conditions, that there will be increased interest in development of natural gas resources on federal lands and elsewhere. Some of these areas are not currently available for leasing, as a result of leasing decisions or local forest and grassland plan decisions. Moreover, current access restrictions would make many of these resources unavailable in the near future. In addition, the steep terrain that is typical of many inventoried roadless areas often makes these areas difficult to access for environmental and/or economic reasons. The likelihood of resources being recovered from inventoried roadless areas even in the absence of a final roadless rule is small, except where leases already exist. Finally, where accessible, exploration and development of these resources would likely take about 5–10 years before production would begin.

The FEIS described the coal production from NFS lands as accounting for about 7% of national production in 1999. The analysis acknowledged the increasing national demand for coal, particularly the low-sulfur coal found primarily in the western U.S. About 2.5 million acres of coal-bearing rock were estimated to occur within inventoried roadless areas in the interior West.

A concern raised by DOE and others was the potential effect on users of this low sulfur coal, primarily electric utilities in the East. According to DOE, many utility and industrial boilers have been designed to blend the western coal with other higher sulfur coal to meet their Clean Air Act compliance goals.

The DOE analysis did not provide any information on the availability of substitute sources of coal if supply from existing mines is reduced.

Overall, the U.S. has abundant coal reserves. Also, alternative sources of low-sulfur coal do exist, concentrated in the western U.S., mostly in Colorado, Montana, and Wyoming. Additionally, the abundant sources of low cost-coal and available technology, such as scrubbers, will enable electric utilities to meet their Clean Air Act compliance goals.

Several commentators on the DEIS, including the Governor of the State of Utah, had questions about access to state-owned.coal. As discussed in the FEIS, access based on existing rights would not be affected by the final rule, therefore, access is guaranteed to coal held under existing rights.

The FEIS identified potential impacts on future phosphate mining on the Caribou National Forest, the only area of active phosphate mining on NFS lands. The FEIS acknowledged that phosphate production from the Caribou accounts for about 12% of national production, and is used to supply regional producers of phosphate fertilizer products and elemental phosphorous. The analysis included an estimate of phosphate resources within inventoried roadless areas of 873.3 million tons, and a description that about 8,000 acres of the area of Known Phosphate Lease Areas are within inventoried roadless areas.

In a letter to OMB, the National Mining Association provided estimates of phosphate reserves in Idaho, Wyoming, Utah, and Montana potentially impacted by the final rule. The company currently mining on the Caribou made these estimates. No documentation was provided for the basis of the estimates. However, their open pit mining estimates for Idaho were less than the resources identified in the FEIS in inventoried roadless areas alone.

In conclusion, the information provided by DOE and others provides additional context to the analysis. However, for coal and phosphate, the impacts noted in these comments fall within the range of effects disclosed in the FEIS. For oil and gas, the Forest Service continues to believe there is a high degree of uncertainty in the available information. Moreover, it seems likely that even if resources do underlie inventoried roadless areas, they would be among the last areas entered for exploration and development for the reasons described above. After careful review of the information provided by DOE and

private parties, the agency has determined that the information does not materially alter the environmental analysis disclosed in the FEIS and does not constitute significant new circumstances or information relevant to environmental concerns bearing on the rulemaking effort.

The Department has decided not to adopt the exception for future discretionary mineral leasing because of the potentially significant environmental impacts that road construction could cause to inventoried roadless areas, but instead determined a more limited exception is appropriate. Existing mineral leases are not subject to the prohibitions, nor is the continuation, extension, or renewal of an existing mineral lease on lands under lease by the Secretary of the Interior as of the date of publication of this rule in the Federal Register. Additionally, road construction or reconstruction may be authorized for new leases on these same lands in the event that application for a new lease is made prior to termination or expiration of the existing lease.

The Department recognizes that this decision may have major adverse economic impacts on a few communities dependent on mineral leasing from inventoried roadless areas. However, if road construction and reconstruction were allowed for future mineral leasing on lands not under mineral lease as of the date of publication of this rule in the Federal Register, an estimated 59 miles of new roads would be constructed in inventoried roadless areas over the next five years. Road construction or reconstruction in support of future mineral leasing on lands not presently under mineral lease could continue at this level or in greater amounts into the foreseeable future. Over an estimated 10 million acres of inventoried roadless areas could be roaded for exploration and development of leasable minerals, although the agency believes it is unlikely that more than a small percentage of these acres would contain minerals sufficient for economic development.

The effects of road construction over time could substantially alter valuable roadless area characteristics by fragmenting habitat, increasing soil disturbance, decreasing water quality, and providing new avenues for the invasion of non-native invasive species. Mineral leasing activities not dependent on road construction, such as directional (slant) drilling and underground development, would not be affected by the prohibition.

The final rule extends indefinitely the timeframe for which roads can be

constructed on areas currently under lease, which are estimated to be less than 1 million acres in extent, or less than 2 percent of the total acreage of inventoried roadless areas. The environmental effects of this extension fall between those described in the FEIS for the preferred alternative, which would have allowed road construction or reconstruction only for the duration of an existing lease, and those described in the FEIS under the potential social and economic mitigation measures, which would have provided an exception for mineral leasing activities within all inventoried roadless areas, with no limitations.

Relative to the preferred alternative, the final rule will somewhat diminish the potential beneficial effects of the overall prohibition on road construction and reconstruction in the areas affected by the minerals leasing exception, due to the greater amount of area potentially disturbed and the effects of associated activities. However, by limiting the area potentially affected to only those areas currently under lease, the potential extent of these activities and their impacts are identified and limited.

*Tongass National Forest Alternatives.* The Tongass Exempt alternative described in the FEIS was not selected. Allowing road construction and reconstruction on the Tongass National Forest to continue unabated would risk the loss of important roadless area values.

The Tongass Deferred alternative was not selected because the agency presently has sufficient information to make this decision, and the decisionmaking processes used have identified the environmental, social, and economic issues that must be addressed. There is no need to postpone the decision.

The Tongass Selected Areas alternative did not meet the purpose and need as well as the selected alternative. Important roadless area values would be lost or diminished because of the road construction, reconstruction, and timber harvesting activities that this alternative allowed.

By applying the final rule to the Tongass National Forest immediately, but allowing road construction, reconstruction, and the cutting, sale, and removal of timber from inventoried roadless areas where a notice of availability for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**, a period of transition is available to affected communities while providing certainty for long term protection of these lands.

The Tongass National Forest has 261 MMBF of timber under contract and 386 MMBF under a notice of availability of a DEIS, FEIS, or Record of Decision. In addition, the Tongass has 204 MMBF available in roaded areas that is sold, has a Record of Decision, or is currently in the planning process. This total of 852 MMBF is enough timber volume to satisfy about seven years of estimated market demand. During the period of transition, an estimated 114 direct timber jobs and 182 total jobs would be affected. In the longer-term, an additional 269 direct timber jobs and 431 total jobs could be lost in Southeast Alaska if current demand trends continue and no other adjustments are provided to allow for more harvest from other parts of the forest. The exception for projects with a notice of availability for a draft environmental impact statement on the Tongass National Forest is because of the unique social and economic conditions where a disproportionate share of the impacts are experienced throughout the entire Southeast Alaska region and most heavily in a few communities.

*Decision Summary.* It is the decision of the Secretary of Agriculture to select Prohibition Alternative 3 and the Tongass Not Exempt Alternative identified in the FEIS as the final rule, with modifications. These modifications include: (1) an exception to the prohibition on road construction and reconstruction for mineral leasing in areas under mineral lease as of the date of publication of this rule in the **Federal Register**; (2) an exception to the timber harvest prohibition for the cutting, sale, or removal of timber in portions of inventoried roadless areas where construction of a classified road and subsequent timber harvest have substantially altered the roadless characteristics, and the road construction and subsequent timber harvest occurred after the area was designated an inventoried roadless area and prior to the date of publication of this rule in the **Federal Register**; and (3) the immediate application of the prohibitions to the Tongass National Forest with a provision that exempts road construction, road reconstruction, and the cutting, sale, or removal of timber if a notice of availability for a DEIS for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. The final rule best meets the agency's goal of maintaining the health and contributions of existing inventoried roadless areas by preserving the relatively undisturbed characteristics of those areas, thereby

protecting watershed health and ecosystem integrity. In evaluating the comments received from the public, the Department believes that there is adequate relevant information to assess reasonably foreseeable significant adverse impacts (40 CFR 1502.22). The FEIS for this final rule documents the adverse impacts road construction and timber harvesting can have in inventoried roadless areas. This final rule reduces potential impacts to a greater degree and with more certainty than Prohibition Alternatives 1 and 2 and the other Tongass National Forest alternatives.

The final rule retains the ability to use timber harvesting for clearly defined purposes where necessary to meet ecological needs, allowing accomplishment of ecological objectives that Alternative 4 would preclude. Allowing clearly defined, limited timber harvest of generally small diameter trees will maintain a valuable management option for the agency to help improve habitat for threatened, endangered, proposed, or sensitive species recovery and to help restore ecological composition and structure, such as reducing the risk of uncharacteristic wildfire effects. As habitat fragmentation, subdivision, and urbanization of lands continues nationally, this decision allows the agency to avoid most human-caused fragmentation of National Forest System inventoried roadless areas to preserve management options for future generations. Finally, these inventoried roadless areas will remain available to all Americans for a variety of dispersed recreation opportunities.

The final rule:

(1) Recognizes that the agency's first and highest priority is to ensure sustainability for resources under its jurisdiction. It protects inventoried roadless areas from the activities that most directly threaten their fundamental characteristics through the alteration of natural landscapes and fragmentation of forestlands.

(2) Protects public health by promoting watershed health and maintaining important sources of clean drinking water for current and future generations.

(3) Responds to the major issues identified in public comments.

(4) Is fiscally responsible, and does not increase the financial burden by adding expensive roads the agency cannot afford to maintain.

(5) Exemplifies the agency's responsibility as a world leader in natural resource conservation by setting an example for the global community.

(6) Recognizes that some communities, such as those in Southeast Alaska, bear a disproportionate share of the burden, and offers assistance to mitigate those impacts.

This decision is expected to cause additional adverse economic effects to forest dependent communities because of the potential reduction in future timber harvest, mineral leasing, and other activities (FEIS Vol. 1, 3–326 to 3–350). However, the Department believes that the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to those local communities. To reduce the economic impacts of this decision, the Chief of the Forest Service will seek to implement one or more of the following provisions of an economic transition program for communities most affected by application of the prohibitions in inventoried roadless areas:

(1) Provide financial assistance to stimulate community-led transition programs and projects in communities most affected by application of the prohibitions in inventoried roadless areas;

(2) Through financial support and action plans, attract public and private interests, both financial and technical, to aid in successfully implementing local transition projects and plans by coordinating with other Federal and State agencies; and

(3) Assist local, State, Tribal and Federal partners in working with those communities most affected by the final roadless area decision.

### Regulatory Certifications

This final rule was reviewed under USDA procedures, Executive Order (E.O.) 12866 on Regulatory Planning and Review, and the major rule provisions of the Small Business Regulatory Enforcement and Fairness Act (5 U.S.C. 800). The Office of Management and Budget (OMB) has determined that this is a major rule, because this rule may have an annual effect of $100 million or more on the economy or, in some sectors, may affect productivity, competition, or jobs. Consequently, the rule is subject to OMB review under E.O. 12866 and a regulatory impact analysis has been prepared for this final rule. This rule is not expected to interfere with an action taken or planned by another agency nor raise new legal or policy issues. This action will not alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients of such programs.

### Regulatory Impacts

*Summary of the Results of the Regulatory Impact Analysis.* Many of the benefits and costs associated with the final rule were not quantifiable. Therefore, many of the costs and benefits are described qualitatively. Although the analysis does not provide a quantitative measure of net benefits, the Department believes the benefits of the rule outweigh the costs.

Local-level analysis cannot easily incorporate the economic effects associated with nationally significant issues. Therefore, the Department believes the aggregate transactions costs (costs associated with the time and effort needed to make decisions) of local level decisions would be much higher than the transactions costs of a national policy, because of the controversy surrounding roadless area management.

National Forest System lands provide a variety of goods and services to the American public. Use of the national forests and grasslands for both commodities and amenity services varies over time, in response to changing market conditions, consumer preferences, and other factors. For the purpose of this analysis, the baseline describes the likely mix of goods and services from the national forests and grasslands in the near future in the absence of the final rule, which is likely to affect some goods and services, while having no effect on others. Details on the environmental effects of the final rule can be found in the Forest Service Roadless Area Conservation Final Environmental Impact Statement (FEIS).

Most of the benefits of the rule result from maintaining roadless areas in their current state, and, therefore, maintaining the current stream of benefits from these areas. The costs are primarily associated with lost opportunities, since the final rule would limit some types of development activities that might have occurred in the future without this rule. Table 1 summarizes the potential benefits and costs of the rule.

*Potential Benefits Of The Roadless Rule.* Undisturbed landscapes provide a variety of monetary and non-monetary benefits to the public. Many of these benefits are associated with the protection of ecological, social, and economic values in inventoried roadless areas.

Air and water quality would be maintained at a higher level than under the baseline. Higher water quality provides a higher level of protection for drinking water sources, reduces treatment costs for irrigation, reservoirs, and other downstream facilities and maintains the value of water-based recreation activities. Higher air quality protects not only values associated with human health, but also improves visibility and benefits recreation and adjacent private property values.

A greater degree of protection of biological diversity and threatened and endangered species would occur if roads and commodity timber harvest were prohibited in inventoried roadless areas as opposed to the baseline. As a result, ecological values would be maintained. Passive use values related to the existence of biological diversity and threatened and endangered species would be maintained, as well as values associated with protecting these areas for future generations.

A number of other benefits are associated with maintaining healthy wildlife and fish populations at a level higher than under the baseline. Some game species are likely to benefit from this protection, which would maintain quality hunting and fishing experiences both within inventoried roadless areas and beyond. Other types of recreation experiences, such as wildlife viewing, also would benefit.

Inventoried roadless areas are important in providing remote recreation opportunities. A greater number of acres in these recreation settings would be maintained than under the baseline. Remote areas are also important settings for many outfitter and guide services. Maintaining these areas increases the ability of the agency to accommodate additional demand for these types of recreation special use authorizations.

Inventoried roadless areas provide a remote recreation experience without the activity restrictions of Wilderness (for example, off-highway vehicle use and mountain biking). Maintaining roadless areas would likely lessen visitation pressure on Wilderness compared to the baseline.

The risk of introducing non-native invasive species would be reduced if road access were not available. This is beneficial to grazing permittees with allotments in inventoried roadless areas, and to collectors of non-timber forest products by maintaining forage quality and quantity, and forest products that cannot compete with invasive species. The reduced probability of introduction would also benefit forest health in inventoried roadless areas and would contribute to the maintenance of biological diversity.

Some planned timber sales in inventoried roadless areas are likely to cost more to prepare and sell than they realize in revenues received. To the extent that these sales will not take

place, a financial efficiency savings would be realized. Implementing the rule could result in agency cost savings. First, local appeals and litigation about some management activities in roadless areas could be reduced, which would avoid future costs. Secondly, the reduction in new miles of roads constructed would reduce the number of miles the agency is responsible for maintaining in the future, resulting in avoiding up to an additional $219,000 per year of costs.

*Potential Costs Of The Roadless Rule.* The prohibition on road construction, reconstruction, and timber harvest except for clearly defined, limited purposes would reduce development of roaded access to resources within inventoried roadless areas compared to the baseline. Roads are required for most timber sales to be economically feasible. For those sales that are financially profitable, the rule would reduce net revenues. In addition to lost revenue, there would be an estimated immediate impact of 461 fewer timber jobs and 841 total jobs, with an associated annual loss of $20.7 million in direct income and $36.2 million in total income. In the longer term, an additional 269 timber jobs and 431 total jobs could be affected from harvest reductions on the Tongass National Forest. The longer-term income effect was estimated at $12.4 million in direct income and $20.2 million in total income. A reduction in the timber program could also affect about 160 Forest Service jobs, with an additional 100 jobs affected on the Tongass in the longer term.

Jobs associated with road construction and reconstruction for timber harvest and other activities would also be fewer than under the baseline. Initially, between 43 and 51 direct jobs and between 88 and 104 total jobs could be affected by reduced road construction and reconstruction. An additional 39 direct jobs and 78 total jobs could be affected by harvest reductions on the Tongass National Forest in the longer term.

The impact on mineral resources will vary, depending on factors such as prices, technology change, and substitutes. Reasonable access to conduct exploration and development of valid claims for locatable minerals (metallic and nonmetallic minerals subject to appropriation under the General Mining Law of 1872) would continue. Such access may involve some level of road construction that, depending on the stage of exploration or development, could range from helicopters, temporary or unimproved

roads, more permanent, improved roads, or nonmotorized transport.

Exploration for and development of leasable minerals (such as oil, gas, coal, and geothermal) on areas not already under lease would likely be limited because roads are often needed for these activities. In the short-term, up to 546 direct and 3,095 total jobs could be affected, with direct annual income effects of $36 million and total income effects of $128 million. Payments to states could be reduced by about $3.2 million per year. Between 308 and 1,371 million tons of coal resources on the Grand Mesa, Uncompahgre, and Gunnison and Manti-LaSal National Forests could be unavailable for development as a result of this rule. About 873 million tons of phosphate resources on the Caribou National Forest may also be unavailable. Other inventoried roadless areas may contain additional coal and phosphate resources. An estimated mean of 11.3 trillion cubic feet of undiscovered natural gas and 550 million barrels of undiscovered oil resources could also be affected. Effects on saleable minerals (such as sand, gravel, stone, and pumice) are expected to be negligible.

New roads have the potential to reduce current operating costs for other users, for example grazing permittees and collectors of non-timber forest products, by allowing faster and easier access. These potential cost reductions would not be realized if road construction is prohibited. The agency, however, builds few roads for recreation, grazing, or collection of non-timber forest products, and this pattern is unlikely to change. New roads built for other purposes may provide additional access for recreationists, including hunters and anglers. Prohibiting construction of new roads would have minimal impacts on these groups, since all temporary roads and many of the other planned roads would be closed once the intended activity is concluded. Therefore, the number of additional road miles that would be available for recreational or other uses would be small.

Opportunities for some types of recreation special uses may be limited in the future. Developed recreation use and road-based recreation uses in general are more likely to occur at higher densities outside of inventoried roadless areas than under the baseline, since expansion into inventoried roadless areas would not occur. However, roads are rarely constructed into inventoried roadless areas for recreation purposes. The development of new ski areas within inventoried roadless areas would be unlikely. Other,

non-recreation special uses may be limited in the future as well. Such special uses include communication sites and energy-related transmission uses (such as ditches and pipelines, and electric transmission lines).

There could be a slight increase in the risk from uncharacteristic wildland fire or insect and disease as a result of reduced opportunities for forest health treatments. However, the Forest Service would likely treat few acres of inventoried roadless areas regardless of the issuance of the Roadless Rule, since moderate and high risk forests in inventoried roadless areas would be given a low priority for treatment, unless there was an imminent threat to public safety, private property, water quality, or threatened and endangered species. While overall fire hazard can still be reduced without roads, restricted road access would likely increase the cost of treatments, which would result in fewer acres treated. Some fuel treatment techniques available under the baseline would not be economically or logistically feasible. Of the 14 million acres in inventoried roadless areas identified as potentially requiring fuel treatment, 6.5 million could still be treated with prescribed fire without mechanical pretreatment. The use of timber harvest for fuel management would be limited to those activities that reduce uncharacteristic wildfire effects through the cutting, sale, or removal of small diameter timber that maintains or improves one or more of the roadless characteristics. For the next five years, about 22,000 acres could be treated by the limited timber harvest allowed under the final rule. Although this is a significant decline in treatment acres compared to acres that would have been harvested under the baseline, the total acreage affected is less than 1 percent of all inventoried roadless area that potentially require mechanical pretreatment.

Agency costs could increase compared to the baseline for some types of activities. Fuel treatment and other ecological restoration treatment costs in inventoried roadless areas would likely increase, but the impact on agency costs is likely to be negligible since treatment in most inventoried roadless areas is a lower priority.

The goods and services that could not be produced from inventoried roadless areas without road construction are likely to be produced either on other parts of National Forest System land or on other lands. Substitute production could result in adverse environmental effects on these other lands. The following Table 1 summarizes the costs and benefits of the final rule.

TABLE 1.—SUMMARY OF COSTS AND BENEFITS OF THE ROADLESS AREA CONSERVATION RULE COMPARED TO THE BASELINE

| Category | Baseline | Final rule |
|---|---|---|
| Air quality [1] | Potential increase in dust, vehicle emissions associated with road use and management activities in inventoried roadless areas. | Air quality is maintained in inventoried roadless areas. |
| Water quality [1] | Potential increase in sediment associated with roads and management activities in inventoried roadless areas. | Water quality is maintained in inventoried roadless areas. |
| Land base available for dispersed recreation activities [1]. | Decrease in remote settings, increase in developed settings on National Forest System lands. | Current land base for remote and developed settings is maintained on National Forest System lands. |
| Quality of fishing and hunting for recreation, commercial, and subsistence users [1].. | Potential habitat degradation, increase in roaded access, and decrease in remote hunting and fishing opportunities. | Existing hunting and fishing quality and access in inventoried roadless areas maintained. Opportunities for remote experiences are maintained. |
| Forage quality for livestock grazing [1] | Increased risk of non-palatable invasive species. | Existing forage quality is maintained. |
| Non-timber forest products [1] | Increased risk of invasive species displacing desired products. | Non-timber forest products maintained at current levels. |
| Existence and bequest values [1] | Potential decrease due to loss of biological diversity and increased risks to threatened and endangered species habitat in inventoried roadless areas. | Values maintained at existing levels due to conservation of biological diversity and habitat for threatened and endangered species in inventoried roadless areas. |
| Agency costs associated with planning activities [1]. | No change in current costs associated with appeals and litigation on roadless area management. | Savings in costs associated with appeals and litigation on roadless area management. |
| Agency cost associated with road maintenance [2]. | Increase up to $219,000 per year in maintenance cost associated with new roads in inventoried roadless areas. | No increase in road maintenance costs in inventoried roadless areas. |
| Projected timber harvest (average annual) from inventoried roadless areas [3]. | 146.7 million board feet | 74.3 million board feet. |
| Timber related jobs [4] | No change to current estimates of future timber associated direct and total jobs. | Estimated job loss of 461 direct jobs and 841 total jobs. An additional 269 direct and 431 total jobs could be affected in the longer term. |
| Timber related income [4] | No change to current estimates of future timber associated direct and total income. | Estimated annual income loss of about $20.7 million direct income and $36.2 million total income. An additional $12.4 million direct income and $20.2 million total income could be affected in Alaska in the longer term. |
| Road construction jobs [5] | No change to current estimates of future road construction direct jobs. | Projected annual job loss ranging from 43 to 51 direct jobs and between 88 and 104 total jobs. An additional 39 direct and 78 total jobs could be affected in the longer term. |
| Exploration and development for locatable minerals (gold, silver, lead, etc.) [1]. | Existing mineral availability continues subject to General Mining Law of 1872. | Access continues subject to General Mining Law of 1872. |
| Exploration and development for leasable minerals (oil, gas, coal, etc.) [1]. | Existing mineral availability continues along with current exploration and development costs. | Exploration and development in areas not under lease as of the date of publication of this rule and requiring roads would be precluded. |
| Leasable minerals related jobs [6] | No change to current estimates of future mineral associated direct and indirect jobs. | Potential effect on mining related employment is a decrease of 546 direct and 3,095 total jobs. |
| Leasable minerals related income [6] | No change to current estimates of future minerals associated direct and total income. | Potential effect on mining related annual income is $36.2 million less direct and $127.8 million less total income. |
| Payments to states for leasable minerals | Payments will continue to vary as extraction varies over time. | Payments associated with coal and phosphate could be reduced by $3.2 million per year. |
| Leasable mineral resources | No change to current estimates of available leasable resources. | About 873 million tons of phosphate and 308 to 1,371 million tons of coal would likely be unavailable for development. About 11.3 trillion cubic feet of undiscovered gas and 550 million barrels of undiscovered oil resources may be unavailable. |
| Exploration and development for salable minerals (sand, stone, gravel, pumice, etc.) [1]. | Existing mineral availability continues along with current exploration and development costs. | In a few isolated cases, development requiring roads may be precluded or costs may increase. |
| Operating costs for grazing permittees [1] | Increased access can potentially decrease cost. | No change in operating costs. |

**3270** **Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations

TABLE 1.—SUMMARY OF COSTS AND BENEFITS OF THE ROADLESS AREA CONSERVATION RULE COMPARED TO THE BASELINE—Continued

| Category | Baseline | Final rule |
|---|---|---|
| Operating costs for collectors of non-timber products [1]. | Increased access can potentially decrease cost. | No change in operating costs. |
| Special-use authorizations (such as communications sites, electric transmission lines, pipelines) [1]. | Current use and occupancies ...................... | Current use and occupancies not affected, future developments requiring roads excluded in inventoried roadless areas unless one of the exceptions applies. |
| Forest health [1] ................................................ | Potential lower cost of treatment due to increased access. | Slightly increased risk because of fewer treatment opportunities. Cost of current treatments remains unchanged. |

[1] Analysis based on qualitative discussion.
[2] Analysis based on historic Agency data on expenditures.
[3] Analysis based on forest-level data on projected timber volumes in inventoried roadless areas.
[4] Analysis based on Agency data from Timber Sales Program Information System Reporting System (TSPIRS) and IMPLAN model multipliers.
[5] Analysis based on Agency estimates of historic expenditures and IMPLAN model multipliers.
[6] Analysis based on Agency production estimates and IMPLAN model multipliers.

*Summary of the Results of the Final Regulatory Flexibility Analysis.* The Department is promulgating a final rule for roadless area conservation that does not impose regulations on small entities. The rule would not suspend or modify any existing permit, contract, or other legal instrument authorizing the occupancy and use of National Forest System land.[1] The rule could affect future opportunities for small entities, but the agency cannot predict at any given time what authorized uses a small entity might want to pursue on National Forest System lands.

Data are limited for linking the proposed rule to effects on small businesses. The agency does not typically collect information about the size of businesses that seek permission to operate on National Forest System lands. The agency sought information to the extent possible by specifically requesting additional information in the initial regulatory flexibility analysis.

The rulemaking has the potential to affect a subset of small businesses that may seek opportunities on National Forest System lands in the future. The primary effect of the rule on small businesses is the potential to affect the future supply of commodity outputs or commercial opportunities for businesses. The change in resource availability is expected to be small across most regions in the country. Therefore, future business opportunities are not likely to be reduced to any great extent in comparison to continuation of current management policies. However, the effects may be more pronounced in the Intermountain and Alaska Regions, with the effects in Alaska increasing in the longer term.

Small businesses in the wood products sector most likely to be affected are logging and sawmill operations. Reductions in the harvest of softwood sawtimber, particularly in the western U.S., are most likely to affect small businesses, since these sectors are dominated by small business. With the exception of the Intermountain (Utah, Nevada, western Wyoming, and southern Idaho) and Alaska Regions, reductions in harvest are estimated to range from less than one percent to four percent. The reduction in the Intermountain Region is estimated to be nine percent. Harvest effects on the Tongass National Forest will be reduced about 18 percent in the short-term, but in the longer-term, harvest could be reduced by about 60 percent absent further adjustments to the Tongass Land and Resource Management Plan.

In the mining sector, small businesses most likely to be affected are businesses involved in the exploration and development of leasable minerals. The final Roadless Area Conservation rule will affect exploration and development for leasable minerals in inventoried roadless areas in the future where road construction is required, except in areas presently under lease.

The potential effects on small businesses involved in livestock grazing and the collection of non-timber forest products are expected to be negligible. There will be fewer roads available for use in the future under the final rule, but the number of miles that would have been built in the next five years and that would have remained open for use is minor compared to the entire National Forest System road system.

Special-use authorizations on National Forest System land could be affected by the final rule, if road access is required. Most of the special uses potentially affected are dominated by large businesses, such as businesses in communication, electric services, gas production and distribution, and resort development. Small businesses with outfitter and guide permits are expected to benefit from the final rule, since these businesses are often dependent on providing services to recreationists interested in remote recreation activities that are often found in inventoried roadless areas.

The effect of the final rulemaking on small governmental jurisdictions is tied to possible reductions in commodity outputs in cases where some portion of federal receipts is returned to the states for distribution to counties, and to changes in the jurisdiction's economic base from changes in employment and business opportunities related to National Forest System outputs and management. Payments to states from timber receipts will be unaffected by the final Roadless Rule through 2006 because the "Secure Rural Schools and Community Self-Determination Act of 2000" was signed into law on October 30 (Pub. L. 106–393). This legislation allows counties to select a payment based on historic payment levels rather than payments based on current receipts. However, this legislation does not affect revenue sharing of federal receipts from mineral leasing on national grasslands and from public domain lands of the national forests. Therefore, the final rule may result in a reduction in those receipts in the future, which would affect revenues shared with states and counties. The agency has also chosen to pursue funds to assist communities undergoing economic transition resulting from implementation of the final Roadless Rule. Such assistance could include financial assistance to stimulate community-led transition programs and projects, support to attract public and

---

[1] Because the roadless rule does not directly regulate small entities, the Department does not believe the Regulatory Flexibility Act applies to this rule.

private interests in implementing local transition projects, coordination with other Federal and State agencies, and assisting local, State, Tribal, and Federal partners to work with the most affected communities. The Forest Service will pursue a six-year economic transition program. The Economic Adjustment Program will be used to fund or support projects that will be specific to the needs of individual communities and important to the national forest or grassland. The Forest Service anticipates requesting $72.5 million in support of these activities between fiscal years 2001 and 2006.

### Environmental Impact

*The Endangered Species Act of 1973, As Amended.* A biological evaluation was prepared which analyzed the potential effects of the action alternatives on threatened, endangered, and proposed species. This evaluation, along with other supporting documentation for the rule, was provided to the U.S. Fish and Wildlife Service and the National Marine Fisheries Service as part of consultation and conferencing under the Endangered Species Act. Both agencies concurred with the determination in the biological evaluation that all of the action alternatives analyzed in the biological evaluation may affect, but are not likely to adversely affect threatened or endangered species or adversely modify designated critical habitat; are not likely to jeopardize proposed species or adversely modify proposed critical habitat; and may beneficially affect threatened, endangered, and proposed species and critical habitat. Copies of these letters of concurrence can be viewed at the project record and can be viewed at the Roadless Area Conservation project website.

*Other Required Disclosures.* The agency has prepared a final environmental impact statement in concert with this rule. In it, the direct, indirect, and cumulative effects of the final rule and alternatives are disclosed. None of the prohibition alternatives are an action that requires consultation under the Fish and Wildlife Coordination Act because they do not require water to be impounded or diverted. The FEIS may be obtained from various sources as indicated in the **ADDRESSES** section of this document.

The Indiana Department of Natural Resources (IDNR) questioned whether the agency had adequately taken into account effects on historic properties and expressed concern that the rule would cause "neglect of historic properties." The IDNR urged the Forest Service to consult with the Indiana State

Historic Preservation Officer pursuant to Section 106 of the National Historic Preservation Act (NHPA). First, the FEIS does evaluate and display the effects of the final rule regarding cultural resources (FEIS Vol. 1, 3–232 to 3–237). The FEIS also makes clear that the prohibitions will not inhibit existing access to historic sites. As for the Section 106 NHPA process, this rulemaking does not constitute an "undertaking" as defined in 36 CFR 800.16. The regulations established by the Advisory Council for Historic Preservation make clear that once an agency determines that it has no undertaking, or that its undertaking has no potential to affect historic properties, the agency has no further Section 106 obligations.

### Controlling Paperwork Burdens on the Public

This rule does not contain any record keeping or reporting requirements or other information collection requirements as defined in 5 CFR part 1320 and, therefore, imposes no paperwork burden on the public. Accordingly, the review provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501, *et seq.*) and implementing regulations at 5 CFR part 1320 do not apply.

### Unfunded Mandates Reform

Pursuant to Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538), the Department has assessed the effects of this proposed rule on State, local, and Tribal governments, and on the private sector. This proposed rule does not compel the expenditure of $100 million or more by any State, local, or Tribal government, or anyone in the private sector. Therefore, a statement under Section 202 of the Act is not required.

### No Takings Implications

This rule has been reviewed for its impact on private property rights under Executive Order 12630. The Department determined that this proposed rule does not pose a risk of taking Constitutionally protected private property; in fact, the proposed rule honors access to private property pursuant to statute and to outstanding or reserved rights.

### Civil Justice Reform Act

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. The proposed revision: (1) preempts all State and local laws and regulations that are found to be in conflict with or that would impede its full implementation; (2) does not retroactively affect existing permits,

contracts, or other instruments authorizing the occupancy and use of National Forest System lands; and (3) does not require administrative proceedings before parties may file suit in court challenging these provisions.

### Federalism and Consultation with Tribal Governments

The agency considered this rule under the requirements of Executive Order 12612 and found the rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, the agency determined that no further assessment on federalism implications is necessary at this time. In addition, the consultation requirements under Executive Order 13132, effective November 2, 1999 were reviewed. This new Order calls for enhanced consultation with State and local government officials and emphasizes increased sensitivity to their concerns.

Forest Service line officers in the field were asked to make contact with Tribes to ensure awareness of the initiative and of the rulemaking process. Outreach to Tribes has been conducted at the national forest and grassland level, which is how Forest Service government-to-government dialog with Tribes is typically conducted.

Outreach to State and local governments has taken place both in the field and Washington offices. Forest Service officials have contacted State and local governmental officials and staffs to explain the notice of intent and the rulemaking process. The agency met with and responded to a variety of information requests from local officials and State organizations, such as the National Governors Association and the Western Governors Association.

In the development of this rule comments received from States, Tribes, and local governments in response to the notice of intent to prepare an environmental impact statement published October 19, 1999 (64 FR 56306) were carefully considered. Following publication of the proposed rule, the agency met with State, Tribal, and local government officials to explain and clarify the proposed rule and the accompanying environmental impact statement. The extent to which additional consultation was appropriate under Executive Order 13132 was considered. In addition, the Forest Service responsible official will seek input and participation by State, local, and Tribal officials in the early stages of forest and project planning regarding

subsequent decisions for inventoried roadless areas.

## List of Subjects in 36 CFR Part 294

Forests and forest products, Highways and roads, Land and resource management planning, National forests, Navigation (air), Recreation and recreation areas, and Wilderness areas.

For the reasons set forth in this preamble, part 294 of Title 36 of the Code of Federal Regulations is amended as follows:

## PART 294—SPECIAL AREAS

1. Add and reserve §§ 294.3–294.9, designate §§ 294.1 through 294.9 as subpart A, and add a subpart heading to read as follows:

### Subpart A—Miscellaneous Provisions

2. Remove the authority citations that follow §§ 294.1 and 294.2 and add an authority citation for the newly designated Subpart A to read as follows:

**Authority:** 16 U.S.C. 472, 551, and 1131.

3. Add a new Subpart B to read as follows:

### Subpart B—Protection of Inventoried Roadless Areas

Sec.
294.10  Purpose.
294.11  Definitions.
294.12  Prohibition on road construction and road reconstruction in inventoried roadless areas.
294.13  Prohibition on timber cutting, sale, or removal in inventoried roadless areas.
294.14  Scope and applicability.

**Authority:** 16 U.S.C. 472, 529, 551, 1608, 1613; 23 U.S.C. 201, 205.

### Subpart B—Protection of Inventoried Roadless Areas

#### § 294.10  Purpose.

The purpose of this subpart is to provide, within the context of multiple-use management, lasting protection for inventoried roadless areas within the National Forest System.

#### § 294.11  Definitions.

The following terms and definitions apply to this subpart:

*Inventoried roadless areas.* Areas identified in a set of inventoried roadless area maps, contained in Forest Service Roadless Area Conservation, Final Environmental Impact Statement, Volume 2, dated November 2000, which are held at the National headquarters office of the Forest Service, or any subsequent update or revision of those maps.

*Responsible official.* The Forest Service line officer with the authority and responsibility to make decisions regarding protection and management of inventoried roadless areas pursuant to this subpart.

*Road.* A motor vehicle travelway over 50 inches wide, unless designated and managed as a trail. A road may be classified, unclassified, or temporary.

(1) *Classified road.* A road wholly or partially within or adjacent to National Forest System lands that is determined to be needed for long-term motor vehicle access, including State roads, county roads, privately owned roads, National Forest System roads, and other roads authorized by the Forest Service.

(2) *Unclassified road.* A road on National Forest System lands that is not managed as part of the forest transportation system, such as unplanned roads, abandoned travelways, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization.

(3) *Temporary road.* A road authorized by contract, permit, lease, other written authorization, or emergency operation, not intended to be part of the forest transportation system and not necessary for long-term resource management.

*Road construction.* Activity that results in the addition of forest classified or temporary road miles.

*Road maintenance.* The ongoing upkeep of a road necessary to retain or restore the road to the approved road management objective.

*Road reconstruction.* Activity that results in improvement or realignment of an existing classified road defined as follows:

(1) *Road improvement.* Activity that results in an increase of an existing road's traffic service level, expansion of its capacity, or a change in its original design function.

(2) *Road realignment.* Activity that results in a new location of an existing road or portions of an existing road, and treatment of the old roadway.

*Roadless area characteristics.* Resources or features that are often present in and characterize inventoried roadless areas, including:

(1) High quality or undisturbed soil, water, and air;

(2) Sources of public drinking water;

(3) Diversity of plant and animal communities;

(4) Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land;

(5) Primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation;

(6) Reference landscapes;

(7) Natural appearing landscapes with high scenic quality;

(8) Traditional cultural properties and sacred sites; and

(9) Other locally identified unique characteristics.

#### § 294.12  Prohibition on road construction and road reconstruction in inventoried roadless areas.

(a) A road may not be constructed or reconstructed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, a road may be constructed or reconstructed in an inventoried roadless area if the Responsible Official determines that one of the following circumstances exists:

(1) A road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property;

(2) A road is needed to conduct a response action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or to conduct a natural resource restoration action under CERCLA, Section 311 of the Clean Water Act, or the Oil Pollution Act;

(3) A road is needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty;

(4) Road realignment is needed to prevent irreparable resource damage that arises from the design, location, use, or deterioration of a classified road and that cannot be mitigated by road maintenance. Road realignment may occur under this paragraph only if the road is deemed essential for public or private access, natural resource management, or public health and safety;

(5) Road reconstruction is needed to implement a road safety improvement project on a classified road determined to be hazardous on the basis of accident experience or accident potential on that road;

(6) The Secretary of Agriculture determines that a Federal Aid Highway project, authorized pursuant to Title 23 of the United States Code, is in the public interest or is consistent with the purposes for which the land was reserved or acquired and no other reasonable and prudent alternative exists; or

(7) A road is needed in conjunction with the continuation, extension, or

renewal of a mineral lease on lands that are under lease by the Secretary of the Interior as of January 12, 2001 or for a new lease issued immediately upon expiration of an existing lease. Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.

(c) Maintenance of classified roads is permissible in inventoried roadless areas.

### § 294.13   Prohibition on timber cutting, sale, or removal in inventoried roadless areas.

(a) Timber may not be cut, sold, or removed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, timber may be cut, sold, or removed in inventoried roadless areas if the Responsible Official determines that one of the following circumstances exists. The cutting, sale, or removal of timber in these areas is expected to be infrequent.

(1) The cutting, sale, or removal of generally small diameter timber is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.

(i) To improve threatened, endangered, proposed, or sensitive species habitat; or

(ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period;

(2) The cutting, sale, or removal of timber is incidental to the implementation of a management activity not otherwise prohibited by this subpart;

(3) The cutting, sale, or removal of timber is needed and appropriate for personal or administrative use, as provided for in 36 CFR part 223; or

(4) Roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after the area was designated an inventoried roadless area and prior to January 12, 2001. Timber may be cut, sold, or removed only in the substantially altered portion of the inventoried roadless area.

### § 294.14   Scope and applicability.

(a) This subpart does not revoke, suspend, or modify any permit,

contract, or other legal instrument authorizing the occupancy and use of National Forest System land issued prior to January 12, 2001.

(b) This subpart does not compel the amendment or revision of any land and resource management plan.

(c) This subpart does not revoke, suspend, or modify any project or activity decision made prior to January 12, 2001.

(d) This subpart does not apply to road construction, reconstruction, or the cutting, sale, or removal of timber in inventoried roadless areas on the Tongass National Forest if a notice of availability of a draft environmental impact statement for such activities has been published in the **Federal Register** prior to January 12, 2001.

(e) The prohibitions and restrictions established in this subpart are not subject to reconsideration, revision, or rescission in subsequent project decisions or land and resource management plan amendments or revisions undertaken pursuant to 36 CFR part 219.

(f) If any provision of the rules in this subpart or its application to any person or to certain circumstances is held invalid, the remainder of the regulations in this subpart and their application remain in force.

Dated: January 5, 2001.

**Dan Glickman,**

*Secretary.*

[FR Doc. 01–726 Filed 1–5–01; 3:45 pm]

**BILLING CODE 3410–11–P**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

STATE OF IDAHO, ex rel.; DIRK
KEMPTHORNE, Governor; PETE T.
CENARRUSA, Secretary of State; ALAN
G. LANCE, Attorney General; J.D.
WILLIAMS, State Controller; MARILYN
HOWARD, Superintendent of Public
Instruction, as the State Board of Land
Commissioners; and STANDLEY F.
HAMILTON, Director, Idaho Department
of Lands,

and

Governor Dirk Kempthorne, in his
capacity as Chief Executive of the State of
Idaho and President of the Idaho Board of
Land Commissioners

Plaintiffs,

INTERMOUNTAIN FOREST
ASSOCIATION,

Plaintiff-Intervenor,

IDAHO STATE SNOWMOBILE
ASSOCIATION, INC., et al.,

Plaintiff-Intervenors,

and

KOOTENAI TRIBE OF IDAHO,

Plaintiff-Intervenor,

vs.

UNITED STATES FOREST SERVICE,

Defendant,

and

IDAHO CONSERVATION LEAGUE,
et al.,

Defendant-Intervenors.

CASE NO: CV99-611-N-EJL

ORDER

In a separate Order issued on this same day in the above-entitled action, the Court granted the Defendant United States Forest Service's Motion to Dismiss and denied as moot the Plaintiff State of Idaho's Motion for Preliminary Injunction. The Court now addresses the remaining motions currently pending in this matter.

The Kootenai Tribe of Idaho seeks to intervene in this action as a plaintiff. The Tribe's motion is unopposed and therefore the Court will grant it. In granting this motion, the Court relies upon the representation made by the Tribe's counsel at the hearing held on February 8, 2000, that the Tribe will make a substitution of local counsel in order to obviate the appearance of conflict created by the current representation. The Court's ruling on this matter, therefore, is contingent upon the substitution of local counsel forthwith.

Idaho Conservation League, *et al.*, moves to intervene as a defendant. The motion is opposed by the State of Idaho. Having reviewed the record and applicable law, the Court concludes that the Idaho Conservation League, *et al.*, has demonstrated interests relating to the subject matter of this action that at a minimum permit intervention under Federal Rule of Civil Procedure 24(b). Accordingly, the motion to intervene will be granted.

The State of Montana and the State of South Dakota both seek leave to file an amicus brief in support of the State of Idaho's action. The Court also received a letter from the Attorney General of the State of Nebraska requesting leave to join in the State of Montana's amicus brief. The Court's Order, issued today, dismissing the State of Idaho's Complaint, renders these requests moot. Moreover, the requests were not timely filed and the Court finds that the interests of the State of Montana and the State of South Dakota are adequately represented by the parties to this case.

## ORDER

Based on the foregoing, and the Court being fully advised in the premises, it is **HEREBY ORDERED** that:

1. The Motion of the Kootenai Tribe of Idaho to Intervene as a Plaintiff (Docket No. 44) is **GRANTED**. This ruling, however, will be revisited if the Tribe fails to seek substitution of local

counsel within seven (7) days of the date of this Order. The Clerk of the Court shall file the Tribe's Complaint. In accordance with the Court's Order, issued today, dismissing the State of Idaho's Complaint, the Court lacks subject matter jurisdiction over Count One of the Tribe's Complaint (the NEPA and APA claim) and it is therefore **DISMISSED**.

2. The Amended Motion for Intervention by Idaho Conservation League, *et al.*, (docket nos. 26 & 47) is **GRANTED**. The Clerk of the Court shall file Idaho Conservation League's Motion to Dismiss and supporting Memorandum. However, the Court's Order, issued today, dismissing the State of Idaho's Complaint, renders the Idaho Conservation League's Motion to Dismiss **MOOT** and it is therefore **DENIED**.

3. The State of Montana's Motion for Leave to File Amicus Brief (Docket No. 67) and the State of South Dakota's Motion for Leave to File Amicus Brief (Docket No. 70) are both **DENIED**. The State of Nebraska's request to join in the State of Montana's amicus brief is **DENIED**.

4. The Court's ruling on the above matters together with the Court's Order, issued today, dismissing the State of Idaho's Complaint, renders the following motions **MOOT** and **DENIED** as such: State of Idaho's Amended Motion to Strike (Docket No. 41); Kootenai Tribe of Idaho's Motion to Expedite Consideration of Motion to Intervene (Docket No. 52); Idaho Conservation League's Motion to Expedite Consideration of Motion to Intervene (Docket No. 48); Idaho Conservation League's Motion for Leave to File Amicus Memorandum (Docket No. 61); Idaho Conservation League's Motion to Expedite Consideration of Motion for Leave to File Amicus Memorandum (Docket No. 63); and Idaho Conservation League's Motion for Leave to Participate in Oral Argument (Docket No. 64).

Dated this _18th_ day of February, 2000.

Edward J. Lodge
United States District Judge

**CIVIL PROCEEDINGS - Pending Motions**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

Judge Edward J. Lodge                     Date: June 14, 2000
Case No:    Cv. 99-611-N(lead) and       Deputy Clerk:  Carol Vaughn
            Cv. 00-141-S                  Reporter:  Peggy Satterfield

**State of Idaho, et al vs. US Forest Service (99-611-N) - Lead**
**Boise County, et al vs. Daniel Glickman, et al (00-141-S)**

### Civil 99-611-N

**Plaintiff-Intervenors:**
    **Bruce Smith** - Plaintiff-Intervenor Intermountain Forest Association
    **Paul Turcke representing Plaintiff-Intervenors**:
      Idaho State Snowmobile Associates, Inc.
      Blueribbon Coalition, Inc.
      The American Council of Snowmobile Associations
    **Mike Elia** - Plaintiff-Intervenor Kootenai Tribe of Idaho

**Defendants:**
    **Andrea Berlowe/Marc Haws** - US Forest Service
    **Laird Lucas and Timothy Preso (via telephone) representing Defendant-**
    **Intervenors (and proposed defendant-intervenors):**
      Idaho Conservation League
      The Wilderness Society
      American Lands Alliance
      Sierra Club
      Pacific Rivers Council
      Oregon Natural Resources Council

### Civil 00-141-S

**Plaintiffs:**
    **Craig Meadows/Timothy Callanan/Jeff Neumeyer** - Boise County, et al

**Defendants:** Same defendants as in case Civil 99-611-N

State of Idaho, et al vs. US Forest Service
Civil 99-611-N and
Boise County, et al vs. Daniel Glickman, et al
Civil 00-141-S
June 14, 2000
Page 2


1. Docket No. 96, Plaintiffs in case 00-141 motion to consolidate shows as pending in 99-611. Motion denied as moot based upon Judge Williams order in 00-141 granting said motion.

2. Docket No. 115, Forest Service's unopposed motion for extension of time to respond to Plaintiff's discovery requests - granted nunc pro tunc as of May 1, 2000.

3. Docket No. 7, Sierra Club, et al's motion to intervene in 99-141. Parties have already been allowed to intervene in 99-611. Motion granted parties shall be allowed to intervene as defendants in 00-141.

4. Docket Nos. 15 and 16 in 00-141, Plaintiffs motions to strike intervenor's motion to dismiss complaint and to strike request for injunctive relief.

Motions denied as moot as Sierra Club allowed to intervene today. Plaintiffs shall have fourteen(14) days from today's date to file any additional response and defendant intervenors shall have fourteen(14) days from the filing of plaintiffs response to file any reply brief.

5. Docket No. 11 in case 00-141, Defendant Intervenor's Motion to Exceed Page Limit on Memorandum - Granted.

6. Plaintiffs in 00-141's Motion for Partial Summary Judgment on ultra vires cause of action (Docket 23) is not ripe as the Forest Service has moved to stay briefing. Motion to stay denied - Forest Service needs to respond.

7. Defendant Forest Service's Motion for Protective Order (Docket No. 119) to stay discovery pending Court's ruling on motion to dismiss against plaintiffs in case 00-141 - granted.

State of Idaho, et al vs. US Forest Service
Civil 99-611-N and
Boise County, et al vs. Daniel Glickman, et al
Civil 00-141-S
June 14, 2000
Page 3


8.  Defendant Forest Service's Motion to Stay Briefing on Plaintiff's Motion for
Partial Summary Judgment on the ultra vires claim of Plaintiffs (Docket 123) -
denied.

The remaining motions pending before the Court and any additional motions filed
on or before June 28, 2000 (14 days from today's date) will be heard by Judge
Lodge on **Monday, August 7, 2000 at 9:30am**.  Response and reply to those
motions filed on or before June 28th will be in accordance with the local rules.  All
parties to respond and brief all motions.

Pleadings previously marked as received by this Court shall be filed as of today's
date.




                              Time: 10:00 - 11:00am
                              Boise





Autos

nwautospace

The Seattle Times Company Classifieds

Ad Info



CLASSIFIEDS    HOME DELIVERY    MONEY    TRAFFIC    WEATHER



Nation/World



HOME
NORTHWEST
SPORTS
BUSINESS
NATION/WORLD
  Sci-Tech
  WTO
  U.S. Wire
  World Wire
ART & LIFE
COMICS & GAMES
OPINION
COLUMNISTS
GETAWAYS
NEIGHBORS

**SEARCH**

*FIND*

Sort:  ● date  ○ rank
Query Help
Browse by date

## Bush would seize reins on lands policy

*Monday, June 26, 2000*

**By JOEL CONNELLY** ✉
SEATTLE POST-INTELLIGENCER NATIONAL CORRESPONDENT

AUSTIN, Texas -- Republican presidential candidate George W. Bush, in environmental stands that set him far apart from opponent Al Gore, is promising to cut more trees, abandon talk of breaching dams and work closely with traditional local power structures.

The Texas governor is unsure whether he can "unscramble the egg" on President Clinton's designation of national monuments, but charges that the president has "virtually shut down the ability of a lot of people to use lands."

Bush, who is targeting the Northwest in his campaign, elaborated on his views late last week in a wide-ranging interview with a small group of reporters.

The main thrust was that Bush promises sweeping changes in the Clinton administration's pro-preservation policies, particularly in national forest lands of the mountains of Washington and Oregon.

He promised to reverse, if possible, Clinton's initiative that would ban road construction on 43 million acres of national forests, more than one-fifth of the nation's federally owned forests.

"We're going to look at a reasonable amount of board-feet to be harvested out of Northwestern timberlands," Bush said. "It's good for America. It's good for our economy. It happens to be good for the local economy as well."

On other issues:

**Arctic Refuge:** Bush reiterated his call to let oil and gas companies conduct exploratory drilling on the coastal plain of Alaska's Arctic National Wildlife Refuge.

Gore has opposed drilling, as have conservationists and some indigenous groups, fearing it would disrupt calving of the giant Porcupine caribou herd.

**National monuments:** Bush said he favors preserving "some of the pristine land" in the West, but said that Clinton "just unilaterally acts" without approval from Congress or localities.

"I don't know the extent to which the president can unscramble the egg," Bush said when




**Finish Your Degree...**
Seattle Pacific University
DEGREE COMPLETION PROGRAM



**Scorecard**
REAL TIME
SPORTS NEWS
& STATISTICS



NWsource
AFFILIATE

MSNBC WIRE

digitalcity

**HEA**
Forest Se
swings a
growth lo

So-called
Death' ar
investiga

Bush has
in Chave
questions

Daughter
president
as cance

Israelis r:
Clinton p

Too man
obsessed
studies fi

Ford and
open up
crash se

Edwards
10 years
$250,000

Suspect
Laden or
attack on

Tiananmo
fake, Chi



Exh 4

asked what he would do about newly designated national monuments. He promised to "work closely with the Senate and Congress and local authorities" on management decisions.

Should a
speech s

News fro
nation

Gore recently announced and acclaimed the Hanford Reach National Monument, calling the free-flowing stretch of Columbia River "one of our greatest national treasures."

News fro
world

**Snake River dams:** While the Clinton administration has made no recommendation, Bush charged that it is bent on removing four dams from the lower Snake River as a means of restoring the river's decimated runs of wild salmon.

SI

**Plmail**
Any news o
to your inbo

**PltoGo**
Top local, b
sports news

**Plmobile**
Latest head
Web-enable

**Pldesktop**
Get the late
your deskto

**Login**
Create or ed
SeattleP-I.c

"The administration wants to breach the dams and the vice president won't tell us what his view is," Bush said. He argued that, "There can be a proper balance with the environment and with a way of life.

"My point is we can have both salmon runs and hydroelectric energy by having salmon-friendly turbines," Bush said.

Gore has refused to rule out any option, but has called for a regional salmon summit that would "bring together all interested parties to find a real solution." It would be patterned after Clinton's 1993 forest summit in Portland, which led to a plan that has largely preserved the Northwest's remaining old growth forests.

In his interview, however, Bush decried results of the timber summit.

"This is a president who went out to the Northwest and declared there was going to be a combination of environmental concerns and timber, which would go hand in hand," he said.

Instead, there was "a major reduction in the amount of board feet that we harvest" which hurt timber-dependent communities, Bush said.

Gore has strongly supported the roadless initiative, and used his 1992 book, "Earth in the Balance," to call for a halt to clearcutting ancient forests in the Northwest.

During the 1980s, a record level of 4 billion board-feet of timber was cut each year from the national forests of the Pacific Northwest, with more than 60,000 acres of old growth forests clearcut each year. In 1992, when Bush's father was president, about 2.14 billion board-feet were cut from the national forests of Oregon and Washington.

But the cutting was virtually halted after U.S. District Judge William Dwyer ruled that the Forest Service had not planned for protection of the northern spotted owl, an endangered species that inhabits ancient forests.

The Clinton administration's forest plan, which covers 24 million acres of Northwest forests, promised "a predictable and sustainable level of timber sales" of 1.2 billion board-feet annually.

The timber cut in 1999, however, was only 569 million board-feet. The Gifford Pinchot National Forest in southwest Washington, once devoted largely to logging, now has 80 percent of its land set aside from cutting.

Defending the Snake River dams, former oilman Bush said the United States is in "an energy crunch" caused by dependence on foreign oil.

"By breaching the dams we would be reducing that amount of domestic (energy) supply,

making us more dependent on foreign sources of energy."

That view is disputed by Pat Ford, head of the regional conservation group Save Our Wild Salmon.

"The four Snake River dams contribute just 4 percent of the Northwest's total electrical generation," said Ford. He said studies have found that conservation and renewable-energy sources can replace kilowatts generated by the dams.

In his interview, Bush echoed many of the views of GOP Sen. Slade Gorton, who has argued that the Clinton administration's forest policies have had a "devastating effect" on Washington's timber towns.

Bush said the reduction in timber harvest is "affecting the quality of life."

---

*P-I reporter Joel Connelly can be reached at 206-448-8160 or joelconnelly@seattle-pi.com*

**Articles related to this subject**
- How Bush and Gore stand on key regional issues
- The green divide is vast for Bush, Gore
- GOP, industries seek to counter development halt
- ► More ...

(Disable inline results)

Printer-friendly version

E-mail this story

---

Home | Site Index | About the P-I | Circulation | Contact Us | Job Openings

Send comments to newmedia@seattle-pi.com
© 1999-2000 Seattle Post-Intelligencer
Terms of Service/Privacy Policy



41331

**Dick Cheney**
500 North Akard Street # 3600
Dallas, Texas 75201
(214) 978-2813

APPENDIX 6

March 6, 1998

Mr. Rhey Solomon
USDA Forest Service
Director, Ecosystem Management Coordination Staff
Mail Stop 1104
Washington, DC 20090-6090

Dear Mr. Solomon:

The current effort to impose an 18-month moratorium on USFS
"ROADLESS" areas within the state of Wyoming prompts me to write
this letter. This effort is clearly outside the legal bounds of the
Wyoming Wilderness Act of 1984   The state of Wyoming is entitled
to exemption from this proposed action.

Nowhere in the Federal Register's Proposed Interim Rule (36 CFR Part
212) RIN AB-68-0095-Temporary Suspension of Road Construction in
Roadless Areas is the language of the Wyoming Wilderness Act
recognized. Having co-sponsored this historic legislation when I was a
member of the U.S. House of Representatives representing Wyoming, I
now feel compelled to help bring this to your attention. Roadless areas
no longer exist within the state of Wyoming. Attempts to reinterpret
the intent of this legislation or its language would move the USFS
efforts outside of all legal bounds and compromise the agency's
integrity.

This congressionally approved legislation designated specific
Wilderness, Wilderness Study Areas, and released for multiple use all
other RARE II forest service lands. This action legally eliminated the
Roadless category within Wyoming's state boundaries.

Exh 6

MAR 2 6 1998
RECEIVED

RECEIVED
APR 2 7 1998

Mr. Rhey Solomon
March 6, 1998

The clear intention of the Wyoming congressional delegation at that time was to insulate Wyoming from constantly changing political agendas, and provide a legal basis for utilization of public lands within the state. Wyoming fulfilled its obligation to contribute to our nation's legacy of Wilderness for other generations. I trust that our federal government will meet its obligation to a trusting nation by respecting the public laws.

Sincerely,

Dick Cheney

cc:    U.S. Senator Craig Thomas
U.S. Senator Mike Enzi
U.S. Congresswoman Barbara Cubin
U.S. Secretary of Agriculture Dan Glickman
Asst. U.S. Secretary of Agriculture Jim Lyons
Governor Jim Geringer, Wyoming

## TRANSITION ADVISORY TEAMS

**EPA**

| Gary | Baise | Baise, Miller & Freer |
|---|---|---|
| Jim | Bennett | Mitken Corporation |
| Gordon | Binder | Aqua International Partners |
| Dorothy | Bowers | Retired |
| Jamie | Conrad | American Chemistry Council |
| Chris | DeMuth | American Enterprise Institute |
| Jim | Ford | American Petroleum Institute |
| Mike | Finnegan | J.P. Morgan |
| Linda | Fisher | Attorney |
| Mary | Gade | Sonnenschein, Nath & Rosenthal |
| Bob | Grady | The Carlyle Group |
| John | Graham | Harvard Center for Risk Analysis |
| Dan | Greenbaum | Health Effects Institute |
| Charlie | Grizzle | The Grizzle Company |
| Hank | Habicht | Global Environment & Technology Foundation |
| Ron | Hammerschmidt | Director, Division of Environment, Kansas |
| Steve | Hayward | Pacific Research Institute |
| Jeff | Holmstead | Latham & Watkins |
| Rich | Innes | Conservation Strategies, LLC |
| Christopher | Jones | Director of EPA, Ohio |
| Chuck | Knauss | Swidler, Berlin, Shereff, Friedman, LLP |
| Debra | Knopman | Progressive Policy Institute |
| Fred | Krupp | Environmental Defense |
| Jonathan | Lash | World Resources Institute |
| Elliot | Laws | Texaco, Inc. |
| Jeff | Leavitt | State of Utah |
| The Honorable Mike | Leiter | Collier, Shannon & Scott |
| Jeff | Loehr | College of Engineering, University of Texas - Austin |
| Ray | Ludwiszewski | Gibson, Dunn, and Crutcher |
| The Honorable Patrick | McCrory | Mayor of Charlotte, NC |
| Dale | Moore | National Cattlemen's Beef Association |
| Jim | Moseley | Farmer |
| Bill | Reilly | World Wildlife Fund |
| Robert E. | Roberts | Environmental Council of the States |
| Theodore | Roosevelt, IV | Lehman Brothers |
| Bill | Ruckelshaus | Madrona Venture Group |
| Jeff | Saltas | Texas Natural Resource Conservation Commission |
| Steve | Sandherr | Associated General Contractors |
| Lynn | Scarlett | Reason Foundation |
| Richard | Schmalensee | Sloan School of Management, MIT |
| Jim | Seif | Pennsylvania Department of Environmental Protection |
| Andy | Sharkey | American Iron and Steel Institute |
| David | Struhs | Secretary, Florida Department of Environment Protection |
| Justin | Wilson | Office of the Governor of Tennessee |
| John Paul | Woodley, Jr. | Office of the Governor of Virginia |

Exh 6

# INTERIOR

## TRANSITION ADVISORY TEAMS

| First Name | Last Name | Organization |
|---|---|---|
| Jack | Abramoff | Greenberg Traurig, LLP |
| Terry | Anderson | The Political Economy Research Center |
| Phil | Baker - Shenk | Dorsey & Whitney LLP |
| The Honorable Eli | Beebout | Speaker, Wyoming House of Representatives |
| Bruce | Benson | Benson Minerals Group |
| Jason | Benson | Public Lands Council |
| Gary | Campbell | Former Governor of New Mexico |
| Greg | Caruthers | BIPAC |
| Bernadette | Casey | Commissioner, New York State Department of Parks and Recreation |
| Bob | Castro | Snell & Wilmer LLP |
| Demar | Comer | Demar Dahl Company |
| Carol | Dahl | Vinson & Elkins LLP |
| W.H. "Buzz" | Dinkins | Perkins Coie LLP |
| Steve | Fawcett | National Environmental Strategies |
| The Honorable Wally | Griles | Former Secretary of Interior |
| The Honorable Don | Hickel | Former Secretary of Interior |
| William | Hodel | Former Assistant Secretary for Fish, Wildlife and Parks |
| Mary Pope | Horn | Lowcountry Open Land Trust |
| Cy | Hutson | Jamison & Sullivan |
| William | Jamison | Preston, Gates, Ellis |
| Lesley | Jarrell | The Trust for Public Land |
| Tom | Kane | National Parks and Conservation Association |
| Robert | Kiernan | The Robert List Company |
| Ray | List | Gibson, Dunn, Crutcher LLP |
| Tim | Ludwiszewski | Crowell, Moring LLP |
| Patty | McCrum | Former Western Represenative, Department of Interior |
| Alby | McDonald | U.S. Oil & Gas Association |
| Frank | Modiano | American Sheep Industry |
| Henson | Moore | American Forest & Paper Association |
| Terry | Moore | Arch Coal |
| Bill | O'Connor | California Farm Bureau Federation |
| Steve | Pauli | Crowell & Moring LLP |
| Hal | Quarles | National Mining Association |
| The Honorable Marc | Quinn | Governor of Montana |
| Dave | Racicot | Association of California Water Agencies |
| Jim | Reynolds | Indiana University |
| Mark | Ridenour | American Petroleum Institute |
| David | Rubin | Janus - Merritt LLC |
| Jennifer | Safavian | State of New Mexico |
| Jacqueline E. | Salisbury | Arizona Department of Environmental Quality |
| Greg | Schafer | Collier, Shannon & Scott |
| Peter | Scott | Conservation International |
| Jim | Seligman | Western Governors' Association |
| Marty | Souby | Massachusetts Department of Environmental Protection |
| Gary | Suuberg | International Association of Fish and Wildlife Agencies |
| Diener | Taylor | True Industries |
| | True | |

## INTERIOR, cont.

| | | TRANSITION ADVISORY TEAMS |
|---|---|---|
| John | Turner | The Conservation Fund |
| The Honorable Barbara | Vucanovich | US Congressman, Retired |
| Rob | Wallace | General Electric |
| The Honorable Malcolm | Wallop | Frontiers of Freedom |
| Tom | Weimer | National Academy of Engineering Program Office |
| Don | Young | Ducks Unlimited |
| Ken | Zangara | Zangara Dodge |