Douglas L. Honnold
Timothy J. Preso
Sanjay Narayan
Earthjustice Legal Defense Fund
209 South Willson Ave.
Bozeman, MT 59715
(406) 586-9699

Nathaniel Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA  98501
(360) 570-9309

Attorneys for Defendant-Intervenors

Laurence ("Laird") J. Lucas (ISB # 4733)
Land and Water Fund of the Rockies
P.O. Box 1612
Boise ID 83701
(208) 342-7024

Local Counsel for Defendant-Intervenors

U.S. COURTS

01 APR -5 AM 11: 13

REC'D _____ FILED
CAMERON S. BURKE
CLERK            IDAHO

**ORIGINAL**

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

KOOTENAI TRIBE OF IDAHO, et al.,          )
                                          )
          Plaintiffs,                     )
                                          )          Case No. CV01-010-N-EJL
          vs.                             )
                                          )          **NOTICE OF FILING**
ANN VENEMAN, in her official capacity     )
as the Secretary of Agriculture, et al.,  )
                                          )
          Defendants,                     )
                                          )
                    and                   )
                                          )
IDAHO CONSERVATION LEAGUE,                )
et al.,                                   )
                                          )
          Defendant-Intervenors.          )
                                          )

62

Defendant-Intervenors Idaho Conservation League, et al. ("ICL"), hereby submit a ruling issued on March 30, 2001, by the United States District Court for the District of Alaska in <u>Sierra Club v. Lyons</u>, No. J00-0009 CV (JKS), and <u>Alaska Forest Association v. Department of Agriculture</u>, No. J99-0013 CV (JKS), for consideration in connection with plaintiffs' pending request for a preliminary injunction. The ruling bears upon the status of timber sales proposed in the Tongass National Forest that were discussed at page 5 of ICL's response to plaintiffs' preliminary injunction motion.

In the ruling, United States District Judge James K. Singleton, Jr., enjoined the Forest Service from "taking any action to change the wilderness character" of roadless areas in the Tongass National Forest that would otherwise be eligible for wilderness designation, pending completion of further environmental analysis of such areas. Order, <u>Sierra Club v. Lyons</u>, No. J00-0009 CV (JKS), slip op. at 32 (D. Alaska, March 30, 2001). This injunction, if it remains in place, will suspend implementation of the Tongass projects identified on page 5 of ICL's preliminary injunction brief.

Respectfully submitted this 4th day of April, 2001,


Douglas L. Honnold
Timothy J. Preso
Sanjay Narayan
Earthjustice Legal Defense Fund
209 South Willson Ave.
Bozeman, MT 59715
(406) 586-9699

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA  98501
(360) 570-9309

Attorneys for Defendant-Intervenors


Laurence ("Laird") J. Lucas (ISB # 4733)
Land and Water Fund of the Rockies
P.O. Box 1612
Boise ID 83701
(208) 342-7024

Local Counsel for Defendant-Intervenors

FILED

MAR 3 0 2001

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
_____ Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SIERRA CLUB, THE WILDERNESS SOCIETY, ALASKA CENTER FOR THE ENVIRONMENT, and SITKA CONSERVATION SOCIETY, <br><br>         Plaintiffs, <br><br> vs. <br><br> JAMES R. LYONS, Under Secretary for Natural Resources and Environment, United States Department of Agriculture; and UNITED STATES FOREST SERVICE, <br>         Defendants. | Case No. J00-0009 CV (JKS) <br> Case No. J99-0013 CV (JKS) <br><br><br> <u>O R D E R</u> |
| ALASKA FOREST ASSOCIATION, CITY OF COFFMAN COVE, METLAKATLA INDIAN COMMUNITY, AND CONCERNED ALASKANS FOR RESOURCES AND ENVIRONMENT, <br><br>         Plaintiffs, <br><br> vs. <br><br> THE UNITED STATES DEPARTMENT OF AGRICULTURE, THE UNITED STATES FOREST SERVICE, DAN GLICKMAN, JAMES LYONS, MICHAEL DOMBECK, RICK CABLES, THOMAS PUCHLERZ, CAROL JORGENSEN, and FRED SALINAS in their official capacities, respectively, as Secretary of Agriculture; Under Secretary of Agriculture; Chief, Forest Service; Regional Forester for the Alaska Region of the Forest Service; Forest Supervisor, Tongass National Forest; Assistant Forest Supervisor, Stikine Area, Tongass National Forest; and Assistant Forest Supervisor, Chatham Area, Tongass National Forest, <br><br>         Defendants. | |

1

47

## INTRODUCTION

Presently before the Court are two related cases, *Sierra Club, et al. v. Lyons, et al.*, J00-0009 CV (JKS) ("*Sierra*") and *Alaska Forest Ass'n, et al. v. United States Department of Agriculture, et al.*, J99-0013 CV (JKS) ("*AFA*"), involving the legality of the revised Tongass Land Management Plan ("TLMP").[1]  The Court has consolidated these cases solely for the purpose of this Order.[2]

## BACKGROUND

The Tongass National Forest is the largest national forest in the United States, covering 17 million acres. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i.  The National Forest Management Act ("NFMA") requires the creation of a forest plan to provide management directives for individual forests, such as the Tongass, within the national system. *See* 16 U.S.C. § 1604.  The Tongass Land Management Plan ("TLMP"), approved in 1979, was the first forest plan implemented following the passage of NFMA. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i.  Under NFMA, plans such as the TLMP must be revised every 15 years. *See* 16 U.S.C. § 1604(f)(5)(A).  Pursuant to NFMA, the Forest Service started preparations in 1987 to revise the TLMP. *See Sierra*, Docket No. 33 at 6.[3]  The revised TLMP represents the first complete revision of the TLMP since it was approved in 1979. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i.

In addition to the procedural requirements set out in NFMA's implementing regulations,

---

[1]  The Court has jurisdiction over this action under 28 U.S.C. § 1331. *See* 28 U.S.C. § 1331; *Joseph v. Adams*, 467 F. Supp. 141, 147 (E.D. Mich. 1978) (explaining that lawsuits claiming a NEPA violation state questions conferring jurisdiction under the federal question statute).

[2]  The parties agree that recently passed regulations, *see* 36 C.F.R. Part 294 (Feb. 19, 2001); Special Areas, Roadless Area Conservation, 66 Fed. Reg. 3244 (Jan. 12, 2001), do not moot the issues before the Court. *See Sierra*, Docket No. 45; *AFA*, Docket No. 73.

[3]  One of the requirements under the revised TLMP was that roadless areas in the Tongass must be evaluated. *See Sierra*, Docket No. 33 at 6.

ORDER

NFMA also requires compliance with the National Environmental Policy Act ("NEPA"). *See* 16 U.S.C. § 1604(g)(1); 42 U.S.C. §§ 4321-4327. NEPA in turn requires preparation of an environmental impact statement ("EIS") for all major federal projects. *See* 42 U.S.C. § 4332(C)(i). To meet this requirement, the Forest Service wrote and circulated several draft versions of the EIS for public comment, beginning with a draft environmental impact statement ("DEIS") in 1990. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i. Shortly after the DEIS was completed, Congress passed the Tongass Timber Reform Act ("TTRA") which created .3 million acres of new wilderness areas in the Tongass. *See Sierra*, Docket No. 33, Ex. 1. The Forest Service continued the process of revising the TLMP and issued a supplemental environmental impact statement ("SDEIS") in 1991. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i.

Following the 1991 SDEIS, a revised supplemental draft environmental impact statement ("RSDEIS") was prepared in 1996, in part as a means of incorporating risk assessments detailing the viability of wildlife populations of the various Alternatives contained in the DEIS. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at Summary i. After the RSDEIS was circulated for public comment, the final environmental impact statement ("FEIS") was issued, adopting Alternative 11 as the Preferred Alternative for implementation of the revised TLMP. *See id.*[4] Shortly after the FEIS was issued, the 1997 Record of Decision ("ROD") was published. *See id.* It adopted Alternative 11 from the FEIS, with some modifications. *See id.*

Upon the publication of the FEIS and the 1997 ROD, several parties filed administrative appeals pursuant to the Forest Service regulations at 36 C.F.R. § 217. *See AFA*, Docket No. 50 at 1. However, before the various appeals were resolved, James Lyons, pursuant to his authority as the Under Secretary of Natural Resources and Environment, exercised discretionary review of land management plans under NFMA, and issued the 1999 ROD. *See id.* at 9. In the 1999 ROD, Under Secretary Lyons significantly modified the 1997 ROD by including additional conservation

---

[4] After the passage of TTRA, the Forest Service did not consider the possibility of creating any new wilderness areas within the Tongass in its SDEIS, its RSDEIS, or most importantly, its FEIS. *See Sierra*, Docket No. 33 at 2-11.

ORDER

measures. *See id.* Under Secretary Lyons also dismissed the administrative appeals of the FEIS and 1997 ROD. *See id.* Plaintiffs in *Sierra* and *AFA*, have brought suit over the legality of the Forest Service's actions in revising the TLMP.

**I.    *Sierra Club, et al. v. Lyons, et al.***

Presently before the Court is a motion filed by Plaintiffs seeking injunctive relief and a declaratory judgment on the grounds that Defendants (collectively "the Forest Service") violated NFMA and NEPA by failing to consider in the revised TLMP any alternatives with new wilderness recommendations. *See Sierra*, Docket No. 33 (Mot.); 35 (Opp'n); 39 (Reply).[5] Plaintiffs are challenging the validity of the TLMP and claim that the Forest Service violated NEPA and NFMA because the FEIS failed to consider the wilderness values of roadless areas within the Tongass and failed to include any detailed alternatives that recommended additions to the National Wilderness System. *See Sierra*, Docket No. 33 at 18, 41. The Forest Service argues that since Congress addressed the Tongass wilderness issue by enacting TTRA, it was not required to consider any additional wilderness thereafter. *See Sierra*, Docket No. 35 at 6.

**A.    NEPA, 42 U.S.C. §§ 4321-4370**

A district court's review of an EIS under NEPA is governed by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706 (1966). Courts may hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2); *Lathan v. Brinegar*, 506 F.2d 677, 692-93 (9th Cir. 1974). While the preparation of an EIS calls for judgment by the agency, the courts should require full, fair, bona fide compliance with NEPA. *See Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981).

NEPA requires that the Forest Service provide a detailed statement regarding the alternatives to an agency's proposed action in every major federal action that significantly affects the

---

[5]    The Forest Service has requested oral argument on Plaintiffs' motion. *See Sierra*, Docket No. 40. Whether to hear oral argument lies within the discretion of the trial court. *See United States v. Cheely*, 814 F. Supp. 1430, 1436 n.4 (D. Alaska 1992). As the parties have thoroughly briefed the issues before the Court, oral argument is not necessary.

ORDER

environment. *See* 42 U.S.C. § 4332(2)(C).  Consideration of all reasonable alternatives to the

agency action is "the heart of the environmental impact statement." *See* 40 C.F.R. § 1502.14 (July

1, 2000); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir.

1995).[6]  "The discussion of alternatives in an EIS . . . is subject to a construction of reasonableness."

*Lange v. Brinegar*, 625 F.2d 812, 818 (9th Cir. 1980).  An EIS is rendered inadequate by the

existence of a viable, but unexamined alternative. *See Citizens For A Better Henderson v. Hodel*,

768 F.2d 1051, 1057 (9th Cir. 1985).

However, "an agency's consideration of alternatives is sufficient if it considers an

appropriate range of alternatives, even if it does not consider every available alternative." *See*

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990).  An agency does

not need to analyze alternatives which are not significantly distinguishable from alternatives

actually considered, or which have substantially similar consequences. *See N. Plains Res. Council*

*v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989).   Therefore, it is necessary to determine whether NEPA

required the Forest Service to consider new wilderness areas in the Tongass.

### 1.   Wilderness Areas

Plaintiffs argue that the Forest Service's failure to consider any new wilderness areas

violated NEPA's requirement that the Forest Service must consider a reasonable range of

alternatives. *See Sierra*, Docket No. 33 at 18.  The Forest Service concedes that it did not consider

wilderness, but argues that it did consider natural setting areas, which it contends are similar to

---

[6] NEPA's alternatives requirement is necessary to ensure that the agency has before it and "takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit analysis. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made." *See Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971).

ORDER

wilderness in many ways, and therefore, is an acceptable alternative. *See Sierra*, Docket No. 35 at 20-23.[7] Plaintiffs' argument is more persuasive for two reasons.

First, the Forest Service has failed to abide by the plain language of NEPA because, by failing to consider any new wilderness designations, it failed to consider all reasonable alternatives. *See Morrison*, 67 F.3d at 729. The creation of wilderness is a reasonable alternative. This is proven by the Forest Service's creation of four different possible land use designations. *See Sierra*, Docket No. 33, Ex. 6 at 18. The possible designations include wilderness, natural setting, moderate development, and intensive development. *See id.* Considering wilderness as a possible alternative, since it is one of the four main categories, certainly seems to be a reasonable alternative. Nonetheless, the Forest Service failed to consider wilderness as a possible alternative. *See id.*, Ex. 8 at 2-3.

Second, natural setting areas are significantly distinguishable from wilderness areas. *See id.*, Ex. 6 at 18. For example, in its FEIS, the Forest Service groups different types of land use designations and distinguishes between natural setting areas and wilderness areas. *See id.*[8] Under the Forest Service's own guidelines, wilderness areas are more protected and receive different land use designations than natural setting areas. *See id.*, Ex. 6 at 18.[9] While it is clear

---

[7] In its SDEIS and its FEIS, the Forest Service was quite open in its refusal to consider wilderness areas, stating that "no additional areas are being considered for [w]ilderness for this Forest Plan revision (Congress having just made that decision)." *See Sierra*, Docket No. 33, Ex. 4 at 9; *see also id.*, Ex. 8 at 2-3.

[8] Land use designations for wilderness areas include Wilderness, Wilderness National Monument, and Non-Wilderness National Monument, *see Sierra*, Docket No. 33, Ex. 6 at 18, while natural setting areas are Research Natural Area, Remote Recreation, Special Interest Area, Old-Growth Habitat, Enacted Municipal Watershed, LUD II, Semi-Remote Recreation, Wild River, Scenic River, and Recreation River. *See id.*

[9] The Forest Service divides land use designations into four different groups: Wilderness, Natural Setting, Moderate Development, and Intensive Development. *See Sierra*, Docket No. 33, Ex. 6 at 18. Thus, it appears that wilderness and natural setting are significantly different, as they are separate groups with separate designations with different criteria and definitions to be considered by the reviewing agency. *See id.*

ORDER

the Forest Service has failed to consider wilderness as a reasonable alternative, an agency may consider the likelihood of congressional action as one factor in deciding whether to consider an alternative. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1020-21 (9th Cir. 1986).

### 2.   Congressional Action

If Congress has recently enacted legislation establishing a clear policy direction, an agency is not required to consider alternatives that are directly adverse to that legislation. *See Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1984) (stating that since Congress has made a considered and recent choice to prohibit sludge discharge through ocean outfalls, the agency was not required to consider outfall disposal as a reasonable alternative). The parties disagree about the likelihood of future congressional action. *See Sierra*, Docket Nos. 35 at 23-25; 39 at 11-15. Therefore, it is necessary for the Court to determine if Congress is unlikely to designate new wilderness in the Tongass.

The Forest Service argues that Congress is unlikely to "be receptive to [w]ilderness recommendations after . . . TTRA." *See Sierra*, Docket No. 35 at 23. As support for its position, the Forest Service cites the opposition to creating additional wilderness in the Tongass submitted by Congressman Young and Senators Stevens and Murkowski. *See id.* at 23-24. Conversely, Plaintiffs argue that the legislative history of TTRA shows that both the public at large and a majority in Congress were in favor of creating over one million acres of more wilderness in the Tongass than TTRA created. *See Sierra*, Docket No. 33 at 37. Thus, it seems that the future of congressionally-created wilderness in the Tongass is debatable. Nonetheless, it is certainly possible that a majority in Congress would be willing to create more wilderness areas in the Tongass in the future, since they were in favor of creating more wilderness in the Tongass than Congress created under TTRA.

The next issue is whether the Forest Service's failure to consider any wilderness was a violation of current federal law under NEPA. In other words, was the Forest Service not required to consider wilderness areas under NEPA because Congress had already spoken on the issue? Specifically, had Congress enacted any legislation that would bar the Forest Service from considering (in its TLMP) the possibility of creating wilderness now or sometime in the future in the Tongass?

ORDER

TTRA does not contain any language that prohibits the Forest Service from considering proposals to create more wilderness in the Tongass. *See Sierra*, Docket No. 33, Ex. 1. Nor does Congress or TTRA command the Forest Service not to consider any such future proposals. *See id.* In fact, TTRA has no effect on the Forest Service's legal requirement to follow NEPA. *Cf. Earth First v. Block*, 569 F. Supp. 415, 421 (D. Or. 1983) (explaining that congressional designation of wilderness in one part of national forest does not imply rejection of other areas for potential wilderness in the future). Consequently, the Forest Service acted unreasonably, arbitrarily, capriciously, and not in accordance with the law. In failing to abide by its own regulations and considering all the reasonable alternatives, the Forest Service violated NEPA.[10]

### B.     NFMA, 16 U.S.C. §§ 1600-1614

The Court's review of an EIS under NFMA is governed by the APA. *See* 5 U.S.C. § 706(2); *Nat'l Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000). To determine whether an agency action is arbitrary and capricious and thus unlawful, courts must determine if there was a "consideration of all the relevant factors and whether there has been a clear error of judgment." *See Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Courts should grant agencies a measure of deference and uphold an agency's interpretation of its regulations unless it is plainly erroneous. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989).

### 1.     Potential Wilderness

The Forest Service's planning regulations state that "unless otherwise provided by law, roadless areas within the National Forest System shall be evaluated and considered for recommendation as potential wilderness areas during the forest planning process." *See* 36 C.F.R. § 219.17(a) (July 1, 2000). The parties agree that the Forest Service must abide by this regulation, *see Sierra*, Docket No. 35 at 16; Plaintiffs argue, however, that the Forest Service failed to follow it.

---

[10] The Forest Service's own regulation states that "roadless areas within the National Forest system shall be . . . considered for recommendation as potential wilderness areas during the forest planning process." *See* 36 C.F.R. § 219.17(a) (July 1, 2000); *see also Cal. v. Block*, 690 F.2d 753, 769 (9th Cir. 1982) (requiring agency to consider possibility of wilderness designation).

ORDER

*See Sierra*, Docket No. 39 at 4-8. The Forest Service contends that it did consider alternatives recommending additional wilderness, but "decided not to recommend any," which action cannot be deemed arbitrary and capricious. *See Sierra*, Docket No. 35 at 16. The Forest Service's argument is not persuasive.

Contrary to the position articulated by the Forest Service, an analysis of the FEIS reveals that it did not consider recommending additional wilderness. *See Sierra*, Docket No. 33, Ex. 8 at 2-3. In its FEIS, the Forest Service explicitly stated that "[s]ince Congress addressed the Wilderness issue during this planning effort, *no additional Wilderness is considered as part of this plan revision.*" *See id.* (emphasis added). The Forest Service's failure to consider wilderness violates NFMA and 36 C.F.R. § 219.17. *See* 36 C.F.R. § 219.17 (July 1, 2000). By failing to consider the wilderness option, the Forest Service failed to consider all the relevant factors and made a clear error of judgment. *See Volpe*, 401 U.S. at 416.[11]

### 2.     Roadless Area Criteria

The Forest Service is required to consider and evaluate roadless areas within the National Forest System under a variety of criteria. *See* 36 C.F.R. § 219.17 (July 1, 2000).[12] Specifically at

---

[11] 36 C.F.R. § 219.12(f) requires the Forest Service to consider a broad range of reasonable alternatives. *See* 36 C.F.R. § 219.12(f) (July 1, 2000). These alternatives should be distributed between the minimum and maximum resource potential. *See* 36 C.F.R. § 219.12(f)(1) (July 1, 2000). By failing to consider wilderness, the Forest Service did not abide by this regulation.

[12] Section 219.17 provides that the evaluation shall include consideration of:
> (i) The values of the area as wilderness;
> (ii) The values foregone and effects on management of adjacent lands as a consequence of wilderness designation;
> (iii) Feasibility of management as wilderness, in respect to size, nonconforming use, land ownership patterns, and existing contractual agreements or statutory rights;
> (iv) Proximity to other designated wilderness and relative contribution to the National Wilderness Preservation System; and
> (v) The anticipated long-term changes in plant and animal species diversity, including the diversity of natural plant and animal communities of the forest planning area and the effects of such changes on the values

ORDER

issue here are sections 219.17(a)(2)(iii) and 219.17(a)(2)(iv).  Subsection (a)(2)(iii) requires the

Forest Service to consider the "[f]easibility of management as wilderness, in respect to size,

nonconforming use, land ownership patterns, and existing contractual agreements or statutory

rights."  *See* 36 C.F.R. § 219.17(a)(2)(iii) (July 1, 2000).  In its FEIS, the Forest Service provided

the relevant information regarding the size, nonconforming use, land ownership patterns, and

existing contractual agreements or statutory rights.  *See, e.g., Sierra*, Docket No. 33, Ex. 7.[13]

Plaintiffs concede that the evaluation contains all the relevant factual information.  *See id.* at

43.  Nonetheless, Plaintiffs argue that the evaluation does not provide an expert assessment of the

feasibility regarding the factual information that Plaintiffs believe is necessary for the public and

Congress to properly evaluate the feasibility of the information.  *See id.*  The Forest Service argues

that it has met all of the § 219.17(a)(2)(iii) criteria, *see Sierra*, Docket No. 35 at 19, and the Court

agrees.  *See Sierra*, Docket No. 33, Ex. 7 at 7-8.  An expert assessment is not required by the plain

language of the section, nor needed for the public or Congress to understand the basic factual

information that has been provided.  *See* 36 C.F.R. § 219.17 (a)(2)(iii) (July 1, 2000).

Subsection (a)(2)(iv) requires the Forest Service to consider the "[p]roximity to other

designated wilderness and relative contribution to the National Wilderness Preservation System."

*See* 36 C.F.R. § 219.17(a)(2)(iv) (July 1, 2000).  The Forest Service did not provide that information

in its FEIS.  *See Sierra*, Docket No. 35 at 20.  Instead, the Forest Service provided the information

regarding the relative contribution to the National Wilderness Preservation System in its analysis of

the management situation ("AMS").  *See id.*, Ex. 1.  However, the Forest Service did not reference

the AMS in its FEIS.  *See Sierra*, Docket No. 33, Exhibit 7.  When this issue was addressed in

public hearings and on administrative appeal, the Forest Service did not mention the AMS, but

---

for which wilderness areas were created. ·
*See* 36 C.F.R. § 219.17(2) (July 1, 2000).

[13]  For example, in its evaluation of Roadless Area Number 201, the Forest Service provides
the size (47,800 National Forest Acres); possible uses (forest land, fish and wildlife resource
improvement projects); and land ownership (from the Tlingit in prehistoric times, to fox farms, to
the Fanshaw Bay Research Center).  *See Sierra*, Docket No. 33, Ex. 7 at 7.

ORDER

stated that the FEIS contained the evaluations required by 36 C.F.R. § 219.17(a)(2). *See id.*, Ex. 17 at 8.

The Forest Service is required to incorporate by reference the material it relied on when reaching its conclusions in its FEIS. *See LaFlamme v. FERC*, 852 F.2d 389, 399 (9th Cir. 1988); *Natural Res. Def. Council v. Duvall*, 777 F. Supp. 1533, 1538 (E.D. Cal. 1991) (explaining that justification for agency's decision "is limited to the four corners" of EIS). The Forest Service failed to incorporate the AMS into the FEIS or the administrative record. *See Sierra*, Docket No. 33, Exhibit 7. Consequently, the Court is only to consider the information in the FEIS. *See Duvall*, 777 F. Supp. at 1538.[14] On its face, the FEIS does not adequately address the relative contribution to the National Wilderness Preservation System.[15] By failing to abide by all of the 36 C.F.R. § 219.17(a)(2)(iv) criteria, the Forest Service failed to consider all the relevant factors and made a clear error of judgment. *See Citizens For Envtl. Quality v. United States*, 731 F. Supp. 970, 983 (D. Colo. 1989) (citing *Volpe*, 401 U.S. at 416).

In sum, the Court shall grant Plaintiffs' motion because the Forest Service violated NFMA and NEPA. The Forest Service violated NEPA because it acted unreasonably, and not in accordance with the law, by failing to abide by NEPA, and its own regulations, and by failing to consider all the reasonable alternatives. The Forest Service violated NFMA because in failing to consider both wilderness and the relative contribution to the National Wilderness Preservation System, it failed to consider all the relevant factors and made a clear error of judgment.

---

[14] The Forest Service's failure to reference and incorporate the AMS deprived Plaintiffs and the public of the opportunity to analyze and comment on the material relied on in making the roadless area evaluations. This violates the policy underlying agency review, which is to discuss all the reasonable alternatives to foster informed decision making and informed public participation. *See* 40 C.F.R. § 1502.21 (July 1, 2000); *Cal. v. Block*, 690 F.2d 753, 768 (9th Cir. 1982).

[15] Plaintiffs also argue that while the AMS is incomplete, it is also "hopelessly" out of date since it was created in 1990 and there have been significant changes in the Tongass. *See Sierra*, Docket No. 39 at 19. For example, the number of inventoried roads decreased from 10.4 million at the time of the AMS, to 9.4 million acres at the time of the FEIS. *See id.* Thus, since the FEIS was inadequate, the Forest Service shall incorporate the AMS into the FEIS and determine the continued validity of the AMS, as it is now over 10 years old.

ORDER

## II.   *Alaska Forest Ass'n, et al. v. United States Department of Agriculture, et al.*

In this action, the Alaska Forest Association, a non-profit trade association representing small timber-related businesses in Alaska, and the city of Wrangell, together with other local communities (collectively "Plaintiffs"), have brought a motion for summary judgment seeking the invalidation of the revised TLMP and have also requested a permanent injunction against implementation of the revised TLMP on the grounds that the revised TLMP violates NEPA, NFMA, the APA, the Federal Advisory Committee Act ("FACA"), the Regulatory Flexibility Act ("RFA"), the Alaska National Interest Lands Conservation Act ("ANILCA"), and TTRA. *See AFA*, Docket Nos. 42 (Intervenors' Mot.); 43 (Mot.); 50 (Opp'n.);[16] 59A (Reply); 61 (Reply). The parties have requested oral argument on the motions before the Court. *See* Docket Nos. 59B, 60.[17]

### A.   Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[a] party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate if the Court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). Courts will construe all evidence and draw all evidentiary inferences in favor of the non-moving party. *See* 10A *Charles Alan Wright et al., Federal Practice & Procedure* § 2727, 459 & nn.4, 5 (3d ed. 1998) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)).

A dispute over a material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[16] The Forest Service has challenged Plaintiffs' standing in its opposition to summary judgment. *See AFA*, Docket No. 50 at 12-24. The Court, however, has already determined that Plaintiffs have both constitutional and prudential standing to bring this suit. *See AFA*, Docket No. 16 at 1.

[17] *See supra* note 5.

ORDER

(1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). However, mere allegations of factual dispute, without more, will not defeat an otherwise proper motion. *See Provenz v. Miller,* 102 F.3d 1478, 1489-90 (9th Cir. 1996); *Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981) (stating that "[a] motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data"). If, from the record before the Court, "there is no genuine dispute respecting a material fact essential to the proof of movant's case and the case cannot be proved if a trial should be held, the [C]ourt may sua sponte grant summary judgment to the non-moving party." *See Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir. 1982).

### B.    Extra-Record Materials

"Judicial review of agency action is generally limited to review of the administrative record." *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir. 1998) (citing 5 U.S.C. § 706). However, there are various circumstances in which a reviewing court may consider extra-record materials, namely:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter, and (4) when the plaintiffs make a showing of agency bad faith.

*See id.* (internal quotations omitted). To support their claim that the Forest Service used improper science and methodology in developing the revised TLMP, Plaintiffs have submitted declarations of experts that were not in the record. *See AFA,* Docket No. 59A at 27. To justify admitting these declarations, Plaintiffs rely on the second and third exceptions to the prohibition of extra-record materials. *See id.*

The principal extra-record declaration relied on by Plaintiffs was that of Walt Sheridan. *See AFA,* Docket No. 43, Sheridan Decl. Sheridan's declaration was primarily used to challenge the scientific merit of the Forest Service's decision, *see id.* at 40-45, and as such does not come within

ORDER

the exceptions to the prohibition on extra-record material. Upon review of the extra-record materials that have been submitted, the Court has determined that the materials do not meet any of the exceptions to the record rule. Consequently, the extra-record materials will not be considered.

### C.    NFMA, 16 U.S.C. §§ 1600-1614

Pursuant to NFMA, the Forest Service must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." *See* 16 U.S.C. § 1604(a). The stated purpose of the management plans is to "provide for multiple use and sustained yield of goods and services from the national Forest System in a way that maximizes long term net public benefits in an environmentally sound manner." *See* 36 C.F.R. § 219.1(a) (July 1, 2000). The management plans must be revised at least every fifteen years, in accordance with the principles of multiple use and sustained yield. *See* 16 U.S.C. § 1604(f)(5)(A). To ensure that the goals of multiple use and sustained yield are fulfilled in an environmentally sensitive way, NFMA's implementing regulations proscribe various procedures for developing a management plan. *See, e.g.,* 36 C.F.R. § 219.16 (July 1, 2000). The parties disagree about the validity of the revised TLMP and the 1997 ROD with respect to: (1) the Forest Service's methods in computing a sale schedule; (2) its analysis of social and economic effects; (3) the role of the Forest Supervisor in the planning process; and (4) the propriety of certain communications involving Under Secretary Lyons. *See AFA*, Docket Nos. 43 at 40-50; 50 at 29-49.

### 1.    Sale Schedule

Plaintiffs and the Forest Service disagree over what constitutes an adequate sale schedule under 36 C.F.R. § 219.16. *See AFA*, Docket Nos. 43 at 40-45; 50 at 44-46.[18] Plaintiffs argue that the current sale schedule is not detailed enough. *See AFA*, Docket No. 43 at 40-45. Specifically,

---

[18] A sale schedule is

> [t]he quantity of timber planned for sale by time period from an area of suitable land covered by a forest plan. The first period, usually a decade, of the selected sale schedule provides the allowable sale quantity. Future periods are shown to establish that long-term sustained yield will be achieved and maintained.

*See* 36 C.F.R. § 219.3 (July 1, 2000).

ORDER

Plaintiffs argue that the calculation of the sale schedule requires statistically reliable "growth and yield tables" that analyze a particular silvicultural method,[19] particular species of interest, and particular geographic locations. *See id.* at 40. Furthermore, Plaintiffs argue that the sale schedule completed by the Forest Service, and the growth and yield tables used to calculate it are statistically unreliable. *See id.* at 41-42.

Conversely, the Forest Service argues that a more detailed sale schedule is not required by NFMA's regulations, nor is a statistically reliable growth and yield table feasible because the revised TLMP incorporates uneven-aged and two-aged timber harvesting, practices that have not been widely used in Alaska. *See AFA,* Docket No. 50 at 44-48. In the past, the Forest Service argues, the prevalent silvicultural system in the Tongass has been even-aged timber harvesting (*i.e.,* clearcutting). *See id.; AFA,* Docket No. 8, Ex. F, 1997 FEIS App. at G-4. As a result of the historic practice of clearcutting, growth and yield tables have not yet been established for the regeneration of trees in the Tongass using alternative harvesting methods. *See AFA,* Docket No. 50 at 47. In the absence of data on the regeneration of trees in the Tongass, the Forest Service has relied on studies done in the Pacific Northwest and its best professional judgment to make growth and yield projections. *See id.* at 47-48. The regulation, argues the Forest Service, does not require anything more. *See id.* The Court agrees.

The regulation does not mandate a particular calculation and the adequacy of the sale schedule is a battle of the experts with the scale tipped in favor of the Forest Service. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.") (internal quotations omitted). In light of the predominant use of clearcutting methods in the Tongass, and the lack of information available as a consequence, the Forest Service's reliance on studies done in the Pacific Northwest and its best professional judgment

---

[19] Silviculture is the way in which a forest is managed for timber harvest and replacement. *See* 36 C.F.R. § 219.3 (2000) (July 1, 2000). Silvicultural systems include even-aged (*i.e.,* clearcutting), uneven-aged, and two-aged harvesting, and regrowth of trees. *See AFA,* Docket No. 8, Ex. F, 1997 FEIS App. G at G-3.

ORDER

when making the calculations for growth and yield tables is reasonable.  Thus, it is not necessary to supplement the FEIS to calculate a new sale schedule.

### 2.    Estimated Effects of Alternatives

Under NFMA, the Forest Service is required to estimate the effects of the proposed management plan alternatives including the social and economic effects of the proposed marketable goods, such as timber.  *See* 36 C.F.R. § 219.12(g) (July 1, 2000).  The allowable saleable quantity ("ASQ")[20] for timber provides a ceiling for the amount of timber that may be sold, as projected over ten years.  *See* 36 C.F.R. § 219.3 (July 1, 2000).  The ASQ is composed of two non-interchangeable components ("NICs"): NIC I is the area most suited for timber harvesting, while NIC II represents the more isolated and remote locations that would be more expensive to harvest.  *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at 3-280–3-281.  Plaintiffs dispute many of the Forest Service's basic assumptions underlying the calculation of the ASQ.  *See AFA*, Docket No. 43 at 45-46.  Plaintiffs claim that these erroneous assumptions distort the relationship between the ASQ and the actual sale level such that the social and economic impacts have not been adequately considered.  *See id.*[21] This claim lacks merit.

The FEIS acknowledges that the ASQ is a ceiling, not a future sales projection and considers that the actual harvest level will be less than the ASQ.  *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at

---

[20] ASQ is defined as the "quantity of timber that may be sold from the area of suitable land covered by the forest plan for a time period specified by the plan."  *See* 36 C.F.R. § 219.3 (July 1, 2000).

[21] Specifically, Plaintiffs attack the Forest Service's reliance on NIC II for harvestable timber, as well as the omission of historic rates of harvest in analyzing the economic impact of the management plan.  *See AFA*, Docket No. 43 at 45-46.  Plaintiffs point to the FEIS, which projects that NIC I will provide 80% to 82% of the ASQ, while NIC II will provide 18% to 20% of the ASQ, *see id.* (citing *AFA*, Docket No. 8, Ex. F, 1997 FEIS at 3-280–3-281), and to their expert's declaration that it is not realistic to assume that any of NIC II is harvestable.  *See id.*  Moreover, Plaintiffs argue that, because historic rates of harvest have been at 68% of the ASQ, projected rates of harvest should be based on that reduced harvest rate.  *See id.*  As it stands, Plaintiffs argue that the assumption for timber harvest is unrealistic, as the present projected marketable output does not incorporate this assumption.  *See id.*

ORDER

3-276 ("Given the uncertainties inherent in developing ASQs, shortfalls between the ASQ and timber sales should be expected."). The FEIS thus properly considered the relationship between the ASQ and the timber sale level, fulfilling the requirement that the Forest Service estimate the effects of the various alternatives on, among other things, the marketable output of goods.

### 3. Forest Supervisor's Role in Planning Process

Pursuant to NFMA, the Secretary of Agriculture is charged with the development of land and resource management plans for the National Forest System. *See* 16 U.S.C. § 1604(a). NFMA's implementing regulations contemplate the following hierarchy for officials involved in the planning process. The Regional Forester is responsible for establishing regional policy for forest planning and approving forest plans within a particular region, *see* 36 C.F.R. § 219.10(a)(1) (July 1, 2000); the Forest Supervisor has the overall responsibility for the preparation and implementation of the forest plan and the EIS and has the responsibility for appointing and supervising the interdisciplinary team, *see id.* §§ 219.10(a)(2), 219.10(a)(3); and, an interdisciplinary team works under the Forest Supervisor in the actual preparation of the EIS and is instructed to seek advice from outside the team when necessary, *see id.* § 219.5(b). The regulations further provide that the Forest Supervisor is to review the interdisciplinary team's plan and the EIS and then recommend a preferred alternative to be published in the draft EIS. *See id.* § 219.12(i) (July 1, 2000). After reviewing the plan and the draft EIS, the Regional Forester is to approve or disapprove of the plan in a record of decision. *See id.* § 219.12(j) (July 1, 2000). Because of its large size, the Tongass is split into three regions with a Regional Supervisor for each region.

The issue is whether the use of a policy group appointed by the Regional Supervisor to advise the interdisciplinary team usurped the role of the Forest Supervisors in the planning process. *See AFA*, Docket No. 43 at 46-50. Plaintiffs argue that, even though the Forest Supervisors were members of the policy group, they did not have enough control over the focus of the group. *See id.* at 50. Plaintiffs further argue that the biologists in the policy group were more interested in habitat conservation than balancing multiple uses, and consequently these biologists recommended

ORDER

conservation regulations to the interdisciplinary team that would not have arisen had the policy group not existed. *See id.*[22] Plaintiffs' arguments are not persuasive.

The Forest Supervisors oversaw the interdisciplinary group and eventually issued a preferred alternative as contemplated by NFMA's regulations. *See id.*[23] Thus, neither the formation of the policy group, nor its advice to the interdisciplinary group violated the role envisioned by NFMA's planning regulations for the Forest Supervisors. In sum, the Forest Service properly abided by NFMA and its implementing regulations as to its sale schedule, the estimated effects, and the role of the Forest Supervisor in its FEIS and the 1997 ROD.

### 4. *Ex Parte* Communications

NFMA provides that

> [w]hen a decision is appealed, appellants or intervenors may request meetings with the Deciding Officer to discuss the appeal, either together or separately, to narrow issues, agree on facts, and explore opportunities to resolve the issues by means other than by review and decision on the appeal. Reviewing Officers may, on their own initiative, request the Deciding Officer to meet with participants to discuss the appeal and explore opportunities to resolve the issues. *However, Reviewing Officers may not participate in such discussions.*

*See* 36 C.F.R. § 217.12(a) (July 1, 2000) (emphasis added). This provision does not provide a blanket prohibition on all *ex parte* communications, it only prohibits the Reviewing Officer from participating in discussions of the appeal with the relevant parties. *See id.* The parties disagree as to whether the Reviewing Officer, Under Secretary Lyons, while completing his review of the

---

[22] Plaintiffs do not, however, argue that the Forest Supervisors were prevented from reviewing and evaluating the interdisciplinary team's plan or the EIS as contemplated by the regulations. Rather, Plaintiffs argue that the plan would simply look different had the policy group not advised the interdisciplinary group. *See AFA*, Docket No. 43 at 50.

[23] Plaintiffs additionally argue that the issuance of the preferred alternative by the Forest Supervisors in a separate letter from the alternatives proposed by the interdisciplinary team violates 36 C.F.R. § 219.12(h)-(i), which states that the alternatives should be in comparative format. *See AFA*, Docket No. 43 at 50. However, the letter from the Forest Supervisors selecting Chapter Three with modifications, was circulated with the RSDEIS for public comment, fulfilling the suggestion by the regulation that the alternatives "should" be presented in comparative format. *See* 36 C.F.R. § 219.12(h)-(i) (July 1, 2000).

ORDER

appeals to the 1997 ROD, violated NFMA by meeting with several different interested parties. *See AFA*, Docket Nos. 43 at 27-28; 50 at 39-41.

There is evidence before the Court that Under Secretary Lyons had improper discussions with various interested parties. *See AFA*, Docket No. 43, Exs. 34-44. For example, Under Secretary Lyons' electronic calendar, personal handwritten calendar, and phone messages reveal that he had several discussion and meetings to discuss the Tongass with Bart Koehler,[24] representative of the Southeast Alaska Conservation Council; Tom Walso, representative for Earth Justice; Nathaniel Lawrence, representative of the Natural Resources Defense Council; as well as various other parties. *See id.*

In sum, Plaintiffs have made a strong circumstantial case that Under Secretary Lyons violated the law by having *ex parte* contacts with parties affected by the review. These contacts occurred under circumstances strongly suggesting that the merits of the parties' appeals were being discussed. To fully resolve this issue, the Court would need to hold an evidentiary hearing to determine for certain what occurred. Nevertheless, since the 1999 ROD is being vacated on other grounds, the Court assumes that any reviewing officer is insulated from any party during a period of review. The Court will consider the issue moot.

---

[24] With respect to these meetings and, more generally, to Under Secretary Lyons' willingness to work with "grassroots conservation stalwarts," Kohler has stated that "I believe that the decision was instead responding directly to the constant rumblings of concerns voiced time and time again by people who kept at it -- who kept urging the highest officials in the Department of Agriculture (the Forest Service's bosses) to set these key areas aside." *See AFA*, Docket No. 59A, Attach. 7 at 1.

ORDER

**D.    NEPA, 42 U.S.C. §§ 4321-4370**

**1.    Standard of Review**

NEPA[25] does not explicitly provide an answer for when an agency is no longer required to supplement a FEIS. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 370-73 (1989). NEPA's implementing regulations provide an agency

> (1) Shall prepare supplements to either draft or final environmental impact statements if:
>> (i) The agency makes *substantial changes* in the proposed action that are relevant to environmental concerns; or
>> (ii) There are *significant new circumstances or information* relevant to environmental concerns and bearing on the proposed action or its impacts.
>
> (2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

*See* 40 C.F.R. § 1502.9(c) (July 1, 2000) (emphasis added). It is not clear at what point supplementation is no longer required, however, it is "clear that an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *See Marsh,* 490 U.S. at 373. However, it is clear that the Forest Service enjoys less deference than usual "in the context of reviewing a decision not to supplement." *See id.* at 378.

---

[25] NEPA provides that

[t]he Congress authorizes and directs that, to the fullest extent possible: . . .

(2) all agencies of the Federal Government shall--

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*See* 42 U.S.C. § 4332.

ORDER

The United States Supreme Court has stated that factual determinations that are of a scientific or technical nature within an agency's realm of expertise warrant deference from a reviewing court and are reviewed under an arbitrary and capricious standard. *See id.* at 377 (stating that an agency's experts are better qualified to determine the significance of a new study than a court, thus an agency's decision not to supplement an FEIS is reviewed under a deferential standard to determine if it is arbitrary and capricious). The Ninth Circuit has declined to extend the arbitrary and capricious standard of review employed to factual determinations. *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995). Consequently, courts in the Ninth Circuit are to review an agency's decision not to supplement a FEIS under a reasonableness standard. *See id.* However, there is very little practical difference between the standards of reasonableness and arbitrary and capricious. *See Marsh*, 490 U.S. at 377 n.23.

### 2.   FEIS and 1997 ROD

Plaintiffs argue that the Forest Service violated NEPA by failing to supplement the FEIS prior to issuing the 1997 ROD. *See AFA*, Docket No. 43 at 28. In particular, Plaintiffs claim that provisions in the 1997 ROD made substantial changes to the FEIS, and that the Forest Service relied on new information not previously considered in the FEIS to complete the 1997 ROD. *See id.* at 28-40. As a result, Plaintiffs argue that the 1997 ROD is invalid, and that the Forest Service must supplement: 1) the findings of a 1997 risk assessment panel on the risks to viable populations of wildlife associated with Alternative 11; 2) standards and guidelines added to the 1997 ROD to protect marten, goshawk, endemic species and wolves; 3) a report by David J. Brooks and Richard W. Haynes discussing the changes in timber demand; and 4) wild and scenic rivers recommendations. *See id.*

### a.   1997 Risk Assessment Panel

A panel was convened in 1995 to assess the risks to the viability of wildlife populations throughout the Tongass associated with Alternatives 1-9 listed in the RSDEIS. *See AFA*, FEIS App. N-1. Because Alternatives 10 and 11 were not available for scrutiny when the risk assessment panels were convened in 1995 and 1996, the Forest Service inferred the risks associated with Alternatives 10 and 11 from the assessments of the other alternatives. *See AFA*, Docket No. 8, Ex.

ORDER

F, 1997 FEIS at 3-63. The analysis of the other Alternatives showed that "the number of acres harvested increased among [A]lternatives, . . . resulting in greater risk that habitat may not be sufficient to maintain viable and well distributed populations." *See AFA*, Docket No. 8, Ex. F, 1997 FEIS App. N at N-1. In 1997, a risk assessment panel was reconvened to confirm the risks to the environment associated with Alternatives 10 and 11 contained in the FEIS. *See id.* Subsequently, the 1997 ROD chose Alternative 11 from the FEIS to implement the revised TLMP. *See id; AFA*, Docket No. 8, Ex. F, 1997 ROD at 2-23.

Plaintiffs allege that the study done by the panel on the risks of Alternative 11 to viable wildlife populations represents significant new information that, under NEPA, requires supplementation of the FEIS. *See AFA*, Docket No. 43 at 28-31. The Forest Service counters that the information contained in Appendix N merely substantiates information that was already considered in Chapter 3 of the FEIS, as allowed pursuant to the appropriate regulations. *See AFA*, Docket No. 50 at 58-59; *see also* 40 C.F.R. § 1502.18(b) (July 1, 2000) (stating that an appendix to and EIS "shall . . . consist of material which substantiates any analysis fundamental to the impact statement"). The issue is whether the panel's 1997 study, published in Appendix N of the FEIS, detailing the risks to viable populations of wildlife of Alternative 11, merely substantiates the analysis in Chapter 3 of the FEIS, or instead provides significant new information not previously considered in the FEIS.

Appendix N compares the analysis of Alternative 11 contained in Chapter 3 of the FEIS with that of the 1997 panel. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS App. N at N-1. Generally, the study by the panel confirmed the analysis in Chapter 3. *See id.* at N-4. The comparison shows that Alternative 5 and Alternative 11 were found by both analyses to be the most protective of the goshawk habitat, *see AFA*, Docket No. 8, Ex. F, 1997 FEIS App. N at N-5, while Alternatives 5, 10, and 11 were found by both analyses to be the most protective of wolves. *See id.* at N-7. Finally, both analyses ranked Alternatives 3 and 11 as having similar impacts on the marten habitat. *See id.* at N-6. Thus, the panel's 1997 assessment of Alternative 11 represents the appropriate material for the Appendix. *See* 40 C.F.R. § 1502.18(b) (July 1, 2000). Specifically, the Appendix contains

ORDER

information that substantiates the analysis of the FEIS, and it is not new information that would require supplementation.

### b.    Brooks and Haynes Report

Both parties agree that the information contained in the report by Brooks and Haynes, released May 15, 1997, provides new information not previously considered in the FEIS. *See AFA*, Docket Nos. 43 at 32-33; 50 at 66-67. The parties disagree, however, on the information's significance. Plaintiffs argue that the report detailing the reduction in timber demand requires supplementation because the Forest Service relied on the report in the planning process. *See AFA*, Docket No. 43 at 32-33. The Forest Service counters that it considered the short-term fluctuations in market demand for timber described in the Brooks and Haynes report and determined that they were not significant to the long term planning of the revised TLMP. *See AFA*, Docket No. 50 at 67-68.

The Forest Service did not rely on the report in the planning process except to comment that the report on the short term fluctuations in timber demand was not relevant to the long-term planning under the revised TLMP. *See AFA*, Docket No. 8, Ex. F, 1997 ROD at 25. The Forest Service had previously evaluated the possible effects of the reduced demand in the foreign timber market in the short term and also evaluated the possible effects of the closure of KPC's mill, and determined that these considerations were better addressed through yearly timber sale project level planning. *See id.*, Ex. F, 1997 FEIS App. M at M-6. When the new Brooks and Haynes report came out projecting an even lower timber demand than had previously been reported, the Forest Service again determined that the report was irrelevant to the long-term, programmatic goals of the revised TLMP. *See id.*, Docket No. 8, Ex. F, 1997 ROD at 25. The Forest Service determined that the report was not significant to the planning process because, in addition to the lack of utility of the short-term projections to the long-term planning of the revised TLMP, the uncertainty of the projections undermined the report's utility. *See id.* (stating that the projections were not particularly useful because "[d]ifferent economists will make different projections of future demand because they often make different assumptions about the future").

ORDER

For the foregoing reasons, the Court finds that the Forest Service acted reasonably when it determined that the information contained in the Brooks and Haynes report did not require supplementation.[26] *See id.*, Ex. F, 1997 FEIS App. M at M-6. To require the agency to address the short term fluctuations in the timber market would prevent the revised TLMP from ever becoming final. The Forest Service thus acted reasonably when it determined that site-specific timber sales are a more appropriate forum to consider the short-term fluctuations in the market.

### c.   Standards and Guidelines for Goshawk, Marten, and Endemic Species

The 1997 ROD provides site-specific standards and guidelines to protect goshawk, marten, and endemic species as a result of concerns highlighted in Appendix N of the FEIS. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS App. N at N-1–N-16. Plaintiffs argue that the addition of these standards and guidelines constitutes a substantial change from the FEIS, thus requiring supplementation. *See AFA*, Docket No. 43 at 33-37. The Forest Service counters that the standards and guidelines come within the range of alternatives considered in the FEIS, and thus they do not require supplementation. *See AFA*, Docket No. 50 at 62. Furthermore, the Forest Service argues that it has met the requisite exceptions to supplementation.

The law in this area is clear. Specifically,

> [t]he agency need not circulate a supplemental draft EIS if (1) "the alternative finally selected by [the agency] was within the range of alternatives the public could have reasonably anticipated [the agency] to be considering," and (2) if "the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform [the agency] meaningfully of the public's attitudes toward the chosen alternative."

*See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508-09 (9th Cir. 1988) (quoting *Cal. v. Block*, 690 F.2d 753, 772 (9th Cir. 1982)). Here, the Forest Service estimated that the effects on the total ASQ, as a result of the standards and guidelines in the 1997 ROD, would be minimal because the measures are site-specific and the requirements (such as surveying and

---

[26] Because the Brooks and Haynes study is an economic report outside the agency's realm of expertise, its significance is a legal rather than a factual question. *See Morrison*, 67 F.3d at 727. Thus, the proper standard of review for the agency's determination of the significance of the report is reasonableness. *See id.*

ORDER

connectivity) do not necessarily result in less available timber for harvest. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS App. N at N-16. Even if the effects of the standards and guidelines were to reduce the timber yield by half, the Forest Service maintains that the ASQ would still come well within the range previously considered (*i.e.*, 122 mmbf in Alternative 5, to 640 mmbf in Alternative 7). *See AFA*, Docket No. 50 at 62.

The Forest Service argues that the RSDEIS detailed the agency's concern over protection for goshawk, marten and endemic species and compared various alternatives to address these concerns. *See id.* Although the standards and guidelines were added to Alternative 11 after the RSDEIS was circulated for public comment, the Forest Service points out that the measures existed within the RSDEIS throughout the different alternatives. *See id.* Thus, the Forest Service argues, the standards and guidelines come within the range of alternatives previously considered by the agency in the RSDEIS, and the public had the opportunity to comment on these measures. *See id.* at 62-66. Further, the Forest Service claims that it was informed of the public's attitudes on the chosen alternatives. *See id.* The Forest Service notes in the 1997 ROD that respondents to the RSDEIS included those who felt the wildlife habitat conservation approach threatened the jobs of timber workers, as well as those who felt that the RSDEIS offered too little protection for wildlife habitat. *See AFA*, Docket No. 8, Ex. F, 1997 ROD at 26-27. It concludes that the supplementation exception applies because standards were within the range of alternatives the public could have reasonably anticipated the agency to consider, and the agency was informed of the public's attitude towards the standards. *See* Docket No. 50 at 62-66. The Court finds the Forest Service's arguments persuasive.

After analyzing the evidence before the Court, it is clear that the Forest Service reasonably concluded that the measures did not require a recalculation of the ASQ. Additionally, the following considerations support the Forest Service's decision not to supplement the FEIS. First, in promulgating the standards and guidelines, the Forest Service complied with NEPA's command to infuse environmental considerations into its decision-making process. *See Marsh*, 490 U.S. at 372 n.14 ("Preparation of an EIS ensures that the environmental goals set out in NEPA are infused into the ongoing programs and actions of the Federal Government.") (internal quotations omitted). Second, the effect on the environment, not the production of an FEIS, is to be considered in

ORDER

determining whether supplementation is required. *See Morrison*, 67 F.3d at 727-28. For these reasons, the additional standards and guidelines in the 1997 ROD do not require supplementation.

### d.   Standards and Guidelines for Wolves

The guideline contained in the revised TLMP for wolves is different than those for marten, goshawk, and endemic species, in that it was explicitly considered in the RSDEIS at 3-239. *See* Docket No. 50 at 70. Because the guideline existed in the RSDEIS, it does not constitute a substantial change in the plan. *See* 40 C.F.R. § 1502.9(c) (July 1, 2000). Thus, the Forest Service was within its discretion in not supplementing the FEIS to consider the guidelines for wolves.

### e.   Wild and Scenic Rivers Recommendations

The Wild and Scenic Rivers Act ("WSRA") states that both Congress and the Department of the Interior may designate rivers as wild and scenic. *See* 16 U.S.C. § 1273(a). The Forest Service may recommend rivers for designation to the President, who may in turn recommend them to Congress. *See id.* § 1275(a). The Forest Service, however, has no authority to designate rivers as wild and scenic on its own. *See id.*

The 1997 ROD recommends 32 rivers for eligibility as wild and scenic. *See AFA*, Docket No. 8, Ex. F, 1997 ROD at A-3. Plaintiffs argue that the number of rivers is not within the range previously considered by the Forest Service. *See AFA*, Docket No. 42 at 29. However, Alternative 1 recommended 112 rivers for eligibility in the RSDEIS and Alternative 9 recommended 0 rivers for eligibility. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at 3-338. Thus, the 32 rivers recommended for eligibility were within the range previously considered by the Forest Service, and supplementation is not required. *See Half Moon Bay*, 857 F.2d at 508-09. In sum, the Court finds that in its FEIS and 1997 ROD, the Forest Service's actions were neither arbitrary nor capricious.

### E.   1999 ROD

The 1999 ROD was issued by Under Secretary Lyons in response to several administrative appeals that were filed challenging the 1997 ROD drafted by Regional Forester Phil Janik. *See AFA*, Docket No. 51, 1999 ROD at 1. The regulations governing appeals of administrative decisions contemplate that the Chief Forester will be the reviewing officer of the Regional Forester's decision, and that the Under Secretary, whose power has been delegated by the Secretary,

ORDER

will review decisions made by the Chief Forester. *See* 36 C.F.R. § 217.7 (July 1, 2000). In dealing with the appeals, Under Secretary Lyons took the unprecedented step of intervening prior to the Chief Forester's review of the 1997 ROD. *See AFA*, Docket No. 51, 1999 ROD at 1. When Under Secretary Lyons issued the 1999 ROD, he simultaneously denied all appeals of the 1997 ROD. *See id.* at 1-2. The 1999 ROD made several significant changes and amendments to the 1999 ROD impacting, *inter alia*, land use designations, timber harvest rotation, road density, and effect on the ASQ. *See generally AFA*, Docket No. 51, 1999 ROD. The parties disagree about the legality of Under Secretary Lyons' actions.

NEPA continues to apply in the administrative appeal process. Specifically, if any of the changes implement a substantial change in the proposed action relating to environmental concerns, the changes require supplementation. *See Half Moon Bay*, 857 F.2d at 508-09. However, supplementation is not required if the changes come within the range of alternatives that could reasonably be expected by the public, and the Forest Service was aware of the public's views of those alternatives.[27] Nonetheless, significant amendments to a management plan must be subjected to the same process as the initial management plan, including the preparation of an SEIS. *See* 36 C.F.R. § 219.10(f) (July 1, 2000); 36 C.F.R. § 219.12(a) (July 1, 2000).

NFMA's regulations do not define "amendment." However, NFMA regulations state that if there is a significant change in the forest plan, the revised forest plan must go through the same process established for the previous forest plan. *See* 16 U.S.C. § 1604(f)(4)-(5). These processes include the preparation of an SEIS that addresses the proposed changes and provides for the opportunity for informed public participation. *See id.*

The Forest Service denies that the changes made to the 1997 ROD are substantial. *See AFA*, Docket No. 50 at 71-74. The most substantial impact of the measures seems to be their combined effect on the ASQ. *See AFA*, Docket No. 43 at 26. The Forest Service argues that the reduction in the ASQ is, however, within the range previously considered by the RSDEIS in Alternatives 4 and

---

[27] It does not appear that public expected the changes implemented in the 1999 ROD as the Forest Service had previously rejected similar proposals.

ORDER

5. Yet, an analysis of the record reveals that Alternatives 4 and 5 were rejected by the 1997 ROD, thus precluding them from the range of alternatives the public could reasonably anticipate the Forest Service to choose from in the 1999 ROD. *See AFA*, Docket No. 8, Ex. F, 1997 ROD at 16. The public was denied the opportunity to comment on these alternatives as they did not expect these Alternatives to be used as they had already been rejected.  Thus, the Forest Service's decision not to supplement or allow the public a chance to comment was unreasonable, arbitrary and capricious.

Moreover, the changes made in the 1999 ROD by Under Secretary Lyons include, *inter alia*, the addition of 13 (*i.e.*, up from 5) "mostly natural" land use designations ("LUDs"); extending the timber harvest rotation from 100 to 200 years in forty-two wilderness analysis areas ("WAAs"); reducing the road density where wolves are present from .7 – 1 of open road per square mile to .7 or less of open road per square mile; and applying the combined effect of these additional conservation measures on the ASQ, reducing it from 267 mmbf to 187 mmbf. *See AFA*, Docket No. 51, 1999 ROD at 10-12.  After reviewing the totality of the circumstances, the Court concludes that the changes to the 1997 Rod are significant and substantial changes which impacted the overall forest plan.

In sum, the Court finds that the 1999 ROD amended the 1997 ROD.  The Forest Service's decision not to provide an SEIS nor provide for proper public participation in the decision, was unreasonable, arbitrary and capricious.  The Forest Service shall therefore prepare an SEIS addressing the changes in the 1999 ROD and afford informed public participation in accordance with NEPA and NFMA.

### F.    TTRA, 16 U.S.C. § 539d

Congress passed TTRA in 1990, while the Forest Service was in the midst of revising the TLMP. *See TTRA*, Pub. L. No. 101-626, 104 Stat. 4426 (1990); *see also* 16 U.S.C. § 539d(a). Section 101 of TTRA amends ANILCA. *See TTRA* § 101. In reforming ANICLA, TTRA requires the Forest Service to "seek to provide a supply of timber from the Tongass National Forest which . . . meets the annual market demand." *See TTRA* § 101(a).  The "seek to meet" market demand provision in TTRA is discretionary to the Forest Service and "gives the Forest Service leeway to

ORDER

choose among various site-specific plans, provided it follows the procedural requirements of the applicable statutes." *See Morrison*, 67 F.3d at 731.

The Forest Service is unable to "seek to meet" the market demand if it does not know what the market demand is. However, there is evidence that the Forest Service has committed to developing procedures to ensure that annual timber sales are consistent with the market demand. *See AFA*, 1997 ROD at 37. Additionally, there is evidence that the Forest Service has implemented a buffer stock system to ensure that market demand can be met. *See* Tongass National Forest Timber, Demand Considerations, Alaska, 65 Fed. Reg. 18,962 (Apr. 10, 2000). Finally, the Forest Service has complied with the applicable regulations, including the development of a sale schedule. In sum, the Forest Service has properly abided by TTRA.

### G.    FACA, 5 U.S.C. App. 2 §§ 1-15

FACA regulates the creation and operation of advisory committees that provide information and advice to the Government. *See* 5 U.S.C. app. 2 § 2. FACA was designed to make advisory committee operations more accountable and open to the public. *See Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 446-47 (D.C. Cir. 1989). However, certain advisory committees are rendered exempt from FACA's procedural requirements by the Unfunded Mandates Reform Act ("UMRA"), 2 U.S.C. § 1534. Committees are exempt under UMRA when they are composed of federal, state, local, or tribal officers, or their designated employees and their purpose is to discuss federal programs that share intergovernmental responsibilities. *See id.*

Plaintiffs argue that the Forest Service violated FACA because the 1996 Risk Assessment Panel that advised the Forest Service on the risks to viable wildlife populations of Alternative 11 did not follow FACA's procedural requirements in that the panel meetings were not open to the public and no notices regarding panel meetings were ever published. *See AFA*, Docket No. 59A at 46-49. The Forest Service argues that the panel was exempt from FACA by UMRA because all of the members of the panel were either federal employees, or designated state employees, who discussed the intergovernmental responsibilities of wildlife protection and social and economic impacts under the revised TLMP. *See AFA*, Docket No. 50 at 79-81. In turn, Plaintiffs dispute the application of UMRA to the panel because it claims several members of the committee do not qualify as properly

ORDER

delegated state officials, or federal employees. *See AFA*, Docket No. 59A at 47-48 nn. 42, 43. Plaintiffs claim that one of the members was a professor at the University of Utah, that the Governor of Alaska did not have the authority to designate members employed by the state university in Alaska to the panel, and that the matters discussed by these members did not involve issues of intergovernmental administration. *See id.* The Forest Service rebuts these arguments, stating that the University of Utah professor is in fact employed by the Forest Service, that the Governor, as an elected official, properly delegated his authority to state employees, and that matters of wildlife protection and social and economic effects under the revised TLMP are issues of intergovernmental responsibility. *See AFA*, Docket No. 50 at 79-81.

After analyzing the record before the Court, there is insufficient evidence for the Court to find any FACA violation.[28] It appears that the risk assessment panels were comprised of either federal or state employees designated by the Government who discussed the intergovernmental responsibilities of wildlife protection and social and economic impacts under the revised TLMP. The Court will therefore not grant the relief requested by the Plaintiffs under FACA.

### H.   RFA, 5 U.S.C. §§ 601-612

RFA requires analysis of the impacts of agency regulations on small businesses. *See* 5 U.S.C. § 601. The various RFA requirements apply to "rules," where

> the term "rule" means any rule for which the agency publishes a general notice of proposed rulemaking pursuant to section 553(b) of this title, or any other law, including any rule of general applicability governing Federal grants to State and local governments for which the agency provides an opportunity for notice and public comment, except that the term "rule" does not include a rule of particular applicability relating to rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or to valuations, costs or accounting, or practices relating to such rates, wages, structures, prices, appliances, services, or allowances.

---

[28] It should be noted that even when FACA's procedural requirements have been violated, if a panel is no longer advising an agency, courts have generally refrained from acting. *See Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1309 (W.D. Wash. 1994) (noting that "FACA can and should be enforced by injunctive relief during the process . . . . [b]ut once a committee has served its purpose, courts generally have not invalidated the agency action even if there were earlier FACA violations"). Therefore, since the panel was active only in 1995 and 1996, even if there were FACA violations, it is not apparent that granting an injunction at this time would be appropriate.

ORDER

*See* 5 U.S.C. § 601(2). Plaintiffs argue that the 1997 ROD and the 1999 ROD are rules within the meaning of the RFA and therefore require analysis of their effects on small businesses. *See AFA*, Docket No. 42 at 38. Plaintiffs' arguments are without merit.

First, it does not appear that forest plans come within the definition of a rule, so RFA's requirements are inapplicable to the situation here. Second, unlike the forest plans, the Forest Service planning regulations are rules for the purposes of RFA. However, RFA does not require a study of the effects of a regulation if the head of the agency certifies that there is not a significant impact. *See* 16 U.S.C. § 605. The preamble to NFMA's implementing regulations states that there is no direct impact on small business as a result of the planning regulations. *See* National Forest System Land and Resource Management Planning, 47 Fed. Reg. 43,026, 43,037 (Sept. 30, 1982). Consequently, on the record before it, the Court cannot find a RFA violation.

## I.     ANILCA, 16 U.S.C. § 3213(b)

ANILCA states that

> [n]o further studies of Federal lands in the State of Alaska for the single purpose of considering the establishment of a conservation system unit, national recreation area, national conservation area, or for related or similar purposes shall be conducted unless authorized by this Act or further Act of Congress.

*See* 16 U.S.C. § 3213(b). Therefore, ANILCA prohibits the study of rivers for eligibility for designation as wild and scenic "for the singular purpose of establishing a conservation system unit." *See id.* Plaintiffs argue that the Forest Service's study and recommendation of wild and scenic rivers violates this "no more" clause. *See* Docket No. 42 at 28-29.

A review of the record before the Court reveals that the Forest Service did not study rivers in Alaska for the single purpose of considering the establishment of a conservation system unit. *See AFA*, Docket No. 8, Ex. F, 1997 FEIS at 3-330. Rather, the Forest Service conducted a study of the rivers for their eligibility as wild and scenic for the purposes of a general land management plan. Thus, no ANILCA violation occurred.

## ORDER

**IT IS THEREFORE ORDERED:**

In *Sierra Club, et al. v. Lyons, et al.*, J00-0009 CV (JKS), the request for oral argument at **Docket No. 40** is **DENIED**. The motion at **Docket No. 33** is **GRANTED**. The Court finds that the Forest Service violated NFMA and NEPA in the revised TLMP by failing to consider any alternatives with new wilderness recommendations, and hereby enjoins the Forest Service from taking any action to change the wilderness character of any eligible roadless area until the Forest Service complies with NEPA and NFMA. To that end, the Forest Service shall prepare a SEIS that evaluates and considers roadless areas within the Tongass for recommendation as potential wilderness areas. The Forest Service shall also provide the relative contribution to the National Wilderness Preservation System in its analysis of the management situation.

In *Alaska Forest Ass'n, et al. v. United States Dep't of Agric., et al.*, J99-0013 CV (JKS), the requests for oral argument at **Docket Nos. 59B** and **60** are **DENIED**. The motions for summary judgment at **Docket Nos. 42** and **43** are **GRANTED**. The 1999 ROD is hereby vacated. The Forest Service is enjoined from implementing the 1999 ROD, and shall prepare an SEIS addressing the changes proposed to the 1997 ROD and provide for informed public participation.

Dated at Anchorage, Alaska, this 30 day of March 2001.

**JAMES K. SINGLETON, JR.**
United States District Judge

ORDER

J00-0009--CV (JKS)
-----------------------
CLARK
LANDON (AUSA)
WALDO

Certified copy J99-013 CV (JKS)

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April, 2001, I caused copies of the

foregoing Notice of Filing to be served by United States first-class mail, postage prepaid,

upon the following:

Andrea Berlowe
U.S. Department of Justice
Environmental and Natural Resources Division
General Litigation Section
PO Box 663
Washington, D.C.  20044-0663

Raymond B. Ludwiszewski
Peter E. Seley
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036

Jeffrey D. Neumeyer
Boise Cascade Corporation
1111 West Jefferson Street
Boise, Idaho  83702

Theresa L. Gardunia
Boise County Prosecuting Attorney
P.O. Box 186
Idaho City, Idaho  83631

Richard T. Roats
Valley County Prosecuting Attorney
P.O. Box 532
Cascade, Idaho  83611

Paul A. Turcke
Moore Smith Buxton & Turcke
225 North 9th Street, Suite 420
Boise, Idaho 83702

LeRoy Wilder
LeRoy Wilder, P.C.
0225 S.W. Montgomery Street, No. 10
Portland, Oregon 97201

Patrick Parenteau
Vermont Law School
Chelsea Street
South Royalton, VT 05068

Scott Reed
P.O. Box A
Coeur d'Alene, ID 83814

_____
Timothy J. Preso